## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LHB INSURANCE BROKERAGE INC., on behalf of itself and all others similarly situated, | ) ) ) **ECF CASE** |
| Plaintiff, | ) ) Civil Case No: 1:08-CV-03095-LTS |
| v. | ) |
| CITIGROUP INC. and CITIGROUP GLOBAL MARKETS, INC., | ) ) ) |
| Defendants. | ) ) |
| | ) |
| LISA SWANSON, Individually And On Behalf of All Others Similarly Situated, | ) ) **ECF CASE** |
| Plaintiff, | ) ) Civil Case No: 1:08-CV-03139-LTS |
| v. | ) ) |
| CITIGROUP, INC., CITIGROUP GLOBAL MARKETS, INC. and CITI SMITH BARNEY, | ) ) ) |
| Defendants. | ) |
| | ) |
| WEDGEWOOD TACOMA LLC, Individually And On Behalf of All Others Similarly Situated, | ) ) **ECF CASE** |
| Plaintiff, | ) ) Civil Case No: 1:08-CV-04360-UT |
| v. | ) ) |
| CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., and CITI SMITH BARNEY, | ) ) ) |
| Defendants. | ) ) |

## AFFIDAVIT OF RICHARD A. SPEIRS IN SUPPORT OF THE MOTION OF DR. MICHAEL A. PASSIDOMO FOR CONSOLIDATION AND FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

STATE OF NEW YORK    )
                             ) ss
COUNTY OF NEW YORK  )

      Richard A. Speirs, being duly sworn, deposes and says:

      1.     I am a member of the firm of Zwerling, Schachter & Zwerling, LLP ("Zwerling,

Schachter"), counsel for Movant Dr. Michael A. Passidomo. I am fully familiar with all the facts

and circumstances herein.

      2.     This affidavit is submitted in support of Movant's motion, pursuant to Rule 42(a)

of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995,

for consolidation and for appointment of Movant as Lead Plaintiff and Zwerling, Schachter as

Lead Counsel in the above-captioned actions.

      3.     Attached as Exhibit A is the first notice of the filing of a class action relating to

the sale of Auction Rate Securities ("ARS"), dated March 27, 2008.

      4.     Attached as Exhibit B is the complaint in *Swanson v. Citigroup, Inc.*, Case No.

1:09-CV-03139-LTS (S.D.N.Y.), dated March 27, 2008.

      5.     Attached as Exhibit C is the certification of Movant in support of his Motion for

Appointment of Lead Plaintiff and Lead Counsel, including a chart of his purchases of ARS.

      6.     Attached as Exhibit D is the firm resume of Zwerling, Schachter, Movant's choice

for Lead Counsel.

                                            Richard A. Speirs

Sworn to before me this
27th day of May, 2008

Notary Public

ALLISON J. SCHOTT
Notary Public, State Of New York
No.01SC6087635
Qualified In Queens County
Commission Expires Feb. 18, 2011

Exhibit A



# Class Action Newsline
## PrimeNewswire, Inc.

*Source:* Levi & Korsinsky, LLP

## Levi & Korsinsky, LLP Announces A Class Action Lawsuit Against Citigroup, Inc. For Auction Rate Securities Damages - C

NEW YORK, March 27, 2008 (PRIME NEWSWIRE) -- Levi & Korsinsky, LLP (www.zlk.com) announced that it had filed a class action lawsuit on behalf of all those who purchased Auction Rate Securities from Citigroup, Inc. (NYSE:C) between March 26, 2003 and February 13, 2008, inclusive (the "Class" or "Class Period"), and who continued to hold such securities as of February 13, 2008 to recover damages caused by Citigroup, Inc.'s ("Citigroup") violation of the federal securities laws. A copy of the Complaint is available at www.zlk.com. The class action is pending in the United States District Court for the Southern District of New York.

The Complaint alleges that Citigroup violated the securities laws by deceiving investors about the investment characteristics of Auction Rate Securities and the auction market in which these securities traded. Auction Rate Securities are either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction Rate Securities generally have long-term maturities or no maturity dates.

The Complaint alleges that, pursuant to uniform sales materials and/or top-down management directives, Citigroup offered and sold Auction Rate Securities to the public as highly liquid cash-management vehicles and as suitable alternatives to money market mutual funds. According to the Complaint, those who now hold Auction Rate Securities sold by Citigroup cannot liquidate their positions since the auction market for these securities has collapsed.

If you purchased or otherwise acquired auction rate securities from Citigroup between March 26, 2003 and February 13, 2008, and continue to hold such securities, you may, no later than May 27, 2008, request that the Court appoint you as a named plaintiff in this lawsuit. Your ability to share in any recovery is not affected by the decision whether or not to serve as a named plaintiff. You may retain Levi & Korsinsky, LLP, or other attorneys, to serve as your counsel in this action.

Individuals and institutions that purchased Auction Rate Securities from Citigroup may have legal rights to recover for any damages incurred. Information about Auction Rate Securities is available at www.auctionratehelp.com

For further information concerning your legal rights, please contact Eduard Korsinsky, Esq. or Juan E. Monteverde, Esq. of Levi & Korsinsky, LLP at 212-363-7500 or via e-mail at info@zlk.com

Levi & Korsinsky, LLP has expertise in prosecuting investor securities litigation and extensive experience in actions involving financial fraud. Levi & Korsinsky, LLP represents investors throughout the nation, concentrating its practice in securities and shareholder litigation.

More information on this and other class actions can be found on the Class Action Newsline at www.primenewswire.com/ca/

```
CONTACT:   Levi & Korsinsky, LLP
           Eduard Korsinsky, Esq.
           Juan E. Monteverde, Esq.
           (212) 363-7500
           Fax: (212) 363-7171
```

```
info@zlk.com
www.zlk.com
www.auctionrateHELP.com
39 Broadway, Suite 1601
New York, NY 10006
```

**Keywords:** <u>**CLASS ACTION LAWSUITS**</u>

<u>PrimeNewswire</u> | <u>Class Action Newsline</u> | <u>Contact Us</u>

Exhibit B



JUDGE CEDARBAUM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



08 CV 03139

Lisa Swanson, Individually )
And On Behalf of All Others Similarly Situated, )      CIVIL ACTION NO. _____
                          )
                          )      **CLASS ACTION COMPLAINT**
                          )      **FOR VIOLATIONS OF**
          Plaintiff,           )      **FEDERAL SECURITIES LAWS**
                          )
    v.                      )
                          )      **JURY TRIAL DEMANDED**
Citigroup Inc., Citigroup Global Markets, Inc. and )
Citi Smith Barney,              )
                          )
        Defendants.         )
                          )

RECEIVE

MAR 27 2008

U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.     This is a federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and continue to hold auction rate securities (also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds) offered for sale by defendants between March 27, 2003 and February 13, 2008, inclusive (the "Class Period").

2.     Defendants represented to investors that auction rate securities were equivalent to cash or money market funds; were highly liquid, safe investments for short-term investing; and were suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3.     Defendants knew, but failed to disclose to investors, material facts about auction rate securities. In particular, defendants knew, but failed to disclose that these auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because defendants were artificially supporting and

manipulating the auction market to maintain the appearance of liquidity and stability. Defendants knew, but failed to disclose that auction rate securities would become illiquid as soon as defendants stopped maintaining the auction market.

4.      On February 13, 2008, 87% of all auctions of auction rate securities failed when defendants and all other major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating investments defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337. Defendants all maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

7.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.    Plaintiff Lisa Swanson, as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities underwritten and sold by Citigroup during the Class Period and continued to hold such auction securities as of February 13, 2008.

9.    Defendant Citigroup Inc. is incorporated in Delaware and its principal executive offices are located in New York, New York.    Citigroup Inc. is the world's leading financial services firm and one of the largest companies in the world.

10.    Defendant Citigroup Global Markets, Inc. is incorporated in Delaware and its principal executive offices are located in New York, New York.    Citigroup Global Markets, a wholly-owned subsidiary of Citigroup Inc., is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").    Citigroup Global Markets is the largest underwriter and broker dealer of auction rate securities in the United States.

11.    Defendant Citi Smith Barney is incorporated in Delaware and its principal executive offices are located in New York, New York.    Citi Smith Barney is a division of Citigroup Global Markets, Inc., and, through its financial advisors, provides brokerage, investment banking and asset management services to Citigroup clients throughout the world.

12.    Unless specifically noted, "Citigroup" refers collectively to defendants Citigroup Inc., Citigroup Global Markets, Inc. and Citi Smith Barney.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

13.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased auction rate securities from Citigroup between March 27, 2003 and February 13, 2008, inclusive, and continued to hold such auction securities as of February 13, 2008 (the "Class").    Excluded from the Class are defendants, the officers and directors of any defendant,

3

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

14.    The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States and Citigroup was the largest underwriter and broker-dealer of auction rate securities while the market for such securities existed. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## GENERAL ALLEGATIONS

### Background

20.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities have generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

21.    Auction rate securities were first introduced in the 1980s. Since then, the market for auction rate securities grew dramatically and the current estimated value of auction rate securities in existence (prior to the collapse of the auction market) is around $350 billion.

22.    Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction

rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

23.    Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities.

24.    The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

25.    The auction itself was of the type commonly referred to as a "Dutch" auction, i.e. one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

26.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

27.    During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate. Since

6

there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

28.    If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred.  In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus.  If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued.  The maximum rate for many auction rate securities, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however.  As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

29.    The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process.  Investors could only submit orders through the selected broker-dealers.  The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

30.    Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer.  This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent.  This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

31.    Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts.  In 2004, the SEC began to investigate these manipulative practices affecting the auction market.  In 2006, the SEC entered into a consent decree with a number of major broker-dealers which required them to disclose certain practices to investors and to stop engaging in certain other practices.  The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. The consent decree did nothing to end the practice of the broker-dealers submitting bids for their

own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

**During the Class Period, Citigroup Materially Misrepresented the Liquidity of and Risks Associated With Auction Rate Securities and Omitted Material Facts About Its Role and the Auction Market**

32.    Auction rate securities were extremely profitable for Citigroup and for the Citigroup financial advisors who sold the securities.  As a large underwriter of auction rate securities, Citigroup received significant underwriting fees from the issuers of these securities.  As one of the largest broker-dealers, Citigroup also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for more than auction rate securities.  Citigroup also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account.  Individual Citigroup financial advisors had a significant financial incentive to sell auction rate securities, as they were compensated by Citigroup for each auction rate security sold.

33.    In order to perpetuate the auction market and sell as many auction rate securities as possible, Citigroup represented to investors in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term investing.  Pursuant to uniform sales materials and top-down management directives, Citigroup financial advisors throughout the United States represented to current and potential Citigroup clients that the auction rate securities sold by Citigroup were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.  Alternatively, Citigroup placed investors in auction rate securities, in lieu of money market funds or other cash investments, without informing them that it would do so and without their knowledge or consent.

34.    Citigroup failed to disclose to investors material facts about auction rate securities. Citigroup failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Citigroup failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because Citigroup and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. In fact, at all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by Citigroup and the other broker-dealers. When Citigroup and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by Citigroup became illiquid. Citigroup also failed to disclose that the auction rate securities it was selling were not short-term investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, Citigroup failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by Citigroup and the other broker-dealers.

35.    Citigroup also failed to disclose to purchasers of auction rate securities material facts about its role in the auctions and the auction market in which these securities were traded. Citigroup failed to disclose that in connection with the sale of auction rate securities, Citigroup simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to Citigroup on its holdings of the auction rate securities. Citigroup failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Citigroup failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine

9

the true risk and liquidity features of auction rate securities. Citigroup continued to aggressively market auction rate securities after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

36.    During the Class Period, Citigroup failed to disclose that the auctions it was conducting were not governed by arms-length transactions but instead suffered from systemic flaws and manipulative practices, including allowing customers to place open or market orders in auctions, intervening in auctions by bidding for Citigroup's proprietary account or asking customers to make or change orders, preventing failed auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

### The Market for Auction Rate Securities Collapses

37.    In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market. In the fall-winter of 2007, more auctions began to fail. Even though some of the auctions that failed initially were conducted by Citigroup, it continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

38.    On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers, including Citigroup, refused to continue to support the auctions.

39.    On February 14, 2008, it was disclosed that Citigroup and UBS, the two largest broker-dealers for auction rate securities, had decided to no longer support the auction market. Virtually every other major broker-dealer, including Goldman Sachs, Morgan Stanley, Lehman Brothers and Merrill Lynch, among others, also decided around the same time to withdraw their

support of the auction market. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

40.    The market for auction rate securities sold by Citigroup was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed. As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by Citigroup traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased and continued to hold auction rate securities sold by Citigroup relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

41.    During the Class Period, defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by Citigroup by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the auction rate securities sold by Citigroup, as alleged herein.

42.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about the auction market and the auction rate securities sold by Citigroup. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the auction rate securities sold by Citigroup, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing and continuing to

11

hold auction rate securities sold by Citigroup at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

43.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Citigroup who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

44.    During the Class Period, as detailed herein, defendants engaged in a scheme and course of conduct to create a market for and artificially inflate the price of auction rate securities sold by Citigroup that operated as a fraud or deceit on purchasers of auction rate securities sold by Citigroup by misrepresenting the liquidity of and risks associated with such securities. Defendants achieved this by making false and misleading statements about the auction market and the auction rate securities sold by Citigroup.  When Citigroup's prior misrepresentations and omissions were disclosed and became apparent to the investing public, the market for auction rate securities collapsed and the auction rate securities sold by Citigroup have become illiquid. As a result of their purchases of auction rate securities from Citigroup during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal

securities laws in that the securities have substantially less value than that represented by defendants.

45.    The collapse of the auction rate securities market at the end of the Class Period was a direct result of defendants' unilateral decision to no longer artificially support the auction rate securities market and the nature and extent of defendants' fraud finally being revealed to investors.

## BASIS OF ALLEGATIONS

46.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings, regulatory filings and reports, securities analysts' reports, interviews with purchasers of auction rate securities, press releases and media reports, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### Against All Defendants

47.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of herself and the Class.

48.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable defendants to sell hundreds of millions, if not billions, of dollars of auction rate securities to current and prospective Citigroup clients, and on which Citigroup made substantial commissions; and (iii) cause plaintiff and other members of the Class to purchase auction rate securities from Citigroup at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

13

49.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Citigroup in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate securities sold by Citigroup, as specified herein.

51.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by Citigroup were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Citigroup during the Class Period.

52.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities. If defendants

14

did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by Citigroup was artificially inflated during the Class Period. In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired and continued to hold auction rate securities sold by Citigroup during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Citigroup, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased and continued to hold their auction rate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Citigroup during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendants Citigroup Inc. and Citigroup Global Markets, Inc.

57.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of herself and the Class.

58.     Defendant Citigroup Inc. acted as a control person of defendants Citigroup Global Markets, Inc. and Citi Smith Barney within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership of Citigroup Global Markets, Inc. and Citi Smith Barney, Citigroup Inc. had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Citigroup Global Markets, Inc. and Citi Smith Barney, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Citigroup Inc. was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     Defendant Citigroup Global Markets, Inc. acted as a control person of defendant Citi Smith Barney within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership of Citi Smith Barney, Citigroup Global Markets, Inc. had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Citi Smith Barney, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Citigroup Global Markets, Inc. was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     As set forth above, Citigroup Global Markets, Inc. and Citi Smith Barney violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, Citigroup Inc. and Citigroup Global Markets, Inc. are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Citigroup during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 27, 2008

Respectfully submitted,

**SEEGER WEISS LLP**

By: _____
Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
One William Street, 10th Floor
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

Daniel C. Girard
Jonathan K. Levine (JL-8390)
Aaron M. Sheanin
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

Counsel for Plaintiff Lisa Swanson

# ATTACHMENT A

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Lisa Swanson, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against Citigroup Inc., prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.      I did not acquire any auction rate securities from Citigroup Inc. at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.      My purchases and sales of auction rate securities sold to me through

Citigroup Inc. are attached as **Attachment A** to this document:

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this **26**th day of March, 2008

_____
Lisa Swanson

2

**ATTACHMENT A**

**LISA SWANSON'S TRANSACTIONS IN AUCTION RATE
SECURITIES SOLD BY CITIGROUP BETWEEN
MARCH 27, 2003 AND FEBRUARY 13, 2008,
AND HELD AS OF FEBRUARY 13, 2008**

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| March 16, 2006 | Blackrock Muniholdings California Auction Market Preferred Stock | 9 | $25,000 | Bought |

Exhibit C

## CERTIFICATION OF DR. MICHEAL A. PASSIDOMO

I, Dr. Michael A. Passidomo, declare that:

1.   I have reviewed the complaint in *Swanson v. Citigroup, Inc.*, Case No. 1:09-CV-03139-LTS (S.D.N.Y.) (filed March 27, 2008) and authorize the filing of a lead plaintiff motion on my behalf.

2.   I did not purchase any security, which is the subject of this action, at the direction of counsel for plaintiff or in order to participate in this private action.

3.   I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   My transactions in the securities that are the subject of this action during the class period are described in Attachment A to this Certification.

5.   During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in any action filed under the federal securities laws.

6.   I will not accept any payment for serving as a representative party on behalf of the class beyond our pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Dr. Michael A. Passidomo, declare under penalty of perjury that the foregoing is true and correct.

May 2008

Dr. Michael A. Passidomo

**Attachment A**
**Dr. Michael A. Passidomo's Class Period Transactions**

| Security | Transaction | # Shares | Share Cost | Total |
|---|---|---|---|---|
| BLACKROCK CALIF MUN INCOME TR, MUN AUC RT CUM PFD SER T7 | Purchase | 120 | $25,000 | $3,000,000 |
| BLACKROCK FLA MUN BD TR SR W7, MUN AUCT RT CUM PFD | Purchase | 40 | $25,000 | $1,000,0000 |
| MFS HIGH INCOME MUN TR, MUN AUC RT PFD SER W | Purchase | 80 | $25,000 | $2,000,000 |
| MFS MUNI INCOME TR AUCT RT, CUM PFD SER TH | Purchase | 60 | $25,000 | $1,500,000 |
| EATON VANCE INSD CALIF MUN, BD FD SER B AUCT PFD | Purchase | 20 | $25,000 | $500,000 |
| NUVEEN DIV ADV MUN FD, INC MUNI PFD SER M 1 UT | Purchase | 39 | $25,000 | $975,000 |
| NUVEEN ARIZ DIV ADV MUN FD 3, MUN AUCT RT PFD | Purchase | 16 | $25,000 | $400,000 |
| NUVEEN FLA QUALITY INCOME MUN, FD MUN AUC RATE PFD SER F | Purchase | 63 | $25,000 | $1,575,000 |

Exhibit D

## FIRM RESUME OF
## ZWERLING, SCHACHTER & ZWERLING, LLP

The firm of Zwerling, Schachter & Zwerling, LLP was formed on January 1, 1985 (the "Zwerling Firm"), and is currently involved in numerous class actions in the areas of securities fraud, consumer fraud, and antitrust litigation.

### Securities Litigation

The Zwerling Firm has acted or is presently acting as a lead counsel or as a member of an executive committee for plaintiffs in many securities related lawsuits, including: *In re Vonage Initial Public Offering (IPO) Securities Litigation*, Civ. No. 07-177 (FLW) (D.N.J.); *In re BP Prudhoe Bay Royalty Trust Securities Litigation*, W.D. Wash. No. C06-1505 MJP; *Diana Allen Life Insurance Trust v. BP plc, et al.*, S.D.N.Y. Civ. No. 06-14209 (PJC); *In re First BanCorp Securities Litigation*, D.P.R. Civ. No. 3:05-cv-02148-PG; *Fox v. Levis, et al.*, S.D.N.Y. No. MD C 06-1506 (RO); *In re Silicon Image, Inc. Securities Litigation*, N.D. Cal. Master File No. C 05-00456 (MMC); *In re: Old Banc One Shareholders Securities Litigation,* N.D. Ill. Civ. No. 00C2100; *In re Network Associates Derivative Litigation*, Sup. Ct. Cal., Santa Clara Co., CV 781854; *In re Telxon Corporation Securities Litigation*, N.D. Ohio, 5:98-CV-2876; *Hayman v. PriceWaterhouseCoopers LLP*, N.D. Ohio 01-CV-1078; *In re Corrections Corporation Shareholder Litigation*, Tennessee Chancery Ct.,  Master File No. 98-1257-iii; In *re Adaptec Inc. Derivative Litigation*, Sup. Ct. Cal., Santa Clara Co., CV 772590; In *re Pacific Scientific Securities Litigation*, C.D. Cal., No. SACV-96-1106-LHM(EEx); *Kaplan v. Prins Recycling Corp.*, D.N.J., 96 Civ. 2444; *In re Health Management Inc. Securities Litigation*, E.D.N.Y., 96 Civ. 889; *Weikel v. Tower Semiconductor, Ltd.*, D.N.J., 96 CV 03711; *In re Bennett Funding Group Inc. Securities Litigation*, S.D.N.Y., 96 Civ. 2583; *In re Horizon/CMS Healthcare*

*Corporation Securities Litigation*, D.N.M., Master File No. 96-044 BB/LCS; *Rosenberg v. Stauth*, W.D. Okla., Civil Action No. 96-1808-M; *In re Solomon, et al. v. Armstrong*, Del. Ch. Ct., CA No. 13515; *In re Archer Daniels Midland Company Derivative Litigation*, Del. Ch. Ct., Cons. C.A. No. 14403; *In Re American Pacific Securities Litigation*, D. Nev., CV-S-93-00576-PMP; *McNeil v. Austin*, Sup. Ct., N.Y. Co., Index No. 33189/91, *In Re Foodmaker/Jack-in-the-Box Securities Litigation*, W.D. Wash., No. C93-517WD; *In re Ames Department Stores, Inc. Stock Litigation*, D. Conn., 90-00027 (PCD); *In Re: General Development Corporation Securities Litigation*, S.D. Fla., 90-069; *In Re Republic Pictures Corporation Shareholders Litigation*, Del. Ch. Ct., C.A. No. 13122; *In Re Blockbuster Entertainment Corp. Shareholders Litigation*, Del. Ch. Ct., Civil Action No. 13319; *In re First Capital Holdings Corporation Financial Products Securities Litigation*, C.D. Cal., MDL No. 901; *In re New World Securities Litigation*, C.D. Cal., CV 88-06260; *In re Anchor Securities Litigation*, E.D.N.Y., 88 Civ. 3024; *3Com Corp. Securities Litigation*, N.D. Cal., C89-20480; *In re Par Pharmaceutical Derivative Litigation*, S.D.N.Y., 89 Civ. 5497 (RPP); *Fishbein v. Resorts International Inc.*, S.D.N.Y., 89 Civ. 6043 (MGC); *In re Bank of Boston Securities Litigation*, D. Mass., 89-2269-H; *In re Howard Savings Bank Securities Litigation*, D.N.J., 89-5131; *Merrit v. Gulf States Utilities Co.*, E.D. Tex., B-86-574-CA.

In addition, the Zwerling Firm represents or has represented public employee pension funds and union pension funds in securities litigations, including: *In Re: Doral Financial Corp. Securities Litigation*, S.D.N.Y., Case No.: 1:05-md-1706 (RO); and *Clinton Charter Township Police and Fire Retirement Systems v. Donald. J. Reckler, et al.,* E.D.N.Y, Case No.: 03 CV 5008 (TCP).

2

The following is a representative sample of the complex securities claims which the Zwerling Firm has litigated:

·    *In re First BanCorp Securities Litigation*, D.P.R. Civ. No. 3:05-cv-02148-PG co-lead counsel in securities fraud class action involving sham mortgage sales transactions between Puerto Rico banks.   The Zwerling Firm achieved a $74.25 million settlement in less than eighteen months of litigation, which is pending court approval.

·    *Hayman v. PriceWaterhouseCoopers, LLP*, N.D. Ohio, 01-cv-1078 brought on behalf of investors in Telxon Corp. securities against the company's auditors for issuing false opinions on the company's financial statements.  The Zwerling Firm obtained a recommendation for a default judgment against PriceWaterhouseCoopers, LLP and subsequently settled the action for $27.9 million.

·    *In re Telxon Corp. Securities Litigation*, N.D. Ohio 5:98-cv-2876 a securities fraud class action where the Zwerling Firm, as sole lead counsel obtained a settlement of $40 million on behalf of investors.  Class members in the PriceWaterhouseCoopers and Telxon actions received over 70% of their losses in the two settlements.

·    *In re Corrections Corporation Shareholder Litigation*, Tennessee Chancery Ct., Master File No. No. 98-1257-iii - shareholder class action challenging a management-led buyout of public shareholders in exchange for shares in a publicly held REIT.

·    *In re Bennett Funding Group Inc. Securities Litigation*, S.D.N.Y., 96 CV 2583 - securities fraud class action involving the single largest alleged Ponzi scheme in the United States.   The Zwerling Firm has been on the Executive Committee which has successfully prosecuted the accountants, insurers, and sellers of the alleged fraudulent securities.

·    *In re Health Management Inc. Securities Litigation*, E.D.N.Y., 96 Civ. 889 - securities fraud class action alleging accounting fraud by the company and its auditors.  The Zwerling Firm was co-lead trial counsel in the first case tried pursuant to the Private Securities Litigation Reform Act of 1995.

·    *Rosenberg v. Stauth*, Civil Action No. 96-1808-M - shareholders' derivative action involving alleged improper business practices at Fleming Companies, Inc. in which the demand futility defense was successfully defeated.

·    *In re ICN/Viratek Securities Litigation*, S.D.N.Y., 87 Civ 4296 - securities fraud class action involving FDA sought approval of an HIV drug.

·    *McNeil v. Austin*, Index No. 33189/91 - shareholders' derivative action regarding the sale of defective nuclear containment systems by General Electric.

3

· *In re Adaptec Inc. Derivative Litigation*, Master File No. CV 772590 and *In re Network Associates Derivative Litigation*, Superior Ct. Cal., Master File No. CV 781854 – shareholders' derivative lawsuits pursuant to California's insider trading statute to recover profits from the company's officers and directors.

· *In re Ames Department Stores, Inc. Stock Litigation*, D. Conn., 90-00027 (PCD) - securities fraud class action in which the Second Circuit reaffirmed the scope of the "in connection with" requirement of the Securities Exchange Act §10(b).

Courts have commented favorably upon the expertise of the Zwerling Firm. In appointing the firm as lead counsel in *In re Old Banc One Shareholders Securities Litigation*, N.D. Ill., 1:00-CV-2100, the Court noted that the "attorneys have extensive experience, many successes on their resumes, and have obtained sizable recoveries on behalf of their clients." Minute Order dated December 21, 2000.

In appointing it as lead counsel in *In re Telxon Corporation Securities Litigation*, N.D. Ohio, 5:98-CV-2876, the Court determined that the Zwerling Firm has "the requisite ability and expertise to prosecute and manage this litigation effectively." Memorandum and Order entered August 25, 1999, p. 39.

As a member of a team of plaintiffs' trial counsel in *In re ICN/Viratek Securities Litigation*, S.D.N.Y., 87 Civ 4296, the Zwerling Firm was complimented by Judge Kimba Wood as having done a "superb job on behalf of the class.... This was a very hard fought case. You had very able, superb opponents, and they put you to your task.... The trial work was beautifully done and I believe very efficiently done...."

In *In re Par Pharmaceutical, Inc. Derivative Litigation*, S.D.N.Y., 89 Civ 5742 (RPP), Judge Patterson, in commenting on the Zwerling Firm, said "[they] acted skillfully and resourcefully.... [The Zwerling Firm] exercised wisdom and judgment and negotiated a skillful

settlement with the defending company and with the officer and director/defendants." Slip Op. dated June 12, 1992.

Chief Judge Weinstein, in the *Jack Eckerd Corporation* litigation (E.D.N.Y. 1986), and Judge Charles P. Sifton in both *Golden v. Shulman* [1988 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶94,060 (E.D.N.Y. 1988) and *Cagan v. Anchor Savings Bank, FSB*, [1990] Fed. Sec. L. Rep. (CCH) ¶94,060 (E.D.N.Y. 1990) also commented favorably upon the Zwerling Firm.

One of the partners of the Zwerling Firm was appointed by former Chief Judge Browning as Proof-of-Claim Counsel in connection with the loss analysis in *In re Washington Public Power Supply System Securities Litigation*, MDL 551, in the United States District Court for the District of Arizona. In that matter, former United States District Judge Nicholas J. Bua, as Special Master appointed by the Court, in commenting on one of the partners in the Zwerling Firm, said: "I . . . find that the services of Mr. Schachter were efficiently and reasonably performed by him personally.... Mr. Schachter specifically was appointed by the District Court to serve as Claims Counsel.... It was not unreasonable for a senior partner like Mr. Schachter, with his vast knowledge of the case, to directly oversee the claims administration process rather than relying upon less knowledgeable junior attorneys. The class received its money's worth for Mr. Schachter's services...."

**Antitrust / Consumer Litigation**

The Zwerling Firm has acted or is presently acting as a lead counsel or member of an executive committee in numerous class actions involving antitrust claims and deceptive trade practices, including: *In Re Oxycontin Litigation*, S.D.N.Y., 04 MDL No. 1603; *In re Neurontin Antitrust Litigation*, D.N.J., MDL No. 1479; *In re Tamoxifen Antitrust Litigation*, E.D.N.Y., MDL No. 1408; *Karofsky v. Abbott Laboratories, et al.*, Case No. CV-95-1009 (as well as in 10

related cases in other state courts); *In Re Lorazepam and Clorazepate Antitrust Litigation*, D.D.C., MDL-1290 (TFH) (as well as in 11 related cases in state courts); *Newman v. DuPont Merck Pharmaceutical Company*, Sup. Ct. Cal., Case No. 788358; *In Re Ciprofloxacin Hydrochloride Antitrust Legislation*, E.D.N.Y., Master File No. CV-00-4428 MDL No. 1383; *Pickett v. Holland America Line*, 2000 WL 1141052 (Wash. App. Div. 1); *Latman v. Costa Cruise Lines*, N.V., 758 So.2d 699 (2000); *Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436 (1999) (as well as in 7 related cases in other state courts); *Garcia v. General Motors Corporation*, N.J. Sup. Ct., Docket No. L-4394-95; *In re Playmobil Antitrust Litigation*, E.D.N.Y., 95 Civ. 2896; and *Boni v. America Online Inc.*, Del. Ch., New Castle County, 95-C-07 and *Feige v. America Online Inc.*, Sup. Ct., N.Y. Co., Index No. 118333/95) (as well as other related cases in state courts).

In the antitrust area, the firm is currently on the Steering Committee for plaintiffs in *In Re: Insurance Brokerage Antitrust Litigation*, D.N.J., MDL No. 1663 04-CV-5184 and 05-CV-5533 ("*Insurance Brokers*"). In *Insurance Brokers*, settlements totaling over $128 million have been reached with two of the many defendant groups. The Zwerling Firm also currently plays a significant role in the prosecution of *Funeral Consumers Alliance, Inc. et al. v. Service Corporation International, et al.*, S.D. Tex., CA No. H-05-cv-03394 (KMH), a major antitrust multi-district litigation.

The Zwerling Firm is one of the three class counsel in *Rodriguez v. West Publishing Corporation*, C.D. Cal., Case No. 05-3222, where a $49 million settlement of antitrust claims has been reached, pending final court approval, on behalf of a class of law graduates enrolled in the BAR/BRI bar review courses.

6

The Zwerling Firm also represents union health and welfare funds in litigation to recover damages for price-fixing and other anti-competitive behavior. Such actions include: *In re Norvir Abbott Laboratories Antitrust Litigation*, N.D. Ca., Case No. 04-1511; *In re: Oxycontin Antitrust Litigation,* S.D.N.Y., 04 MDL 1603 (SHS); *In Re Tamoxifen Citrate Antitrust Litigation*, E.D.N.Y., MDL No. 1408 (ILG); *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, E.D.N.Y., Master File No.: 1:00-MD-1383 (DGT).

In *In re Norvir Abbott Laboratories Antitrust Litigation*, N.D. Ca., Case No. 04-1511, the Zwerling Firm represents the SEIU International Health Fund ("SEIU") against Abbott Laboratories in an action for monopoly leveraging under Section 2 of the Sherman Antitrust Act, as well as the California Unfair Competition law and state law unjust enrichment. On June 13, 2007, the court certified a nationwide class for injunctive relief under the Sherman Antitrust Act and for money damages under the unjust enrichment laws of 48 of the 50 States; the SEIU was appointed to serve as a class representative. A trial in this matter is scheduled for the fall of 2008.

In *In Re Oxycontin Litigation*, S.D.N.Y., 04 MDL No. 1603, the Zwerling Firm represents Local 1199 National Benefit Fund and has been appointed third-party payor co-lead counsel. This matter challenges the monopoly pricing of Oxycontin, a pain killer, the patents for which are in question. The matter is currently stayed pending the resolution of the underlying patent litigation.

The Zwerling Firm was appointed co-lead counsel for plaintiffs in numerous related indirect purchase actions brought against Mylan Laboratories, Inc. regarding injury to competition and monopolization, as well as price fixing. Those actions included an action in federal court, *In Re Lorazepam & Clorazepate Antitrust Litigation*, D.D.C., MDL-1290 (TFH)

7

and resulted in settlements of over $100 million. The plaintiffs represented by the Zwerling Firm

included several institutions, such as union health funds and private insurers.

The Zwerling Firm was co-lead counsel and a member of the Executive Committee in

eleven actions filed against the major pharmaceutical manufacturers alleging violations of state

antitrust laws for charging higher prices to consumers who purchased brand name prescription

drugs from retail pharmacies. Those cases resulted in a $65 million settlement. The courts

presiding over those cases have commented on the Zwerling Firm's expertise:

- I think the lawyering in this case is most commendable. I think that both sides have accorded themselves in a manner that allows us to be proud of the profession. . .

*Kerr v. Abbott Laboratories, et al.*, Case No. 96-2837, Transcript of Hearing at 16-17. (Dist. Ct. Hennepin Co., Minn., Nov. 24, 1998).

- this Court, in particular, has been helped along every step of the way by some outstanding lawyering . . . You can hardly say that there's been anything but five star attorneys involved in this case.

*Scholfield v. Abbott Laboratories, et al.*, Case No. 96 CV 460, Transcript of Hearing at 31 & 33. (Cir. Ct. Dane Co., Wisc., Oct. 5, 1998).

- I think the quality of counsel is excellent.

*McLaughlin v. Abbott Laboratories, et al.*, Case No. CV 95-0628, Transcript of Hearing at 28. (Super. Ct. Yavapai Co., Ariz., Oct. 28, 1998).

- I'll join my learned colleagues from this and other jurisdiction[s] in commending counsel in arriving at something that represents a great deal of hard work and a great deal of ingenuity in putting together a settlement of this magnitude and complexity, and especially the cost effective way in which this settlement is proposed to be distributed.

*Karofsky v. Abbott Laboratories, et al.*, Case No. CV-95-1009, Transcript of Hearing at 17. (Super. Ct. Cumberland Co., Maine, Dec. 2, 1998).

In addition, the Zwerling Firm represented consumers who were victims of overcharging

in the sale of toys in *In re Playmobil Antitrust Litigation*, E.D.N.Y., 95 Civ. 2896. Judge Seybert

8

complimented the work of Class Counsel, including the Zwerling Firm, stating in her opinion certifying the Class:

> As set forth in greater detail in the firm resumes...: (1) Zwerling, Schachter & Zwerling, LLP [and three other firms] ... all have extensive familiarity with the prosecution of complex litigations, class actions and specifically, antitrust litigations.... This is further borne out by counsels' submissions and conduct to date before this Court.

*In re Playmobil Antitrust Litigation*, 1998 WL 966003 at *13 (E.D.N.Y. Dec. 30, 1998).

In the area of deceptive trade practices, the Zwerling Firm was lead counsel in coordinated nationwide actions against the world's leading passenger cruise lines regarding their advertising practices concerning "port charges." (*Cicogna v. Royal Caribbean Cruises, Ltd.*, Cir. Ct. Dade Co. 96-08075; *Espinet v. Kloster Cruise Ltd.*, Cir. Ct. Dade Co. 96-08076; *Bellikoff v. Celebrity Cruises Inc.*, Cir. Ct. Dade Co. 96-08077; *Hackbarth v. Carnival Cruise Lines Inc.*, Cir. Ct. Dade Co. 96-08078; *Glassman v. Renaissance Cruises, Inc.*, Cir. Ct. Broward Co. 96-005490; *Pickett v. Holland America Line*, Sup. Ct., King Co. (Wash.) 96-2-10831 ("*Pickett*"), *Barton v. Princess Cruises Inc.*, Sup. Ct., L.A. Co. BC 148448); *Millheiser v. Dolphin Cruise Line*, Cir. Ct. Dade Co. 96-18146; *Latman v. Costa Cruise Lines N.V.*, Cir. Ct. Dade Co. 96-18139; and *Cronin v. Cunard Cruise Line*, Sup. Ct., N.Y. Co., 96-115899). These cases resulted in settlements in excess of $100 million. In *Pickett*, the Court complimented the Zwerling Firm by declaring that "[t]his has been litigated very professionally from the beginning to the end."

In addition, the Zwerling Firm was involved in cases regarding defective automobile brakes (*McGill v. General Motors Corp.*, Sup. Ct., Bronx Co., Index No. 15525-95) (related to *Garcia v. General Motors Corp.*, N.J. Sup. Ct., Docket No. L-4394-95) and defective pacemakers (*Gould v. Telectronics Pacing Systems*, S.D. Ohio, 95-726).

9

The Zwerling Firm was appointed Administrator for the General Motors Diesel Litigation Fund under the direction of Judge Henry Bramwell, District Judge, United States District Court, Eastern District of New York.

**Other Complex Litigation**

In *County of Nassau v. Hotels.com, L.P.*, E.D.N.Y., Case No. 2:06-cv-05724, the Zwerling Firm represents Nassau County (NY) in a class action seeking to recover unpaid taxes from internet-based hotel reservation companies on behalf of a class consisting of all New York counties and municipalities.

In addition, the Zwerling Firm has also represented union health and welfare funds in litigation against the tobacco industry. Those claims were for the excess costs incurred by the funds in providing health care to the members of their unions as a result of the fraudulent and deceptive practices of the tobacco companies *(Eastern States Health & Welfare Fund, et al. v. Philip Morris, Inc., et al.*, Sup. Ct. N.Y. Co., Index No. 97/603869).

The Zwerling Firm has been counsel in high profile constitutional and civil rights actions. In *Haley v. Pataki*, N.D.N.Y., 95-CIV 550, the firm obtained an order forcing the Governor of the State of New York to stop withholding salaries from legislative employees in an attempt to coerce members of the State Legislature to vote on his State budget. In a related case, *Dugan v. Pataki*, Sup. Ct., Kings Co., Index No. 16341/95, the Zwerling Firm obtained the same relief for the elected members of the State Legislature.

The Zwerling Firm has represented the New York City Council in *Mayor of the City of New York v. Council of the City of New York*, Sup. Ct., N.Y. Co., Index No. 402354/95, an action in which the Mayor challenged the legislative powers of the City Council in connection with the establishment of a board to review allegations of police corruption.

10

The Zwerling Firm also represented the Straphangers Campaign, a mass transit advocacy group, in *New York Urban League v. Metropolitan Transportation Authority*, 95-CIV-9001 (RPP), an action to compel the State of New York and the MTA to allocate transit subsidies in a manner which does not have a discriminatory impact on minority ridership in New York City.

The Zwerling Firm was an active member of the 9/11 Union Project where it provided legal representation *pro bono* for low income victims of the World Trade Center attacks and their families.

### Members of the Firm

#### Jeffrey C. Zwerling

Jeffrey C. Zwerling was admitted to the bar of the State of New York in 1972 and to the bar of the State of Arizona in 1981; he is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Second Circuit. He received a Bachelor of Science degree with Honors from Lehigh University in 1968 and a Juris Doctor degree from Columbia University School of Law in 1971. He was Articles Editor of the Columbia Journal of Transnational Law. His professional affiliations include: New York State Bar Association, Association of the Bar of the City of New York, Nassau County Bar Association, and State Bar of Arizona.

On July 1, 1977, Mr. Zwerling founded the Law Offices of Jeffrey C. Zwerling; on January 1, 1985 that firm became Zwerling, Schachter & Zwerling, LLP. Prior to 1977, Mr. Zwerling was associated with the firms of Gasperini, Koch & Savage; Koch & Gluck; and Murray A. Gordon, P.C., with emphasis on civil litigation, real estate, general corporate and commercial matters. Mr. Zwerling has represented and advised the Uniformed Fire Officers Association in regard to its pension funds and annuity plans.

11

Mr. Zwerling has extensive experience in all phases of complex litigation, including jury and non-jury trials, mediation, expert discovery, and settlement negotiations. He has negotiated several innovative corporate governance and structural changes in the resolution of shareholders' complaints. He is highly knowledgeable about economic and finance issues.

Mr. Zwerling is located in both the Zwerling Firm's New York and Long Island offices.

**Robert S. Schachter**

Robert S. Schachter was admitted to the bar of the State of New York in 1972; he is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York and the Central District of California, the United States Court of Appeals for the Second, Fifth and Ninth Circuits, and the Supreme Court of the United States. He received a Bachelor of Arts degree from Syracuse University in 1968 and a Juris Doctor degree from Brooklyn Law School in 1971. His professional affiliations include: The American Bar Association (Lecturer, Panels in Class Actions, 1980 and 1998) and the Second Circuit Federal Bar Council. Mr. Schachter was a panelist at the Public Funds Summit (2002-2004), Investment Education Symposium sponsored by the Council of Louisiana Trustees (2002), and Fire & Police Pension Summit (2002).

Prior to the formation of the Zwerling Firm, Mr. Schachter was associated since 1973 with the firm now known as Labaton Sucharow & Rudoff LLP. Mr. Schachter became a partner of that firm on January 1, 1978, concentrating in complex multi-district litigation.

Mr. Schachter has extensive experience in all phases of complex litigation. He has been involved in many settlement negotiations, as well as the drafting of complex settlement documents, and has particular expertise in the administration of class settlements. Mr. Schachter

has been instrumental in crafting novel settlements which have been applauded by courts in securities, as well as antitrust matters, including corporate governance issues.

Mr. Schachter is located in the Zwerling Firm's New York office.

**Robin F. Zwerling**

Robin F. Zwerling was admitted to the bar of the State of New York in 1976; she is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second, Fourth and Seventh Circuits, and the Supreme Court of the United States. She received a Bachelor of Arts degree *cum laude* from Jackson College of Tufts University in 1972, and a Juris Doctor degree from Georgetown University Law Center in 1975. Her memberships include: the American Bar Association, the National Institute of Trial Advocacy, the National Association of Securities and Commercial Law Attorneys, and the Second Circuit Federal Bar Council. As a member of the Program Committee of the Second Circuit Federal Bar Council, Ms. Zwerling plans and coordinates Continuing Legal Education programs.

Ms. Zwerling has concentrated in litigation since her graduation from law school. At that time, she became associated with Martin, Clearwater & Bell, becoming a partner in 1982 and remained there until the formation of the Zwerling Firm in 1985. Ms. Zwerling has extensive experience in all phases of litigation, including trials and appellate arguments. She has tried cases in both state and federal courts. Ms. Zwerling successfully completed the National Institute of Trial Advocacy's Advanced Trial Practice course after having tried a number of cases.

Ms. Zwerling is located in the Zwerling Firm's New York office.

13

**Susan Salvetti**

Susan Salvetti was admitted to the bar of the State of New York in 1980; she is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit. She received a Bachelor of Arts degree *summa cum laude* from Thomas More College of Fordham University in 1976 and a Juris Doctor degree from Fordham University School of Law in 1979. Her memberships include: the American Bar Association, the New York State Bar Association – Committee Member of the Commercial and Federal Litigation Section on Class Actions, Who's Who in American Women, and Phi Beta Kappa. Ms. Salvetti authored the published *Report on Class Certification for Particular Issues Pursuant to Federal Rules of Civil Procedure 23(C)(4)(A)*, 12 NYLitigator 63 (2007).

Ms. Salvetti has concentrated in litigation throughout her career, becoming a partner of the Zwerling Firm on January 1, 1992. Prior to her association with the firm in 1985, she was associated with Martin, Clearwater & Bell. Prior to that time, Ms. Salvetti was associated with Newman, Tannenbaum, Helpern & Hirschtritt, a general practice firm.

Ms. Salvetti has extensive experience in all phases of complex litigation, including as trial counsel and complex discovery. She has taken numerous depositions, argued motions before courts, and has negotiated complicated settlements in both securities and consumer matters.

Ms. Salvetti is located in the Zwerling Firm's New York office.

**Richard A. Speirs**

Richard A. Speirs was admitted to the bar of the State of New York in 1986; he is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Tenth Circuit. He received a Bachelor of Arts degree *cum laude* from Brooklyn College of the City University of New York in 1976. Mr. Speirs received his Juris Doctor degree from Brooklyn Law School in 1985, where he was awarded the Order of the Coif and was the recipient of American Jurisprudence Awards in Conflicts of Law and Labor Law. He is a member of the New York State Bar Association and the Second Circuit Federal Bar Council. Mr. Speirs was a panelist at the Public Funds Summit in 2007.

Mr. Speirs became a partner of the firm on January 1, 2000. Prior to his association with the Zwerling Firm in 1997, Mr. Speirs was an associate of Bernstein Litowitz Berger & Grossmann LLP where he concentrated primarily in securities and class action litigation.

Mr. Speirs has extensive experience in all phases of complex litigation, including the investigation and analysis of potential matters and the development of electronic discovery requirements. He has conducted many depositions of both fact and expert witnesses and has acted as trial counsel.

Mr. Speirs is located in the both the Zwerling Firm's New York and Long Island offices.

**Senior Counsel**

**Hillary Sobel**

Hillary Sobel was admitted to the bar of the State of New York in 1989; she is also admitted to the following federal courts: the United States District Court for the Southern and

15

Eastern Districts of New York and the United States Court of Appeals for the Fourth and Ninth Circuits. She received a Bachelor of Arts Degree from Barnard College of Columbia University in 1985, and a Juris Doctor degree from the Benjamin N. Cardozo School of Law of Yeshiva University in 1988, where she was Editor of the ILSA International Law Journal. Her memberships include: the American Bar Association.

Ms. Sobel has been involved in complex discovery, including responding to and drafting discovery requests, questioning fact and expert witnesses, as well as arguments before the court. She has also participated at trial, including witness questioning, as well as trial preparation.

Ms. Sobel is located in the Zwerling Firm's New York office.

**Stephen L. Brodsky**

Stephen L. Brodsky was admitted to the bar of the State of New York in 1994; he is also admitted to the United States District Court for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Third and Eighth Circuits. He received a Bachelor of Arts degree *summa cum laude* from the University of Pennsylvania in 1989, and a Juris Doctor degree from Columbia Law School in 1993, where he was a Harlan Fiske Stone Scholar and member of the Columbia Journal of Law and Social Problems. His memberships include: Phi Beta Kappa.

Mr. Brodsky has published "The Time is Right For Mid-Size Public Or Union Pension Funds To Be Lead Plaintiffs in Securities Class Action," in Investment Management Weekly (Vol. 21, Issue No. 10, March 10, 2008); "Federal Courts in New York Provide Framework For Enforcing Preliminary Agreements," in the New York State Bar Association Journal (March/April 2001) and "Defending an Agent Against a Claim for Breach of Warranty of

Authority," NYLitigator (Spring 2001). Prior to joining the Zwerling Firm, Mr. Brodsky was associated with Sonnenschein Nath & Rosenthal, LLP.

Mr. Brodsky is located in the Zwerling Firm's New York office.

**Associates of the Firm**

**Sona R. Shah**

Sona R. Shah was admitted to the bar of the State of New Jersey in 1997, and to the bar of the State of New York in 1998; she is also admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York. She received a Bachelor of Arts degree from New York University in 1994, and a Juris Doctor degree from Fordham University School of Law in 1997. Her professional affiliations include: the New York State Bar Association.

Prior to her association with the Zwerling Firm, Ms. Shah was associated with the Center for Constitutional Rights.

Ms. Shah is located in the Zwerling Firm's New York office.


**Shaye J. Fuchs**

Shaye J. Fuchs was admitted to the bar of the State of New Jersey in 1999 and to the bar of the State of New York in 2000; he is also admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York. He received a Bachelor of Arts degree *magna cum laude* from Queens College of the City University of New York in 1995, and a Juris Doctor degree from Brooklyn Law School in 1998. His memberships include: the American Bar Association, the New York County Lawyers Association, and Phi Beta Kappa.

17

Prior to his association with the Zwerling Firm, Mr. Fuchs interned at the New York Stock Exchange Enforcement Division and has been of counsel in securities class action lawsuits.

Mr. Fuchs is located in the Zwerling Firm's Long Island office.

## Justin M. Tarshis

Justin M. Tarshis was admitted to the bar of the State of New York in 2003; he is also admitted to the United States District Court for the Southern and Eastern Districts of New York. He received a Bachelor of Science degree from the University of Wisconsin in 1999, and a Juris Doctor degree *cum laude* from Brooklyn Law School in 2002. While in law school, Mr. Tarshis was the recipient of the Samuel L. Sporn Academic Achievement Scholarship and the CALI Excellence for the Future Award in Civil Practice. In addition, Mr. Tarshis served as an intern to the Honorable Shira A. Scheindlin of the Southern District of New York, as well as an intern in the New York State Attorney General's Office.

Mr. Tarshis is located in the Zwerling Firm's New York office.

## Paul Kleidman

Paul Kleidman was admitted to the bar of the State of New York in 2002; he is also admitted to the United States District Court for the Southern and Eastern Districts of New York. He received a Bachelor of Science degree from Boston University in 1998, and a Juris Doctor degree from the State University of New York at Buffalo School of Law in 2001. While in law school, Mr. Kleidman was the recipient of the Martin Feinrider Merit Scholarship. He served as

18

Business Editor of the Buffalo Human Rights Law Review and was a Senior Member of the Jessup International Moot Court Board.

Prior to joining the Zwerling Firm, Mr. Kleidman was an Assistant Corporation Counsel in the General Litigation Division of the New York City Law Department. There, he worked on high profile class action lawsuits, including *Benjamin v. Horn* in the Southern District of New York.

Mr. Kleidman is located in the Zwerling Firm's New York office.

## Stephanie E. Kirwan

Stephanie E. Kirwan was admitted to the bar of the State of New Jersey in 2004, and to the bar of the State of New York in 2005; she is also admitted to the following federal courts: the United States District Court for the District of New Jersey, and the United States District Court for the Southern and Eastern Districts of New York. She received a Bachelor of Arts degree from Tufts University in 2000, and a Juris Doctor degree *cum laude* from New York Law School in 2004, where she was an associate editor for the Law Review. Her professional associations include: the New York State Bar Association, the New York County Lawyers Association; and the New York State Trial Lawyers Association.

Prior to her association with the Zwerling Firm, Ms. Kirwan was associated with the Renzulli Law Firm where her practice concentrated in litigation.

Ms. Kirwan is located in the Zwerling Firm's New York office.

### David R. Kromm

David R. Kromm was admitted to the bar of the State of New York in 2001. He received a Bachelor of Arts degree and graduated with Departmental Honors from Wheaton College in 1997, and a Juris Doctor degree from St. John's University School of Law in 2000, where he was Editor-in-Chief of the St. John's Journal of Legal Commentary. While in law school, Mr. Kromm served as an intern with the United States Attorney's Office, Southern District of New York. His professional affiliations include the New York State Bar Association.

Prior to his association with the Zwerling Firm, Mr. Kromm worked as a criminal trial prosecutor with the Office of the District Attorney, Bronx County (New York) for six years. As a prosecutor, he was lead counsel in approximately two dozen criminal trials.

Mr. Kromm is located in the Zwerling Firm's New York office.

### Ana Cabassa

Ana Maria Cabassa was admitted to the bar of the State of New York in 2001 and to the bar of the District of Columbia in 2002; she is admitted to the following federal courts: the United States District Court for the District of Columbia, and the Tax Court. She received a Bachelor of Science degree in Accounting and Finance, *magna cum laude*, from Georgetown University in 1995 and a Juris Doctor degree from New York University, School of Law in 2000. She received the Thomas Stoddard Award for editing contributions to the Journal of Legislation and Public Policy. Her professional affiliations include: American Bar Association and New York State Bar Association.

Ms. Cabassa is also a Certified Public Accountant.

Prior to her association with the Zwerling Firm, Ms. Cabassa was associated with Latham

& Watkins, LLP, where she represented clients in antitrust, securities and complex commercial litigation matters.

Ms. Cabassa has extensive experience in all phases of complex litigation, including the investigation and analysis of potential matters and the development of electronic discovery requirements.

Ms. Cabassa is located in the Zwerling Firm's New York office.

## Of Counsel

### Dan Drachler

Dan Drachler was admitted to the bar of the State of New York in 1988; he is also admitted to the bar of the States of Washington, New Jersey and Minnesota; he is admitted to the following federal courts: the United States District Court for the Southern and Eastern Districts of New York, the United States District Court for the Western and Eastern Districts of Washington, the United States Court of Federal Claims, and the United States Court of Appeals for the Ninth and Federal Circuits. Mr. Drachler received a Bachelor of Arts degree *cum laude* from the University of South Carolina in 1980, and his Juris Doctor degree *cum laude* from New York Law School in 1987. At New York Law School, Mr. Drachler was a member of the law review and was a John Ben Snow Merit Scholar. His professional affiliations include: the American Bar Association, the Washington State Bar Association, the King County Bar Association, and the National Association of Consumer Advocates.

Prior to joining the Zwerling Firm, Mr. Drachler served as Chief Deputy Attorney General for the State of New York. In that position, all litigation and administrative proceedings

in the Securities Bureau were subject to Mr. Drachler's review.  Mr. Drachler also regularly counseled state agencies and the Governor's office regarding a variety of legal and non-legal matters. From 1987 to 1993, Mr. Drachler was an associate and then partner of Koppell, Drachler & Lipofsky.  At that firm, he concentrated in general civil litigation, real estate, and trusts and estates.

Mr. Drachler was an Adjunct Professor at New York Law School from 1992-97.  He taught "Negotiation, Counseling and Interviewing," a course designed to develop skills in counseling clients and conducting negotiations in simple and complex matters.

Mr. Drachler is located in the Zwerling Firm's Seattle office.

## Joseph Lipofsky

Joseph Lipofsky was admitted to the bar of the State of New Jersey in 1972, and is also admitted to the bar of the States of New York, Missouri and Michigan; he is admitted to the following federal courts:  the United States District Court for the Southern and Eastern Districts of New York, the District of New Jersey, the Eastern District of Missouri, the Eastern District of Michigan, and the Supreme Court of the United States.  He received a Bachelor of Science degree from Rider College in 1969, and a Juris Doctor degree *cum laude* from Seton Hall University School of Law in 1972.  His professional affiliations include: the American Bar Association; the New York State Bar Association, where he serves on the Executive Committee of the Antitrust Section; the National Lawyers Guild; and the National Association of Consumer Advocates.  He also serves as a Board Member for Brooklyn Legal Services Corporation A; and for the Sugar Law Center for Economic and Social Justice.

22

Prior to joining the Zwerling Firm, Mr. Lipofsky served as Deputy Counsel to the Attorney General of New York. In that capacity, he regularly counseled state agencies and the Governor's office regarding a variety of legal and non-legal matters. From 1991 to 1993, Mr. Lipofsky was counsel to the firm of Koppell & Drachler and then partner of Koppell, Drachler & Lipofsky. Prior to 1991, he served as an attorney and Executive Director with legal service programs in New Jersey, Missouri and Michigan, as well as with various labor unions including their ERISA funds.

Mr. Lipofsky is located in the Zwerling Firm's New York office.

**Jonathan Platnick**

Jonathan Platnick was admitted to the bar of the State of New York in 1979. Mr. Platnick received a Bachelor of Arts degree *magna cum laude* from The City University of New York 1971, and his Juris Doctor degree from the New York University School of Law in 1978.

His memberships include: Phi Beta Kappa.

Mr. Platnick is located in the Zwerling Firm's New York office.

**Timothy E. Gillane**

Timothy E. Gillane was admitted to the bar of State of New York in 1988; he is also admitted to the United States District Courts for the Southern and Eastern Districts of New York. He received a Bachelor of Arts degree *cum laude* from the University of Connecticut in 1973, a Masters of Arts degree from Boston College (where he also taught under a fellowship) in 1975, and a Juris Doctor degree from New York Law School in 1987. His professional affiliations

include the Brehon Law Society.

Prior to joining the Zwerling Firm, Mr. Gillane was a staff attorney at Robin, Schepp, Yuhas, Doman & Harris, where his practice concentrated in litigation.

Mr. Gillane is located in the Zwerling Firm's Long Island Office.

## Lisa Holman

Lisa Holman was admitted to the bar of the State of New York in 1998. She received a Bachelor of Arts degree from Cornell University in 1994, and a Juris Doctor degree from the University of Michigan Law School in 1997. Her memberships include the American Bar Association and the New York State Bar Association.

Prior to joining the Zwerling Firm, Ms. Holman practiced corporate law and securities litigation with Goodkind Labaton Rudoff & Sucharow, LLP, now known as Labaton Sucharow & Rudoff LLP.

Ms. Holman is located in the Zwerling Firm's New York office.

\\Zszny01\ny_docs\OG\RESUMES\MASTERS\Securities.doc