UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP AUCTION RATE SECURITIES LITIGATION | MASTER FILE<br>08 Civ. 3095 (LTS)(FM) |
| This Document Relates to:<br>All Actions | |

## LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiff Michael A. Passidomo (hereafter, "Lead Plaintiff" or "Passidomo"), on behalf of himself and all others similarly situated, by his attorneys, and pursuant to Federal Rules of Civil Procedure ("FED. R. CIV. P.") Rule 11(b)(3), makes the allegations in this Consolidated Amended Complaint ("Complaint") upon information and belief (except as to allegations about himself) and based upon the investigation of counsel into the facts and circumstances alleged herein, which included, *inter alia*, a review and analysis of: (i) the filings of defendant Citigroup, Inc. ("Citigroup") made with the Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, news articles, and other publications disseminated by or concerning Citigroup and the other defendants named in this Complaint (together, the "Defendants") and auction rate securities ("ARS"); (iii) media reports concerning the Defendants and ARS; (iv) transcripts of Citigroup's quarterly earnings conference calls; (v) the corporate websites of Defendants; (vi) other public and non-public information concerning Defendants and ARS; and (vii) consultations with investigators and consultants. Lead Plaintiff believes that after reasonable opportunity for discovery, substantial evidentiary support will likely exist for the following allegations:

## NATURE OF ACTION

1.      Lead Plaintiff brings this action, pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a) and (c), §§206 and 215 of the Investment Advisers Act of 1940 (the "1940 Act"), and various state statutes and common law, on behalf of a class of investors in Citigroup ARS (as defined below in ¶2) underwritten and/or sold in auctions managed by Citigroup or defendant Citigroup Global Markets Inc. ("Global Markets"), or purchased through broker-dealer defendant Smith Barney ("Smith Barney").

2.      Defendants, during the Class Period (defined below in ¶19), engaged in a scheme, practice or course of conduct to manipulate the market for ARS underwritten and/or sold by them in auctions they managed ("Citigroup ARS").

3.      Citigroup ARS could only be sold in auctions managed by them; no public market for Citigroup ARS existed.

4.      During the Class Period and unbeknownst to Lead Plaintiff and the Class (defined below in ¶19), Defendants manipulated the market for Citigroup ARS, fostering the illusion that a valid market existed where buyers and sellers came together, with supply and demand in balance, allowing for the successful completion of auctions, when in fact no such balance existed.

5.      During the Class Period, Defendants regularly intervened to ensure that the auctions for Citigroup ARS did not fail. By doing so, Defendants garnered auction dealer fees based, in part, upon the amount of the Citigroup ARS sold in the auctions, and sold their own inventory of Citigroup ARS to members of the Class (described below in ¶42).

6.      When Defendants ceased intervening into auctions for Citigroup ARS, the auctions failed in their entirety, and the Citigroup ARS market came to a sudden and immediate halt. Lead Plaintiff and the Class were left with billions of dollars of Citigroup ARS and no

market to sell their positions.

## JURISDICTION AND VENUE

7.        The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78o(a), and Rule 10b-5(a) and (c), promulgated thereunder, §§206 and 215 of the 1940 Act, 15 U.S.C. §§80b-6 and 80b-15, unfair and deceptive practices acts for the States of Arizona, Florida, Illinois, Maryland, Wisconsin, Colorado, Kentucky, New Mexico, Delaware, South Dakota and North Dakota (the "Deceptive Practices Acts"), and common law breach of fiduciary duty. In addition, Lead Plaintiff seeks injunctive relief.

8.        Jurisdiction for Counts I and II exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

9.        Jurisdiction for Count III exists pursuant §214 of the 1940 Act, 15 U.S.C. §80b-14.

10.       Jurisdiction for Counts IV through VI exists pursuant to 28 U.S.C. §§1332(a), 1332(d)(2), and/or supplemental jurisdiction.

11.       Venue is proper in this District pursuant to §27 of the Exchange Act, 28 U.S.C. §1391(b) and 28 U.S.C. §1337, and §214 of the 1940 Act, 15 U.S.C. §80b-14. Defendants maintain their principal places of business and transact business in this District, and many of the acts giving rise to the violations alleged herein occurred in this District.

## PARTIES

12.       Lead Plaintiff purchased Citigroup ARS through his account at Smith Barney during the Class Period, and suffered damages thereby. The annexed Certification by Passidomo reflects his Class Period Citigroup ARS purchases. Passidomo has been appointed Lead Plaintiff in this action by the Court in an order dated June 25, 2008.

3

13.     Citigroup is a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup was incorporated in 1988 under the laws of the State of Delaware.

14.     Global Markets is Citigroup's primary U.S. broker-dealer subsidiary. Global Markets is a broker-dealer registered with the SEC pursuant to §15(b) of the Exchange Act. Global Markets has its principal place of business and is headquartered in New York.

15.     Global Markets has conducted Citigroup ARS auctions at least since 2003.

16.     Global Markets has been appointed by the issuer of securities to serve as a dealer in auctions and is paid by the issuer a dealer fee for those services based upon the principal amount of the securities placed through Citigroup.

17.     Smith Barney provides investment advice, financial planning and brokerage services to affluent individuals, companies, and non-profits. For the fiscal year 2007, Smith Barney earned over $3 billion in commissions and fees, which includes brokerage services. Smith Barney is a division of Global Markets. Smith Barney is within the Global Wealth Management segment of Citigroup's business.

18.     Smith Barney has sold Citigroup ARS to investors at least since 2004, and sold Citigroup ARS to Lead Plaintiff and other members of the Class during the Class Period.

### CLASS ACTION ALLEGATIONS

19.     Lead Plaintiff brings this action as a class action pursuant to FED. R. CIV. P. 23(a) and 23(b)(3), except as to Count VI, on behalf of all persons who purchased (including those persons who placed hold orders, as described in ¶30) Citigroup ARS during the period from August 1, 2007 through February 11, 2008 (the "Class Period") and were damaged thereby,

4

except the Defendants, their partners, directors, officers and employees or of their subsidiaries or affiliates (as defined in SEC Rule 12b-2) during the Class Period ("Excluded Persons"), or any entity in which any Excluded Person or entity has a controlling interest, and the legal representatives, heirs, successors and assigns of any Excluded Person (the "Class").

20.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  Defendants issued, sold or managed auctions of more than $30 billion of Citigroup ARS.  During the Class Period, Defendants sold or offered for sale in Defendants-managed auctions billions of dollars of Citigroup ARS.

21.    Lead Plaintiff's claims are typical of the claims of the Class because he and the Class members sustained damages from Defendants' wrongful conduct.

22.    Lead Plaintiff will adequately protect the interests of the Class.  Lead Plaintiff has retained counsel who is experienced and competent in class action securities litigation.  Lead Plaintiff has no interests which are in conflict with those of the Class.

23.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

24.    Common questions of law and fact predominate over questions which affect only individual members.  Among the questions of law and fact common to the Class are:

      (a)    Whether the federal securities laws were violated by Defendants' acts;

      (b)    Whether Defendants pursued the fraudulent scheme and course of manipulative conduct complained of;

      (c)    Whether Defendants acted knowingly, intentionally or recklessly;

      (d)    Whether Defendants manipulated the market for the Citigroup ARS in auctions that they managed;

(e)     Whether Smith Barney violated the 1940 Act;

(f)     Whether Global Markets and Smith Barney violated the State Deceptive Practices Acts;

(g)     Whether Smith Barney owed fiduciary duties to the Class and if so, whether it breached those duties; and

(h)     The extent and measure of damage sustained by the Class.

## FACTUAL ALLEGATIONS

### General Background: Auction Rate Securities

25.     ARS have, in one form or another, existed for over two decades.

26.     In the aggregate, by the end of the Class Period, the ARS market had grown to nearly $340 billion.  Of that, according to an Industry Focus report entitled, "Collapse of the Auction Rate Market," dated April 14, 2008, and issued by Global Markets, "80% of the outstanding auction rate securities are debt instruments and the remaining 20% (or $72 b) are preferred securities (essentially a form of equity, largely used by closed-end funds)."

27.     ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 28, or 35 days.  Generally, ARS trade and are callable at par on the auction date.

28.     The auctions serve two purposes. First, an auction provides a means for investors who no longer want to hold their ARS to resell them to other investors. Second, an auction determines the interest rate the issuer of the ARS will pay during the period until the next auction.

29.     Interest is paid in the current period based on the interest rate determined in the prior auction.

6

30.    Investors submit orders to buy (or bid), hold or sell ARS through the broker-dealers selected by the issuer of a specific ARS.  In a buy or sell order, an investor (new or pre-existing) submits a bid to purchase or sell the ARS.  A hold order, while resulting in a new purchase of the same ARS, does not require a bid in order to receive the interest rate determined at the auction.

31.    The broker-dealer manages the auction process.  Most auctions are run by a single broker-dealer.

32.    Once the broker-dealer receives the orders, it then submits them to the auction agent.  The auction agent collects orders from the broker-dealers, determines the amount of ARS available for sale, organizes the bids, and determines the clearing rate, *i.e.*, the final rate at which all of the ARS are sold.

33.    In the event the auction agent does not receive sufficient orders to purchase all the ARS being sold in the auction, the auction is said to have failed. In other words, an auction fails if there are more ARS for sale than there are bids for them.  If there is a failed auction, holders of ARS are not able to exit their positions in the ARS through the auction.

34.    In the over two decades prior to the beginning of the Class Period, according to reports of  an analysis made by Moody's, only thirteen auctions of ARS failed, the last one in 2006.

35.    During the Class Period, and unbeknownst to Lead Plaintiff and the members of the Class, auctions managed by entities other than the Defendants began to fail, slightly at first and building to complete failure by February 13, 2008.

**Defendants' Manipulative Misconduct during the Class Period**

36.    Beginning no later than August 1, 2007 and continuing throughout the Class

Period, in their roles actively selling and managing Citigroup ARS auctions, Defendants knew that the number of buyers for Citigroup ARS did not match or exceed the sellers of Citigroup ARS. As a consequence of this imbalance, Defendants' auctions would have failed without Defendants' intervention.

37.     Defendants knew of this imbalance and that the consequence of these imbalances would lead to failed auctions of Citigroup ARS without Defendants' intervention because of the roles they played in the Citigroup ARS auctions they managed.

38.     As the Regional Bond Dealers Association recently explained in its August 15, 2008 letter to the SEC and others:

> Lead managers in an ARS transaction exercise an almost complete degree of control over information associated with auctions. Lead managers are the only dealers associated with an ARS that know, for example, the number of bidders at an auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there are sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions (before those rates are disclosed to the issuer and investors). *The lead manager is also the only party* (other than perhaps the auction agent, who is not a principal in the transaction) *who knows whether the lead manager itself bid at an auction for its own account and whether that bid was necessary for the auction's success.* [Emphasis added.]

39.     In its multiple roles in underwriting Citigroup ARS, selling Citigroup ARS and/or managing auctions of Citigroup ARS, Defendants received fees for their services from, among others, the issuers of Citigroup ARS.

40.     When Defendants underwrite offerings of Citigroup ARS, the issuer pays them underwriting fees.

41.     When Defendants manage auctions of Citigroup ARS, Defendants receive from the issuer "auction dealer fees." These fees are paid on the principal amount of the securities, *i.e.*, the Citigroup ARS, placed with investors through Defendants.

42.     In order to prevent failed auctions, the consequent loss of underwriting and auction dealer fees, and allow Defendants to sell the Citigroup ARS inventory held on Citigroup's balance sheet, Defendants embarked on a practice to regularly and increasingly intervene to prevent failed auctions. By so doing, Defendants fostered the illusion of a stable market for Citigroup ARS in auctions it managed during the Class Period.

43.     Throughout the Class Period, supply of Citigroup ARS was increasing while the demand for Citigroup ARS was decreasing.

44.     When the supply of Citigroup ARS exceeded the bids (or demand) for Citigroup ARS, Defendants submitted bids to ensure that those ARS offered would be sold in the auction. They did this regularly throughout the Class Period. Indeed, while Defendants' competitors experienced failed auctions during the Class Period, Defendants' auctions did not.

45.     Lead Plaintiff and members of the Class continued to purchase Citigroup ARS believing that the "auction process" was in fact occurring as an auction is intended to, *i.e.*, buyers and sellers each bidding for and offering for sale Citigroup ARS based upon a specified clearing rate.

46.     The scope and pattern of Defendants' ever-increasing intervention into the auctions for Citigroup ARS was unknown to Lead Plaintiff and the members of the Class.

47.     Notwithstanding that Defendants knew during the Class Period that sellers and Citigroup ARS supply outstripped buyers and demand, they nonetheless continued to underwrite Citigroup ARS and/or act as a broker-dealer managing auctions through which Lead Plaintiff and the Class purchased Citigroup ARS.

48.     Citigroup ARS for which Global Markets served as the auction dealer during the Class Period included:

(a)     HIGHLANDS COUNTY FLA HEALTH FACS AUTH REV—VAR-HOSP-ADVENTIST HLTH SYS-B, dated August 8, 2007, auctioned every 7 days;

(b)     EDUCATIONAL FDG SOUTH INC FLA EDL LN REV-VAR-AMT-STUDENT LN BKD-A-8, dated November 7, 2007, and auctioned every 28 days;

(c)     CALIFORNIA STATEWIDE CMNTYS DEV AUTH REV-VAR- LA CNTY MUSEUM ART PJ-B, dated November 9, 2007, and auctioned every 7 days;

(d)     HARRIS CNTY TEX HEALTH FACS DEV CORP HOSP REV-ARS-BAYLOR COLLEGE MED-A-4, dated November 15, 2007, and auctioned every 7 days; and

(e)     VERMONT ST STUDENT ASSISTANCE CORP ED LN REV- ARS-TAXABLE-SER YY, dated December 5, 2007, and auctioned every 28 days.

49.     During the Class Period, and while knowing that sellers and supply of Citigroup ARS outstripped buyers and demand, Defendants' "auction desk" continued to tout to its Smith Barney brokers new issues for which Citigroup ARS would be sold.

50.     The auction desk, Defendants' central command center for its Citigroup ARS business, sent mass e-mails to its Smith Barney brokers identifying Citigroup ARS issues, the commission to the brokers for placing the Citigroup ARS, and the "price talk" (*i.e.*, the range of likely clearing rates for the auction) payable to investors who purchased these issues.

51.     E-mail traffic to Smith Barney brokers touting the sale of Citigroup ARS to the Class increased significantly during the second half of 2007 (*i.e.*, during the Class Period).

52.     To entice Smith Barney brokers into selling and investors into acquiring these new issues, the commission rates to brokers increased as did the interest rates paid on the Citigroup ARS to investors.

53.     As reported in *The Wall Street Journal* on July 28, 2008:

10

Wall Street firms started raising commissions paid to some brokers at outside dealers who sold the securities to clients, an action that might serve as an enticement to them to sell more. *On Nov. 2, 2007, for example, Credit Suisse's short-term trading desk sent out an email informing its salespeople that Citigroup was increasing its commissions to outside dealers from 0.15 of a percent of the security sold to 0.20 of a percent on certain of its auction-rate securities, according to a person familiar with the email.* By the start of January, their commissions on all types of Citigroup's auction-rate securities rose to 0.15 of a percent, instead of 0.1, says the person. [Emphasis added.]

54.    In December 2007, Defendants, in a mass e-mail to its Smith Barney brokers, encouraged them to sell a Defendants'-underwritten offering of Citigroup ARS issued by Baylor School of Medicine ("Baylor ARS"), with the "price talk" of 3.3-3.4%. As an incentive to its brokers to sell the Baylor ARS, Defendants offered an increased commission to 25 basis points (from the usual 18-20 basis points). After the initial e-mail, Defendants internally disseminated another e-mail, this time with the "price talk" increasing the yield to investors to 3.5-3.6%, and increasing the Smith Barney brokers' commission from 25 basis points to 50 basis points.

55.    Defendants' auction desk told Smith Barney brokers that the attractive terms did not reflect any increased risk associated with the ARS, but rather was a means to bring money into the firm because Citigroup was contending with the negative financial impact of the subprime crisis.

56.    Defendants' competitor, UBS, knew that Defendants were supporting the auctions, although Lead Plaintiff and members of the Class did not.

57.    As stated in an e-mail dated January 13, 2008 between and among UBS personnel, setting out a discussion of key points regarding ARS and setting forth UBS options, option number 5 included, in part, "Continue to support the Auctions …." In assessing this option, the e-mail declares: "Our competitors are all pursuing this option with their own liquidity for their own clients (Citi, BOA, RBS, JPM)."

58.    Another UBS e-mail, this one dated February 7, 2008 (between and among UBS personnel), reflected Defendants' knowledge of the impact of no longer supporting auctions (*i.e.*, letting them fail), on the eve of Defendants' decision to cease supporting auctions:

> This is bad. I took a ride w my neighbor form citi, they are looking at some worse case scenarios that are really shaking them up. ... Things like affects to IBD, lending and other businesses if corporations get stuck with billions in failed auctions, where do they get their cash and from whom. ... I would say if body language is meaningful, they are either teetering on the edge or the pressure is just unbelievable. He was dying to ask me if we are contemplating failing auctions.

59.    Ultimately, on February 11, 2008, Defendants ceased intervening into the auctions to prevent them from failing. Consequently, all of Defendants' Citigroup ARS auctions failed, leaving Lead Plaintiff and the members of the Class unable to sell their Citigroup ARS.

60.    Not until March 2008 when Defendants mailed to Lead Plaintiff his brokerage statement for the period from February 1 through February 29, 2008, did Defendants finally admit in a "Message" at the end of the statement, "that the Auction-Rate Securities (ARS) market is experiencing a supply and demand imbalance, resulting in failed auctions and significantly reduced or lack of liquidity."

### After Defendants Ceased Intervening in the Citigroup ARS Auctions

61.    As noted in an article in the April 14, 2008 edition of the DealBook page of *The New York Times*, "A Long, Cold Cashless Siege,"

> Indeed, experts say that calling these securities auction-oriented is something of a misnomer because real auctions – during which buyers and sellers meet and an interest rate is set based upon their interest – weren't taking place in recent years. Instead, the Wall Street firms in charge of the auctions smoothed the process by bidding with their own capital rather than rustling up thousands of buyers to meet up with sellers every week or so.
>
> Given this market's size, it became harder for Wall Street to arrange true auctions regularly.
>
> ***

"Auction securities became a managed bidding system, not a true investor auction," said Joseph S. Fichera, chief executive of Saber Partners, a financial advisory firm. *"The investor never knew how many investors there were, how often the brokerage firms were stepping in to make the system work, nor that the broker's support could stop all of a sudden.*

*"If we had transparency in the system, investors could have judged the ability to sell in the individual auctions and bid accordingly,"* he added. [Emphasis added.]

62.     As reported in the June 5, 2008 edition of *The Bond Buyer*:

Martha Mahan Haines [SEC Chief of Office of Municipal Securities] said that *one of the biggest problem in the ARS market was its opacity, which may have kept investors from knowing that a small group of broker-dealer firms that bid on the auctions were critical to preventing widespread failures.* Even though broker-dealers disclosed that they were bidding on auctions, *the extent of their participation was unknown,* she said.

"If investors could see that broker-dealers were so active in this market ... perhaps it wouldn't have grown so large, well beyond the broker-dealers' ability to hold it up," Haines said, speaking at the Securities Industry and Financial Markets Association's legal and compliance conference in New York. "We may not have gotten into this mess had there been transparency." [Emphasis added.]

## COUNT I
### Violations of Section 10(b) and Rule 10b-5(a) and (c): Market Manipulation
### (Against All Defendants)

63.     Lead Plaintiff repeats and realleges each of the allegations set forth in ¶¶1 through 8, and 11-62.

64.     During the Class Period, with knowledge of or reckless disregard for the truth, Defendants engaged in manipulative conduct.

65.     Defendants knew or recklessly disregarded that: (a) as of the commencement of the Class Period, sellers and supply of Citigroup ARS outstripped buyers and demand for Citigroup ARS, an imbalance that would lead to failed auctions; (b) in order to avoid failed auctions, Defendants would need to intervene to give the illusion of an equality of buyers and sellers of Citigroup ARS; and (c) without Defendants' intervention, the auctions would fail, and

Defendants would: (i) not receive underwriting fees for new Citigroup ARS offerings, (ii) not receive broker-dealer fees and commissions associated with the offering and sale of Citigroup ARS; (iii) not receive auction dealer fees associated with the auctions of Citigroup ARS; (iv) subject themselves to huge liabilities to issuers of Citigroup ARS and investors who purchased Citigroup ARS (including Lead Plaintiff and the members of the Class); and (v) subject themselves to regulatory investigations and proceedings.

66.    No later than by the commencement of the Class Period, Defendants knew that the Citigroup's financial statements would reflect a continuing negative impact from the subprime crisis. Accordingly, Citigroup needed to find a means by which to offset the negative impact and so, embarked on a course of conduct to support its auctions of Citigroup ARS to generate underwriting, broker-dealer and auction dealer fees.

67.    Citigroup succeeded in offsetting the negative impact from its exposure to the subprime crisis quarter after quarter during the Class Period.

68.    As demonstrated by the statements of its Chief Financial Officer (Gary Crittenden) in the 3rd Quarter 2007 earnings conference call held on October 15, 2007 and again in the 4th Quarter 2007 earnings conference call held on January 15, 2008, Citigroup's Global Wealth Management business – of which Smith Barney is a part – continued to contribute growing revenues.

69.    During the 3rd Quarter earnings conference call, for example, Citigroup's CFO reviewed the slide presentation disseminated to analysts participating in the call, and stated:

> ... items which significantly impact the results for the quarter. First we took a 1.352 billion write-down in our highly-leveraged finance portfolio. Secondly, we took write-downs in the value of our mortgage backed securities and leveraged loans which were warehoused for future CDO or CLO securitizations as well as on CDO positions of 1.561 billion net of any hedges.

\*\*\*

Drivers of non-interest revenues also grew nicely ... In our Global Wealth Management business assets under fee based management grew 38% or 20% organically. In Investment Banking we ranked Number 1 in global debt underwriting, Number 3 in announced and completed M&A and Number 2 in global equity underwriting on a year to date basis.

\*\*\*

Year to date revenue growth trends are strong despite the severe market dislocations in the third quarter. We're pleased to see that the relative growth rates of our businesses: markets and banking, international consumer, and Global Wealth Management all grew revenues at double digit rates.

70.     At the outset of the 4th Quarter earnings conference call, Citigroup's CEO Vikram Pindit remarked: "In particular, we had record results in Wealth Management...."  Later during that same call, Citigroup's CFO Gary Crittenden reviewed the slide presentation disseminated to analysts participating in the call, and stated:

Slide 1 shows you the consolidated results that we have for the quarter. To summarize our fourth quarter results, *net revenues declined 70%, primarily on $17.4 billion in writedowns in fixed income on our direct subprime exposures, partially offset by continuing underlying growth in many of our other businesses.*

\*\*\*

Drivers of non-interest revenues also grew nicely. Credit card purchase sales were up 8% in the U.S. and 37% internationally. Internationally, organic card purchase sales growth was 25%. International assets under management were up 24% in International Consumer, client capital under management in CAI was up 26%. In our Global Wealth Management business, assets under fee-based management grew 27%, or 9% organically. In Investment Banking, for the full year 2007, we ranked number one in global debt underwriting, number three in announced and completed M&A, and number three in global equity underwriting. [Emphasis added.]

71.     Defendants destroyed documents pertaining to Citigroup ARS in auctions managed by them. The documents at issue were covered by *subpoena* issued by the New York Attorney General (the "NYAG") on April 14, 2008.

72.     The *subpoena* demanded production of "recordings of telephone conversations concerning the marketing, sale, distribution or auction of auction-rate securities."  Citigroup

15

admitted to the NYAG that its auction desk recordings had been destroyed and are not recoverable.

73.     Lead Plaintiff and other members of the Class purchased Citigroup ARS during the Class Period while Defendants engaged in the manipulative conduct alleged in this Count.

74.     Defendants' manipulative conduct was furthered by their use of the mails, including, but not limited to, sending to Lead Plaintiff and the Class their brokerage statements reflecting that a market for Citigroup ARS existed during the Class Period.

75.     When Lead Plaintiff and other members of the Class purchased Citigroup ARS, they did so in reliance upon the integrity of the market for Citigroup ARS, specifically that the prices at which they purchased Citigroup ARS, the prices at which Citigroup ARS were sold, and the interest rates set on the Citigroup ARS were determined by the natural interplay of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct.

76.     Lead Plaintiff and other members of the Class would not have purchased the Citigroup ARS at the prices they paid, if at all, had they been aware of Defendants' manipulative conduct.

77.     When Defendants decided to no longer manipulate the market for Citigroup ARS and failed to step in to support the market, the market for Citigroup ARS collapsed. Lead Plaintiff and the Class could not sell their Citigroup ARS because no market to do so existed.

78.     Since February 11, 2008, Lead Plaintiff and the Class have been unable to sell their Citigroup ARS, rendering their investments illiquid.

79.     Defendants admitted, at least by June 2008 when they mailed to Lead Plaintiff his brokerage statement for the period from May 1 through May 31, 2008, that: "There is currently no publicly-traded market or price for ARS that are experiencing failed auctions."

80.     By reason of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, by employing devices, schemes and artifices to defraud, and/or engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class during the Class Period.

81.     At all relevant times, Defendants' manipulative conduct, directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.

82.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Citigroup ARS during the Class Period in an amount to be determined at trial.

83.     Lead Plaintiff and the Class have suffered damage because the prices paid and the interest rates set were not determined by the natural interplay of supply and demand when they purchased Citigroup ARS; rather they were set by the manipulative conduct alleged.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Citigroup and Global Markets)

84.     Lead Plaintiff repeats and realleges each of the allegations set forth in Count I.

85.     Citigroup acted as a controlling person of Global Markets and Smith Barney within the meaning of §20 of the Exchange Act.

86.     Citigroup, in its Form 10-K for fiscal year ended December 31, 2007 (the "2007 10-K"), describes itself as "a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers."

87.     According       to       Smith       Barney's       website,       at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008):

We Provide an End-to-End Platform

Through the full range of affiliated Citigroup companies, we provide an end-to-end platform of financial services—everything from cash management to financial planning, brokerage services, estate planning, block trading and alternative investments, in addition to M&A advisory services for middle-market privately held companies....

88.     Citigroup's 2007 10-K also illustrates Citigroup Segments and Products, and identifies Smith Barney as within Citigroup's Global Wealth Management business segment.

89.     According     to     Smith     Barney's     website,     at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008):

Citigroup Inc., a leading global financial services company, has some 200 million customer accounts. Citigroup does business in 100 countries, providing consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. Major brand names under Citigroup include ... Smith Barney ...

90.     Citigroup's 2007 10-K identifies Global Markets as one of the "Citigroup's primary U.S. broker-dealer subsidiary."

91.     Citigroup incorporates the financial results of Global Markets and Smith Barney into its own financial statements which it files with the SEC.

92.     Citigroup provides for litigation reserves against losses from legal proceedings in which it and its subsidiaries, including specifically Global Markets, are named defendants.

93.     Citigroup, by virtue of its ownership of Global Markets and Smith Barney, had the power to influence and control, and did influence and control, the misconduct of Global Markets and Smith Barney about which Lead Plaintiff complains.

94.     According     to     Smith     Barney's     website,     at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008): "Smith Barney is a division of Citigroup Global Capital Markets Inc., a global, full-service

financial firm that provides brokerage, investment banking and asset management services to corporations, governments and individuals around the world."

95.     Global Markets, by virtue of its relationship with Smith Barney, had the power to influence and control, and did influence and control, the misconduct of Smith Barney about which Lead Plaintiff complains.

96.     By reason of such wrongful conduct, Citigroup and Global Markets are liable pursuant to §20(a) of the Exchange Act.

97.     As a direct and proximate result of Citigroup's and Global Market's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Citigroup ARS from Defendants during the Class Period in an amount to be determined at trial.

**COUNT III**
**Violations of Section 80b-6 of the 1940 Act**
**(Against Smith Barney)**

98.     Lead Plaintiff repeats and realleges each of the allegations set forth in ¶¶1 through 7, 9, and 11-62.

99.     Lead Plaintiff brings this Count on behalf of all members of the Class who, during the Class Period, had an investment advisory contract with Smith Barney to provide investment advisory services, and who paid investment advisory fees to Smith Barney.

100.    Smith Barney is an investment adviser as defined in §80b-2(11) of the 1940 Act.

101.    Smith Barney engages in the business of providing investment advice either directly or indirectly through the use of the mails and/or other means of interstate commerce.

102.    Smith Barney and the other defendants engaged in manipulative conduct alleged above, specifically manipulating the market for Citigroup ARS in auctions operated by them.

103.   By reason of the conduct set forth herein, Smith Barney acted in violation of §80b-6 of the 1940 Act.

104.   Pursuant to §80b-15(b) of the 1940 Act, the contracts for the provision of investment advisory services are void, and Lead Plaintiff demands, on behalf of the members of the Class for whom this Count is brought, rescission of the contracts and a return of all monies and fees paid by these Class members to Smith Barney for investment advisory services in the Class Period that led to the purchase of Citigroup ARS during the Class Period.

## COUNT IV
## Breach of Fiduciary Duty
## (Against All Defendants)

105.   Lead Plaintiff repeats and realleges each of the allegations set forth in ¶¶1 through 7, and 10-62.

106.   Lead Plaintiff brings this Count on behalf of all members of the Class who acquired Citigroup ARS that are not "covered securities," as that term is defined in the Securities Litigation Uniform Standards Act, 15 U.S.C. §78bb(f)(5)(E) ("Covered Securities") and who have investment advisory contracts and discretionary accounts with Smith Barney.

107.   Defendants, by providing investment advice to the members of the Class for whom this Count is brought, owe a fiduciary duty to them to act in the best interests of these members of the Class rather than for themselves.

108.   Defendants, by engaging in the manipulative conduct alleged herein, violated their fiduciary duties to those members of the Class for whom this Count is brought.

109.   As a consequence of Defendants' intervention to prevent its Citigroup ARS auctions from failing as alleged above in ¶¶42 and 65, members of the Class for whom this Count is brought acquired Citigroup ARS without the knowledge that such intervention was at

Defendants' discretion, and that discretion would be exercised in Defendants' best interests.

110.    As a result of Defendant's breach of fiduciary duties, those members of the Class for whom this Count is brought have suffered damages in an amount to be determined at trial.

111.    The damages suffered by members of the Class for whom this Count is brought were a direct and foreseeable result, proximately caused by Defendant's breach of fiduciary duties.

### COUNT V
### Violations of the State Deceptive Practices Acts
### (Against Defendants Global Markets and Smith Barney)

112.    Lead Plaintiff repeats and realleges each of the allegations set forth in ¶¶1 through 7, 10-62, and 65.

113.    Lead Plaintiff brings this Count on behalf of all members of the Class who during the Class Period were residents of Arizona, Florida, Illinois, Maryland, Wisconsin, Colorado, Kentucky, New Mexico, Nebraska, Idaho, Delaware, South Dakota or North Dakota, and who acquired Citigroup ARS that are not Covered Securities.

114.    Defendants have engaged in the unfair or deceptive acts or practices set forth above to manipulate the market for Citigroup ARS with the intent that Lead Plaintiff and members of the Class rely on those manipulative acts or practices in connection with the purchase of Citigroup ARS.

115.    When Lead Plaintiff and other members of the Class on whose behalf this Count is brought purchased Citigroup ARS, they did so in reliance upon the integrity of the market for Citigroup ARS, specifically that the prices at which they purchased Citigroup ARS, the prices at which Citigroup ARS were sold, and the interest rates set on the Citigroup ARS were determined by the natural interplay of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct.

116.    Lead Plaintiff and other members of the Class on whose behalf this Count is brought would not have purchased the Citigroup ARS at the prices they paid, if at all, had they been aware of Defendants' manipulative conduct.

117.    As a result of Defendants' acts or practices in manipulating the market for Citigroup ARS (as alleged above in ¶¶36 through 60), Lead Plaintiff and the members of the Class for whom this Count is brought have suffered actual damages.

118.    Defendants maintain offices in Arizona, Florida, Illinois, Maryland, Wisconsin, Colorado, Kentucky, New Mexico, Delaware, South Dakota and North Dakota through which they transact business, including with Lead Plaintiff and those members of the Class for whom this Count is brought.

119.    Lead Plaintiff and the members of the Class for whom this Count is brought purchased Citigroup ARS in each Class Member's home state.

120.    As a result of the foregoing, Global Markets and Smith Barney have violated the following state statutes:

    (a)    Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann §44-1522 *et seq.* (2008);

    (b)    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201 *et seq.* (West 2008);

    (c)    Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. §505/1 *et seq.* (West 2008);

    (d)    Maryland Consumer Protection Act, Md. Code Ann., Comm. Laws §§13-301 *et seq.* (West 2008);

    (e)    Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. §100.18 (West 2007);

    (f)    Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. 6-1-101 *et seq.* (West 2008);

(g)     Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§367.110 *et seq.* (West 2007);

(h)     New Mexico Unfair Practices Act, N.M. Stat. Ann. §§57-12-1 *et seq.* (West 2008);

(i)     Delaware Consumer Fraud Act, Del. Code Ann. Tit. 6 §§2511 *et seq.* (West 2008);

(j)     South Dakota Deceptive Trade Practices and Consumer Act, S.D. Codified Laws §§37-24-1 *et seq.*; and

(m)     North Dakota Consumer Fraud Act, N.D. Cent. Code Ann. §51-15-01 *et seq.* (West 2007).

121.   By reason of the foregoing, Lead Plaintiff and members of the Class for whom this Count is brought have been damaged in an amount to be determined at trial.

## COUNT VI
### Injunctive Relief
### (Against All Defendants)

122.   Lead Plaintiff repeats and realleges each of the allegations set forth in ¶¶1 through 7, 10-18, and 25-62.

123.   Lead Plaintiff brings this Count on behalf of the Class pursuant to FED. R. CIV. P. 23(b)(2). The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  Defendants issued more than $30 billion of Citigroup ARS. During the Class Period, Defendants sold or offered for sale in Defendants-managed auctions billions of dollars of Citigroup ARS.

124.   Lead Plaintiff's claims in this Count are typical of the claims of the Class because he and the Class members have no market into which they may resell their Citigroup ARS without the explicit assistance of Defendants.

125.   Lead Plaintiff will adequately protect the interests of the Class.  Lead Plaintiff has

retained counsel who is experienced and competent in class action securities litigation. Lead Plaintiff has no interests which are in conflict with those of the Class.

126.    Questions of law and fact common to the Class include:

(a) whether Defendants have refused to make a market into which the Class may resell their Citigroup ARS; and

(b) whether Lead Plaintiff and the Class have no adequate remedy at law.

127.    On February 11, 2008, Defendants ceased their manipulation of the market for Citigroup ARS, the auctions for Citigroup ARS failed, and the investments of Lead Plaintiff and the Class in Citigroup ARS became illiquid.

128.    Defendants admitted, at least by June 2008 when they mailed to Lead Plaintiff his brokerage statement for the period from May 1 through May 31, 2008, that: "There is currently no publicly-traded market or price for ARS that are experiencing failed auctions."

129.    Defendants refuse to make a market into which Lead Plaintiff and the Class can resell Citigroup ARS, thereby making appropriate the final injunctive relief sought here, i.e., that Defendants should be enjoined from interfering with the ability of any member of the Class to resell their Citigroup ARS in a secondary market.

130.    As a consequence of the failure of the Citigroup ARS market on February 11, 2008 after Defendants ceased engaging in their manipulative conduct, Lead Plaintiff and the Class have been unable to sell their Citigroup ARS.

131.    Lead Plaintiff and the Class cannot sell the Citigroup ARS they purchased during the Class Period.

132.    By reason of the foregoing, Defendants should be enjoined from interfering with the ability of any member of the Class to resell their Citigroup ARS in a secondary market.

133.    Lead Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to FED. R. CIV. P. 23(a) and 23(b) on behalf of the Class defined herein;

B.    With respect to Counts I, II, IV, and V, awarding Lead Plaintiff and the members of the Class compensatory damages;

C.    With respect to Count III, awarding rescissionary damages;

D.    With respect to Count VI, granting Lead Plaintiff and the members of the Class equitable relief against Defendants, enjoining them from interfering with the ability of any members of the Class from selling their Citigroup ARS in a secondary market;

E.    Awarding Lead Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

F.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:        August 25, 2008

ZWERLING, SCHACHTER
& ZWERLING, LLP

By: _____ s/ Robert S. Schachter _____
    Jeffrey C. Zwerling
    Robert S. Schachter
    Hillary Sobel
    Paul Kleidman
    Justin M. Tarshis
    41 Madison Avenue, 32nd Floor
    New York, NY 10010
    Tel:  (212) 223-3900
    Fax:  (212) 371-5969
    jzwerling@zsz.com
    rschachter@zsz.com
    hsobel@zsz.com
    pkleidman@zsz.com
    jtarshis@zsz.com

*Lead Counsel for Lead Plaintiff Dr. Michael A. Passidomo and the Class*

CRIDEN & LOVE, P.A.
Michael E. Criden
Kim Lucas
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel.:  (305) 357-9000
Fax:  (305) 357-9050
mcriden@cridenlove.com
klucas@cridenlove.com

*Co-Counsel for Lead Plaintiff*

## CERTIFICATION OF LEAD PLAINTIFF DR. MICHAEL A. PASSIDOMO

I, Dr. Michael A. Passidomo, declare that:

1.  I have reviewed the Lead Plaintiff's Consolidated Amended Complaint in *In re Citigroup Auction Rate Securities Litigation*, Master File No. 08 Civ. 3095 (LTS)(FM) (the "Action") and authorize its filing.

2.  I did not purchase any security, which is the subject of this action, at the direction of Lead Counsel or my other counsel or in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  My transactions in the securities that are the subject of this action during the class period are described in the attachment to this Certification.

5.  During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in any action filed under the federal securities laws, with the exception of this Court appointing me as Lead Plaintiff in the Action.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond our *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Dr. Michael A. Passidomo, declare under penalty of perjury that the foregoing is true and correct.

August 20, 2008

_____
Dr. Michael A. Passidomo

Lead Plaintiff's Class Period Citigroup ARS Purchases

| Date Acquired | Description | Units | Unit Cost | Cost |
|---|---|---|---|---|
| 08/01/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 08/01/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 08/02/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 08/02/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 08/03/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 08/06/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 08/06/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 08/07/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 09/04/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 09/05/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 09/05/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 09/06/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 09/06/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 09/07/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 09/10/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 09/10/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 10/01/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |

1

| Date | Description | | | |
|---|---|---|---|---|
| 10/01/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 10/02/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 10/03/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 10/03/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 10/04/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 10/04/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 10/05/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 10/26/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 10/29/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 10/29/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 11/01/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 11/01/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 11/06/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 11/07/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 11/07/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 12/03/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 12/03/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 12/04/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 12/05/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |

2

| | | | |
|---|---|---|---|
| 12/05/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 12/06/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 12/06/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 12/07/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 01/02/08 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 01/02/08 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 01/03/08 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 01/03/08 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 01/04/08 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 63 | $ 25,002.75 | $ 1,575,173.25 |
| 01/07/08 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 01/07/08 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 01/08/08 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 01/25/08 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 63 | $ 25,002.75 | $ 1,575,173.25 |
| 02/04/08 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 39 | $ 25,000.00 | $ 975,000.00 |
| 02/04/08 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 02/05/08 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 02/06/08 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 02/06/08 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 02/07/08 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |

3

| 02/07/08 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
|---|---|---|---|---|

4