UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE: CITIGROUP AUCTION RATE SECURITIES LITIGATION,

This Document Relates To:

08 Civ. 3095

-------------------------------------------------------x

No. 08 Civ. 3095 (LTS)(FM)
No. 09 md 2043 (LTS)

**OPINION AND ORDER**

APPEARANCES:

ZWERLING, SCHACHTER & ZWERLING
By: Richard A Speirs, Esq.
Robert S. Schachter, Esq.
41 Madison Avenue
New York , NY 10010

*Attorneys for Lead Plaintiff*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
By: Brad Scott Karp, Esq.
Susanna Michele Buergel, Esq.
1285 Avenue of the Americas
New York, NY 10019
- and -
By: Charles Edward Davidow, Esq.
2001 K Street, N.W., 5th Floor
Washington , DC 20006

*Attorneys for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

By Order dated June 25, 2008, the Court consolidated the five putative class actions identified above under the caption In Re: Citigroup Auction Rate Securities Litigation, and appointed Michael A. Passidomo ("Passidomo" or "Plaintiff") as Lead Plaintiff. On August 26, 2008, Lead Plaintiff filed a Consolidated Amended Complaint (the "Complaint") alleging that named Defendants Citigroup, Inc. ("Citigroup"), Citigroup Global Markets, Inc. ("CGMI"), and Smith Barney[1] (collectively "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5(a) and (c) promulgated thereunder, Sections 206 and 215 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), and various state laws in connection with Defendants' underwriting and/or selling of Auction Rate Securities ("ARS") in auctions that Defendants managed. Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint for failure to state a claim upon which relief can be granted. Defendants also invoke Federal Rule of Civil Procedure 12(b)(1) in connection with their arguments that Plaintiff lacks standing to pursue certain of the claims asserted in the Complaint. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

The Court has reviewed thoroughly and considered carefully the parties' submissions and, for the following reasons, grants Defendants' motion to dismiss the Complaint.

## Background

The following facts are drawn from the Complaint unless otherwise indicated.

Plaintiff brings this action on behalf of all persons who purchased Citigroup ARS (including persons who placed hold orders for such securities) during the period from August 1,

---

1 The Court makes no determination as to the legal status of Defendant Smith Barney, which Defendants contend is not a separate suable entity, in view of the disposition of Defendants' motion.

2007, through February 11, 2008 (the "Class Period").  (Compl. ¶ 19.)

ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically reset through auctions.  (Compl. ¶ 27.)  Interest rates are paid in the current period based on a price determined at the prior auction.  (Id. at ¶ 29.)  Additionally, at the auctions, investors are able to resell their ARS.  (Id. at ¶ 28.)  A broker-dealer manages the auction process; most auctions are run by a single broker-dealer.  (Id. at ¶ 31.)  The auction agent collects orders from the broker-dealers, determines the amount of ARS available for sale, organizes the bids, and determines the clearing rate (i.e., the final rate at which all the of the ARS are sold).  (Id. at ¶ 32.)  If there are more ARS for sale than there are bids for the ARS, the auction fails and the holders of the ARS are unable to resell the ARS.  (Id. at ¶ 33.)

Defendants' Conduct

Defendants receive fees for services in connection with the auctions, including fees for underwriting offerings of Citigroup ARS, and "auction dealer fees" (fees paid on the principal amount of the securities places with investors through Defendants) for managing Citigroup ARS auctions.  (Id. at ¶¶ 40-41.)  A failed auction would result in the loss of underwriting and auction dealer fees.  (Id. at ¶ 42.)

During the Class Period, the supply of Citigroup ARS was increasing while demand was decreasing. (Id. at ¶ 43.)  Defendants knew that buyer demand for ARS did not match or exceed seller offerings of Citigroup ARS.  (Id. at ¶ 36.)  Defendants were aware that this imbalance would lead to failed auctions unless Defendants intervened.  (Id. at ¶ 37.)

Defendants regularly and increasingly intervened throughout the class period in order to prevent failed auctions.  (Id. at ¶ 42.)  When supply exceeded demand, Defendants submitted bids to ensure that the ARS offered at auction would be sold.  (Id. at ¶ 44.)  Defendants

continued to underwrite and/or act as a broker-dealer managing auctions despite their knowledge that supply outstripped demand. (Id. at ¶ 47.) Although Defendants' competitors experienced failed auctions during the Class Period, Defendants' conduct prevented Defendants' auctions from failing. (Id. at ¶ 44.) According to the Complaint, Defendants prevented the failed auctions in order to offset the negative impact of the subprime crisis and to generate underwriting, broker-dealer and auction dealer fees. (Id. at ¶ 66.)

        Plaintiff and other members of the putative class continued to purchase Citigroup ARS believing that the auction process was occurring as intended. (Id. at ¶ 45.) Defendants' increasing intervention into the auctions was unknown to Plaintiff and purported class members. (Id. at ¶ 46.) Citigroup ARS for which CGMI served as auction dealer during the Class Period included HIGHLANDS COUNTY FLA HEALTH FACS AUTH REV–VAR-HOSP-ADVENTIST HLTH SYS-B, dated August 8, 2007, auctioned every 7 days; EDUCATIONAL FDG SOUTH INC FLA EDL LN REV-VAR-AMT-STUDENT LN BKD-A-8, dated November 7, 2007, and auctioned every 28 days; CALIFORNIA STATEWIDE CMNTYS DEV AUTH REV-VAR- LA CNTY MUSEUM ART PJ-B, dated November 9, 2007, and auctioned every 7 days; HARRIS CNTY TEX HEALTH FACS DEV CORP HOSP REV-ARS-BAYLOR COLLEGE MED-A-4, dated November 15, 2007, and auctioned every 7 days; and VERMONT ST STUDENT ASSISTANCE CORP ED LN REV-ARS-TAXABLE-SER YY, dated December 5, 2007, and auctioned every 28 days. (Id. at ¶ 48.) Defendants' "auction desk" continued to tout new issues for which Citigroup ARS would be sold during the Class Period, id. at ¶ 49, and also increased both the commission rates to brokers and the interest rates paid to investors in order to entice brokers and investors, id. at ¶¶ 52, 54. Defendants' auction desk told Smith Barney brokers that the attractive terms did not reflect any increased risk associated with the ARS. (Id. at ¶ 55.)

On February 11, 2008, Defendants ceased intervening in the auctions to prevent the auctions from failing. (Id. at ¶ 59.) All of Defendants' Citigroup ARS auctions failed. (Id.) Plaintiff and the members of the putative class were unable to sell their Citigroup ARS. (Id.) In a brokerage statement for the February 1, 2008, through February 29, 2008, period, a "Message" stated "that the Auction-Rate Securities (ARS) market is experiencing a supply and demand imbalance, resulting in failed auctions and significantly reduced or lack of liquidity." (Id. at ¶ 60.)

Following the auction failures, there was no longer a market for Citigroup ARS and Plaintiff and other class members have been unable to sell the ARS, rendering them illiquid. (Id. at ¶¶ 77-78.) Plaintiff and other class members relied upon the integrity of the market for Citigroup ARS, specifically the understanding that the prices at which the ARS were sold, and the interest rates set, were determined by the natural interplay of supply and demand, and they would not have purchased these ARS at the prices they paid, if at all, if they had been aware of Defendants' manipulative conduct. (Id. at ¶¶ 75-76.)

2006 SEC Order and Subsequent Disclosures

Following an investigation into some of the practices described above and prior to the commencement of the Class Period, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, dated May 31, 2006 ("the "2006 SEC Order"). (See Declaration of Charles E. Davidow ("Davidow Decl."), Ex. 1.)[2] This 2006 SEC Order, which is available on

---

[2] The Court takes judicial notice of the 2006 SEC Order concerning ARS practices and disclosure requirements, the disclosure statements printed on Plaintiff's trade confirmations and incorporated from the Citigroup Smith Barney website by reference therein, and the prospectus-type "official statements" issued in connection

the SEC website, described the conduct of certain broker-dealers, including CGMI, in the ARS market. (Davidow Decl. at ¶ 2, Ex. 1.) Specifically, the 2006 SEC Order described broker-dealer practices in connection with ARS auctions including intervention in the auctions through bidding from their proprietary accounts, and asking customers to make or change orders, without adequately disclosing such conduct. (Id., Ex. 1, at p 6.) According to the 2006 SEC Order, the broker-dealers intervened to prevent failed auctions, to set a "market" rate, and to prevent all-hold auctions. (Id.) The 2006 SEC Order noted that, in certain instances, such intervention affected the clearing rate. (Id.) As part of the remedial action ordered, CGMI was directed to provide all customers who purchased ARS from CGMI with a written description of the material auction practices and procedures. (Id. at p. 10.) The 2006 SEC Order provides that the disclosure requirement can be

---

with the ARS offerings cited in the Complaint. (Davidow Decl. Exs. 1-7, 16-28.) Judicial notice of such public and transaction documents integral to Plaintiff's information-related market manipulation claims is appropriate and does not require conversion of the motion to one for summary judgment. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) ("where public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records"); see also Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (The Second Circuit has long "held that for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6): '[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'" quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)); see also Staehr v. Hartford Financial Services Group, 547 F.3d 406, 426 (2d Cir. 2008) (district court did not err by refusing to convert appellees' motion to one for summary judgment; although a Rule 12(b)(6) motion to dismiss shall be treated as one for summary judgment if matters outside the pleadings are presented to and not excluded by the court, "matters judicially noticed by the District Court are not considered matters outside the pleadings."). Although Plaintiff has objected to the Court taking judicial notice of anything other than his trade confirmations, Plaintiff has not contested the authenticity of the documents of which the Court takes judicial notice. Plaintiff's request, in footnote 9 of its brief, to conduct discovery in connection with this motion is denied.

satisfied by including a written notification with the trade confirmation that a written description of the Respondent's material auction practices and procedures is available on a specified page of the broker-dealer's website. (Id.)

Trade confirmations for ARS purchases that Plaintiff made from CGMI included language stating: "FOR A DESCRIPTION OF CITIGROUP GLOBAL MARKETS, INC.'S AUCTION PRACTICES AND PROCEDURES PLEASE VISIT WWW.SMITHBARNEY.COM/PRODUCTS_SERVICES/FIXED_INCOME/AUCTION_RATE_SECURITIES/" and stating that hard copy was available upon request. (See, e.g., Davidow Decl., Exs. 3-7.) The practices and procedures section of the November 14, 2006, version of the website disclosure proffered by Defendants on this motion practice states, inter alia, that Citigroup is permitted to submit orders for its own account, that, in doing so, it would have an advantage over other bidders, and that, where Citigroup was the only broker-dealer, it could set the clearing rate with its order. (Davidow Decl., Ex. 2.) This section also states that Citicoup may routinely place one or more bids in an auction in order to prevent a failed auction or to prevent an auction from clearing at a rate that Citigroup does not believe reflects the market for the ARS being auctioned. (Id.) The website further states that "[b]ids by Citigroup or by those it may encourage to place bids are likely to affect (i) the auction rate – including preventing the auction rate from being set at the Maximum Rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Citigroup not bid or not encouraged others to bid . . . ." (Id.)

The official statements for the five Citigroup ARS identified in the body of the Complaint include similar disclosure language regarding broker-dealer conduct. (See, e.g., Davidow Decl., Ex. 16, Official Statement for the Highlands County Health Facilities Authority, Hospital Revenue Bonds, at p. 13 ("Each Broker-Dealer is permitted, but not obligated, to submit

Orders in Auctions . . . The respective Broker-Dealers routinely place bids in Auctions generally for their own accounts to acquire securities for their inventories, to prevent an 'Auction Failure' . . . or to prevent an auction from clearing at a rate that such Broker-Dealer believes does not reflect the market for such securities."); id. at p. 14 ("The Broker-Dealers are not obligated to continue to place such Bids . . . to prevent an Auction Failure . . .").) They also include language that describes the advantages a broker-dealer bidding for its own account would have over other bidders. (Id. at p. 13.)

## DISCUSSION

In deciding a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do." Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citation omitted). Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citations omitted). This Twombly standard applies to all civil actions. Id. at 1953.

Securities fraud claims are also subject to additional pleading requirements. Lead Plaintiff's Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Produce 9(b) and the Private Securities Litigation Reform Act of 1995 (the

"PSLRA"). Rule 9(b) requires that allegations of fraud be stated with particularity. Fed. R. Civ. P. 9(b). Under the PSLRA, in an action for money damages requiring proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2) (West 2009).

A court considering a motion to dismiss "is normally required to look only to the allegations on the face of the complaint." Roth, 489 F.3d at 509. However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Id. Courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). The Court may also consider matters subject to judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also Staehr v. Hartford Financial Services Group, 547 F.3d 406, 425 (2d Cir. 2008) ("Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, we have acknowledged that the court may also consider matters of which judicial notice may be taken." (internal quotation marks omitted)).

Market Manipulation

Plaintiff alleges that Defendants engaged in market manipulation in violation of Section 10(b) and Rule 10b-5(a) and (c).[3] In order to state a claim for market manipulation, a

3 The Complaint does not assert, and Plaintiff's memorandum of law in opposition to Defendants' motion specifically disavows, any Section 10(b) claim based on

plaintiff must allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI, 493 F.3d at 101. Although market manipulation is a claim for fraud and is therefore subject to the heightened pleading requirements of Rule 9(b), at early stages of the litigation a plaintiff need not plead manipulation to the same degree of specificity as a simple misrepresentation claim. Id. at 101-102. "Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." Id. at 102. The PSLRA's heightened pleading standard for scienter also applies to a market manipulation claim. Id.

*Plaintiff's Fraud Allegations*

Plaintiff's market manipulation claim fails because he has not met the heightened pleading standard of Rule 9(b). Although less specificity is required in pleading a market manipulation claim than for a claim based on simple misrepresentation, "general allegations not tied to the defendants or resting upon speculation are insufficient." ATSI, 493 F.3d at 102. Instead, a claim for market manipulation must include specific, particularized allegations as to the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants in that conduct. Id. As the Second Circuit stated in ATSI, "[t]his test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id. at 102 (noting that this test met the Rule 9(b) goals, while also considering

---

material misrepresentations or omissions. (See Pl.'s Opp. at 11, heading 2, "The [Complaint] alleges manipulative conduct, not misrepresentations or omissions.")

what facts a plaintiff can realistically plead at such an early stage of the litigation). Plaintiff's Complaint does not include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect. Instead, Plaintiff relies on general and conclusory allegations regarding Defendants' practices in connection with ARS auctions. Absent particularized allegations regarding Defendants' alleged manipulative conduct, Plaintiff cannot state a claim for market manipulation.

*Scienter*[4]

Plaintiff's Complaint also fails to meet the PSLRA's heightened pleading standard for scienter. Under the PSLRA, a plaintiff must plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors. 15 U.S.C.A. § 78u-4(b)(2) (West 2009); see also ATSI, 493 F.3d at 102 ("This pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."). A plaintiff may satisfy this heightened pleading requirement by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. In evaluating a complaint to determine whether the facts alleged give rise to a strong inference of scienter, courts must take into account plausible opposing inferences. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). It is not enough that the inference of scienter is merely "reasonable" or "permissible," "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as

---

4 The Court rejects Plaintiff's request to draw an adverse inference based on Defendants' alleged spoliation of evidence, Compl. at ¶¶ 71-72. At this stage in the proceedings, the Court is assessing the sufficiency of Plaintiff's pleading and is not engaged in weighing evidence.

compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

Plaintiff has failed to allege facts giving rise to a strong inference of scienter either by alleging motive and opportunity or by alleging strong circumstantial evidence of conscious misbehavior or recklessness. Plaintiff's conclusory allegations regarding Defendants' motive for the alleged manipulation focus principally on Defendants' desire to sell Citigroup ARS to offset subprime market losses and to obtain fees for services in connection with the auctions; they are insufficient to give rise to a strong inference of scienter. Insofar as Plaintiff's allegations of scienter rest on arguments that Defendants' were motivated to offset possible losses from other business activities, the motive allegation is too generalized to meet the scienter pleading requirement. See Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001) (summarizing earlier holdings that motive to show profitability, which is common to all for-profit enterprises, is too generalized to support viable scienter claim).

Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter. See, e.g., Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute."); In re Marsh & Mclennan Companies, Inc. Securities Litigation, 501 F. Supp. 2d 452, 489 (S.D.N.Y. 2006) ("Although an auditor's receipt of consulting fees inordinately disproportionate to its auditing fees may give rise to a proper inference of motive . . . allegations of payment for services rendered are generally inadequate."); Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) ("alleged desire to realize greater transaction fees and its close relationship with [financial services holding company client] are insufficient to show an improper motive [on part of the investment banking firm]").

Plaintiff has also failed to allege particularized facts giving rise to a strong inference of scienter based on circumstantial evidence of conscious misbehavior or recklessness. Instead, the very market conditions – specifically the "subprime crisis" – that Plaintiff cites in his Complaint in connection with Defendants' intent to continue receiving ARS-related fees, give rise to an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors. Plaintiff's failure to allege particularized facts giving rise to an inference of scienter at least as strong as any opposing inference requires dismissal of the market manipulation claim.

*Reliance*

As Plaintiff has acknowledged, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999); see also ATSI, 493 F.3d. at 100 ("The deception [in a market manipulation claim] arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." (internal quotation marks and citations omitted).) Thus, as the Second Circuit stated in ATSI, a necessary element of a market manipulation claim is that the damage alleged was caused by reliance on an (ultimately incorrect) assumption of an efficient market free of manipulation. ATSI, 493 F.3d at 101. Additionally, the Second Circuit "ha[s] noted '[t]he general rule . . . that reasonable reliance must be proved as an element of a securities fraud claim.'" First Lincoln Holdings, Inc. v. Equitable Life Assurance Society of U.S., 43 Fed. Appx. 462, 463 (2d Cir. 2002) (emphasis in the original) quoting Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996).

Plaintiff has specifically disclaimed any invocation of the "fraud-on-the-market" approach to the reliance element of his market manipulation claim. Where fraud on the market is plead, there is a rebuttable presumption: "that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004). Unrebutted, this presumption allows a securities fraud plaintiff to satisfy the reliance element of the Exchange Act. Id. However, where a plaintiff does not plead that the market in which he purchased his shares was efficient, he cannot rely on the "fraud-on-the-market presumption" of reliance, and must instead specifically allege reliance. See, e.g., In re Initial Public Offering Securities Litigation, 471 F.3d 24, 42-43 (2d Cir. 2006) ([Basic Inc. v. Levinson, 485 U.S. 224, 245-47 (1988)] fraud-on-the-market presumption of reliance not applicable where Plaintiffs' own allegations and evidence demonstrate that an efficient market could not be established). Here, Plaintiff does not plead market efficiency and, in connection with this motion practice, specifically acknowledges that the market was not efficient, stating that "[b]ecause Citigroup ARS did not trade on an open, public market, Plaintiff does not invoke the fraud on the market theory." (See Pl.'s Opp. at 12.)

Plaintiff must therefore plead facts sufficient to demonstrate the basis for his reliance; the Complaint is fatally deficient in this regard. Plaintiff here has offered only conclusory allegations of reliance. He alleges that he and the class members "believ[ed] the 'auction process' was in fact occurring as an auction is intended" and that he "purchased Citigroup ARS . . . in reliance upon the integrity of the market for Citigroup ARS, specifically that the prices . . . were determined by the natural interplay of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct." (Compl. at ¶¶ 45, 75.) Plaintiff does not identify any basis for

the market "integrity" assumption upon which the class allegedly relied.

Furthermore, the documents proffered by Defendants, and of which the Court takes judicial notice, negate any inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable. The 2006 SEC Order, Plaintiff's trade confirmations and language from the Citigroup Smith Barney website incorporated by reference therein, and the official statements issued in connection with ARS specifically enumerated in the Complaint, all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them. (See Davidow Decl., Exs. 1-7, 16-21.) These documents disclosed that the ARS market was not necessarily set by the "natural interplay of supply and demand," but that they could be set by broker-dealers, such as CGMI. Plaintiff's failure to proffer specific factual allegations as to the basis for his alleged reliance on market "integrity" is, in the face of such disclosures and his disclaimer of any contention that the ARS market was efficient, fatal to his claim for market manipulation.

Section 10(b)'s prohibition on manipulative practices "is fully consistent with the fundamental purpose of the [Exchange] Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor." ATSI, 493 F.3d at 100 quoting Santa Fe Ind., Inc. v. Green, 430 U.S. 462, 476-477 (1977). Here, Defendants disclosed the practices of which Plaintiff now complains; absent specific allegations of the basis for Plaintiff's incorrect assumptions about the ARS market and the reasonableness of the alleged reliance in the face of such disclosure, Plaintiff's market manipulation claim must be dismissed.

*Loss Causation*

Plaintiff's market manipulation claim also fails because the Complaint's loss causation allegations are insufficient. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted). Plaintiff has failed to allege that he suffered any specific economic harm as result of Defendants' conduct and, thus, he has not alleged loss causation sufficiently. See, e.g., In re UBS Auction Rate Securities Litigation, No. 08 Civ. 2967, 2009 WL 860812, at * 3 (S.D.N.Y. 2009) ("To state a cause of action for either material misstatement or omission or for market manipulation under § 10(b) and Rule 10b-5, a plaintiff must plead a theory of damages cognizable under the Rule."); see also 15 U.S.C.A. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). Plaintiff does not specifically allege that he tried to sell his ARS, nor does he allege that the interest rates set through Defendants' allegedly manipulative conduct were lower than they would have been absent such conduct.

Investment Advisers Act Claim

Defendants move to dismiss Plaintiff's claim that Smith Barney violated Section 80b-6 of the Investment Advisers Act on the grounds that Plaintiff does not have standing to assert such a claim. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III"); Central States Southeast and Southwest Areas Health and Welfare Fund v.

Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."). Plaintiff argues that the Court has jurisdiction of the Investment Advisers Act claim because he brings it "on behalf of all members of the Class who, during the Class Period, had an investment advisory contract with Smith Barney to provide investment advisory services, and who paid investment advisory fees to Smith Barney." (Pl's Opp. at 32, quoting Compl. at ¶ 99.)

        Although a lead plaintiff himself need not have standing to assert every claim that may be made on behalf of all the potential class and subclass members, it is not sufficient to assert, without identifying the class members implicated and without any factual support, that there are class members who would have such a claim. See In re Global Crossing, Ltd. Securities Litigation, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003) ("nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case"); In re Authentidate Holding Corp., No. 05 Civ. 5323, 2006 WL 2034644, at *6-7 (S.D.N.Y. July 14, 2006) (Lead plaintiff lacked standing to bring a Section 11 claim where "[t]he Complaint asserts, without identifying the Class Members implicated and without any factual support, that 'Class Members acquired Authentidate common stock traceable to the February 2004 Registration Statement.'"). Instead, "[i]n conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims." In re Global Crossing, Ltd. Securities Litigation, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003). As the court noted in In re Initial Public Offering Securities Litigation,

214 F.R.D. 117 (S.D.N.Y. 2002), "[c]ourts in this circuit have repeatedly held that, [i]n order to maintain a class action, Plaintiffs must first establish that they have a valid claim with respect to the shares that they purchased. If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim." Id. at 122 (internal quotation marks omitted); see also Baughman v. Pall Corp., 250 F.R.D. 121, 127 (E.D.N.Y. 2008) ("any concerns with respect to [potential Lead Plaintiff's] ability to represent plaintiffs who purchased shares after the partial disclosures are mitigated by [its] obligation, as Lead Plaintiff, to designate appropriate named plaintiffs to assist in advancing such claims"); see also Hevesi v. Citigroup Inc., 366 F.3d 70, 82-83 (2d Cir. 2004) (recognizing that because of the PSLRA requirements regarding the lead plaintiff's financial stake in the case, the lead plaintiff will not always have standing to sue on every claim, but noting that "the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class").

Plaintiff's general allegations that there are class members who entered into an investment advisory contract with Smith Barney, in the absence of any specific factual allegations identifying such class members or the alleged investment advisory contracts, are insufficient to demonstrate the requisite existence of a representative plaintiff with standing to pursue the Investment Advisers Act claim on behalf of the class. Plaintiff's Investment Advisers Act claim must, accordingly, be dismissed for lack of subject matter jurisdiction.

Control Person Liability

Plaintiff asserts claims for control person liability under Section 20(a) against Defendants Citigroup and CGMI. "To establish a prima facie case of control person liability, a

plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communications, 493 F.3d at 109. Plaintiff has failed to allege sufficiently any primary violation and, thus, his Section 20(a) claims must fail.

State Law Claims

Plaintiff also asserts claims for breach of fiduciary duty against all Defendants and claims for violations of various state deceptive practices acts against CGMI and Smith Barney. Defendants argue that Plaintiff's own claims, which relate to "covered securities," are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which "makes federal courts the exclusive venue of, and federal law the exclusive source of remedy for, certain class actions alleging securities claims." Dacey v. Morgan Stanley Dean Witter & Co., 263 F. Supp. 2d 706, 709 (S.D.N.Y. 2003). Plaintiff argues that he is only bringing these state law claims on behalf of those class members who purchased Citigroup ARS that are not "covered securities" under SLUSA. (See Pl's Opp. at p. 25; Compl. at ¶¶ 106, 113.) Lead Plaintiff, however, lacks standing to pursue such claims on behalf of absent class members and the Complaint does not specifically identify representative class members who have purchased Citigroup ARS that are not "covered securities" under SLUSA. Conclusory allegations that such ARS and such class members exist are insufficient, for the reasons discussed in connection with the Court's dismissal of Plaintiff's Investment Advisers Act claim. Accordingly, the breach of fiduciary duty and state statutory claims in the Complaint are dismissed as preempted by SLUSA insofar as they are asserted on behalf of Lead Plaintiff and other purchasers of "covered securities," and are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction insofar as they are

asserted on behalf of putative class members who did not purchase "covered securities."

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted, without prejudice to Plaintiff's ability to file an amended complaint. Any amended complaint must be filed and served by October 1, 2009, with a courtesy copy provided for Chambers. Failure to file and serve a timely amended pleading will result in the entry of judgment, without further advance notice to the parties to these consolidated putative class actions, dismissing Counts One and Two with prejudice, dismissing Counts Four and Five as preempted by SLUSA insofar as they relate to "covered securities" and dismissing Counts Three, Four and Five for lack of subject matter jurisdiction insofar as they assert claims under the Investment Advisers Act or state law claims relating to securities that are not "covered" within the meaning of SLUSA. This Opinion resolves docket entry no. 47.

SO ORDERED.

Dated: New York, New York
September 11, 2009

LAURA TAYLOR SWAIN
United States District Judge