UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP AUCTION RATE SECURITIES LITIGATION | MASTER FILE 08 Civ. 3095 (LTS) |
| | 09-MD-2043-LTS |
| This Document Relates to: *In re Citigroup Auction Rate Securities Litigation*, 08-cv-03095 LTS | **ORAL ARGUMENT REQUESTED** |

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT

ZWERLING, SCHACHTER & ZWERLING, LLP
Robert S. Schachter
Hillary Sobel
Stephen J. Riegel
Paul Kleidman
Justin M. Tarshis
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969
rschachter@zsz.com
hsobel@zsz.com
sriegel@zsz.com
pkleidman@zsz.com
jtarshis@zsz.com

*Lead Counsel for Lead Plaintiff Dr. Michael A. Passidomo and the Class*

CRIDEN & LOVE, P.A.
Michael E. Criden
Kevin Love
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel: (305) 357-9000
Fax: (305) 357-9050
mcriden@cridenlove.com
klove@cridenlove.com

*Co-Counsel for Lead Plaintiff*

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Factual Background ............................................................................................................... 3

ARGUMENT ........................................................................................................................ 4

I.  The SCAC Sufficiently Alleges Defendants' Market Manipulation ............................... 4

    A.  Defendants' Manipulation Constitutes Unlawful Conduct ................................. 4

    B.  The SCAC Satisfies the Pleading Requirements of Rule 9(b) ........................... 7

    C.  The SCAC Specifies the Basis for the Class's Reasonable Reliance Upon the Natural Interplay of Supply and Demand ................................................................. 12

        1.  The SCAC alleges reasonable reliance on an unmanipulated market ................. 12

        2.  Defendants do not proffer a contrary inference that negates the SCAC's allegations of reasonable reliance ........................................................................ 13

    D.  The SCAC Alleges Defendants' *Scienter* ....................................................... 15

        1.  Defendants' conscious manipulation of the Citigroup ARS market ................. 15

        2.  Defendants' documents concede their motive ................................................... 18

II.  Passidomo Stated His Own Cognizable Loss and Loss Causation ............................... 20

    A.  The Regulatory Settlement Preserves Class Claims ......................................... 21

        1.  The Regulatory Settlement did not operate to release Class claims ................. 23

        2.  Passidomo has properly pled benefit-of-the-bargain damages ......................... 24

    B.  Passidomo Adequately Alleges Loss Causation ............................................... 26

III.  The SCAC Alleges Secondary Liability ..................................................................... 29

CONCLUSION .................................................................................................................... 30

## TABLE OF AUTHORITIES

Cases

*Aimis Art Corp. v. Northern Trust Secs., Inc.,*
   641 F. Supp. 2d 314 (S.D.N.Y. 2009)........................................................................21

*Air et Chaleur, S.A. v. Janeway,*
   757 F.2d 489 (2d Cir. 1985) .....................................................................................22

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007) ................................................................................passim

*Brotman v. National Life Ins. Co.,*
   No. 94 CV 3468 (SJ), 1999 WL 33109 (E.D.N.Y. Jan. 22, 1999) ..........................8

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,*
   423 F. Supp. 2d 348 (S.D.N.Y. 2006).....................................................................28

*ClearOne Comm'ns, Inc. v. Lumbermens Mut. Cas. Co.,*
   No. 2:04-CV-00119 TC, 2005 WL 2716297 (D. Utah Oct. 21, 2005) ...................8

*Cortec Indus., Inc. v. Sum Holding L.P.,*
   949 F.2d 42 (2d Cir. 1991) ......................................................................................13

*Davidoff v. Farina,*
   No. 04 Civ. 7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)...........19, 20

*Dover Ltd. v. Assemi,*
   No. 08 Civ. 1337 (LTS)(JCF), 2009 WL 2870645 (S.D.N.Y. Aug. 5, 2009) .......26

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)................................................................................................27

*Federal Ins. Co. v. Sabine Towing & Transp. Co.,*
   783 F.2d 347 (2d Cir. 1986) ....................................................................................22

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994) ......................................................................................28

*GFL Advantage Fund, Ltd. v. Colkitt,*
   272 F.3d 189 (3d Cir. 2001) ......................................................................................6

*Gurary v. Winehouse,*
   190 F.3d 37 (2d Cir. 1999) ......................................................................................12

*Hawkins v. Inserra,*
   No. 8:07CV368, 2007 WL 4527836 (D. Neb. Dec. 18, 2007)...............................29

*Healthcare Fin. Group, Inc. v. Bank Leumi USA,*
   No. 08 Civ. 11260 (VM), 2009 WL 3631036 (S.D.N.Y. Oct. 26, 2009) ............................................27

*In re AOL Time Warner, Inc. Sec. Litig.,*
   503 F. Supp. 2d 666 (S.D.N.Y. 2007)....................................................................................................27

*In re Bristol-Myers Squibb Sec. Litig.,*
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................................................20

*In re Currency Conversion Fee Antitrust Litig.,*
   361 F. Supp. 2d 237 (S.D.N.Y. 2005)....................................................................................................23

*In re Initial Public Offering Sec. Litig.,*
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...........................................................................................*passim*

*In re Initial Public Offerings Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006) .................................................................................................................5, 7

*In re Initial Public Offering Sec. Litig.,*
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)....................................................................................................27

*In re JP Morgan Chase Sec. Litig.,*
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................................................19, 20

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
   218 F.R.D. 76 (S.D.N.Y 2003) ...............................................................................................................8

*In re Pfizer, Inc. Sec. Litig.,*
   584 F. Supp. 2d 621 (S.D.N.Y. 2008)...............................................................................................27-28

*In re Tommy Hilfiger, Sec. Litig.,*
   No. 04-civ-7678, 2007 WL 5581705 (S.D.N.Y. July 20, 2007)..............................................................30

*In re UBS Auction Rate Sec. Litig.,*
   No. 08 CV 2967 (LMM), 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) .............................................21, 25

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001) .................................................................................................................18

*Kauffmann v. Yoskowitz,*
   No. 85 Civ. 8414 (PKL), 1989 WL 79364 (S.D.N.Y. July 13, 1989) .....................................................26

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) ......................................................................................................27, 28, 29

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887 (2d Cir. 1976) ..................................................................................................................8

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,*
   No. 02 Civ. 1230 (LMM), 2003 WL 21088506 (S.D.N.Y. May 14, 2003) ........................................ 19

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) ........................................................................................................ 18

*Osofsky v. Zipf,*
   645 F.2d 107 (2d Cir. 1981) ........................................................................................................ 24

*Panos v. Island Gem Enters., Ltd.,*
   880 F. Supp. 169 (S.D.N.Y. 1995) ............................................................................................ 20, 24

*Roth v. Jennings,*
   489 F.3d 499 (2d Cir. 2007) ........................................................................................................ 14

*Rothenberg v. Perelman,*
   No. 89 Civ. 4308, 1990 WL 3244 (S.D.N.Y. Jan. 9, 1990) ......................................................... 5

*S.E.C. v. First Jersey Securities Inc.,*
   101 F.3d 1450 (2d Cir. 1996) ........................................................................................................ 4

*Santa Fe Indus. v. Green,*
   430 U.S. 462 (1977) ....................................................................................................................... 27

*Schlanger v. Four-Phase Sys. Inc.,*
   555 F. Supp. 535 (S.D.N.Y. 1982) ............................................................................................... 30

*Schreiber v. Burlington Northern, Inc.,*
   472 U.S. 1 (1985) ............................................................................................................................ 5

*Sedona Corp. v. Ladenburg Thalmann & Co.,*
   No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ........................ 30

*Sullivan & Long, Inc. v. Scattered Corp.,*
   47 F.3d 857 (7th Cir. 1995) ........................................................................................................... 6

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.,*
   No. 06-CV-13447 (CM), 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ...................................... 29

*United States v. Gilbert,*
   668 F.2d 94 (2d Cir. 1981) ............................................................................................................ 8

*United States v. Mulheren,*
   938 F.2d 364 (2d Cir. 1991) ........................................................................................................ 6

*Van Syckle v. C.L. King & Assocs., Inc.,*
   822 F. Supp. 98 (N.D.N.Y. 1993) ............................................................................................... 22

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.,*
 No. 08 Civ. 7422(VM), 2009 WL 4668579 (S.D.N.Y. Dec. 9, 2009) ....................................................4

*Vogel v. Sands Bros. & Co.,*
 126 F. Supp. 2d 730 (S.D.N.Y. 2001)...............................................................................................18, 19

*Wigand v. Flo-Tek, Inc.,*
 609 F.2d 1028 (2d Cir. 1979) ...........................................................................................................25

*Zisholtz v. SunTrust Banks, Inc.,*
 No. 1:08-cv-1287-TWT, 2009 WL 3132907 (N.D. Ga. Sept. 24, 2009) ......................................11, 17

Statutes

Securities Exchange Act of 1933 §10(a)(3), 15 U.S.C. §77j(a)(3) ..........................................................14

Securities Exchange Act of 1934 §28(a), 15 U.S.C. §78bb(a)...............................................................24

Securities Exchange Act of 1934, §10(b), 15 U.S.C. §78j(b) .............................................................*passim*

Rules

Fed. R. Civ. P. 23(c).............................................................................................................................23

Fed. R. Civ. P. 23(d) .............................................................................................................................2

Fed. R. Civ. P. 23(e)..............................................................................................................................2

Regulations

17 C.F.R. §230.427..............................................................................................................................14

PRELIMINARY STATEMENT

Defendants'[1] motion rests upon two inconsistencies. First, Defendants claim that because Lead Plaintiff Passidomo ("Passidomo" or "Plaintiff") availed himself of their offer contained in the Global Markets settlement (the "Regulatory Settlement")[2] his claims fail; yet that settlement specifically preserved the claims here. Second, Defendants impugn Passidomo's use of the SEC Complaint (and other consent orders) asserting they may not establish Defendants' liability here; yet Defendants rattle the 2006 SEC Order as a sword by which to avoid liability for their misconduct. Defendants cannot have it both ways.

Defendants ignore the facts hoping the Court will do the same. Defendants suggest that notwithstanding that Passidomo has comported with the Court's September 11, 2009 Opinion and Order (the "*Sept. 11th Op.*") to provide more specificity for a market manipulation claim, Plaintiff has "cured none of the defects" of the initial complaint. A review of the SCAC's allegations demonstrates that Defendants' argument has no merit.

Defendants' own documents – quoted in the SCAC as produced to regulators and as described by the regulators in their complaints – provide a sufficient basis upon which this Court can conclude Plaintiff has adequately alleged that Defendants:

- manipulated the market for Citigroup ARS, intervening into the Citigroup ARS market by increasing the amount of Citigroup ARS they purchased, thus fostering the illusion that there existed ample buyers for Citigroup ARS other than Defendants (*see, e.g.*, ¶¶10, 62);

- recognized during the Class Period that investors believed that the market for Citigroup ARS had legitimate liquidity, *i.e.*, that sufficient buyers and sellers existed for the Citigroup ARS, while knowing that the contrary was true (*see, e.g.*, ¶¶73-74);

---

[1] All capitalized terms have the same meaning as in the Second Consolidated Amended Complaint ("SCAC") unless otherwise noted. "¶" citations refer to the SCAC.

[2] The Regulatory Settlement offered to purchase Citigroup ARS only from *some* investor Class members, *i.e.*, "retail investors," referred to as "Eligible Investors" (*see Declaration of Hillary Sobel*, dated January 21, 2010 (the "*Sobel Decl.*"), Ex. A at 3.I.B.), for a purported value of $7 billion out of over $30 billion in outstanding Citigroup ARS at the close of the Class Period. ¶32.

• understood the effect of their wholesale stoppage of intervening into the Citigroup ARS market (*see, e.g.*, ¶¶11, 85, 101, 104-105); and thus

• provided a motive for Defendants to delay the occurrence of those effects. *See, e.g.*, ¶¶59, 94-95.

Notably, Defendants do not contest engaging in any of the conduct alleged; they do not even contest engaging in their conduct knowingly. At bottom, Defendants only argue that their conduct, as alleged in the SCAC, did not run afoul of §10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"). Yet, unquestionably the SEC and the courts have found market manipulation, *i.e.*, a rigging of the market, rather than "permit[ting the] operation of the natural law of supply and demand," is illegal. The 2006 SEC Order concluded that mere "intervention into auctions" without proper disclosure violated certain *disclosure* laws; it did not suggest or condone market manipulation, let alone even address it. Moreover, the disclosure of some possible "intervention into auctions" does not disclose the wholesale control exercised by Defendants over Citigroup ARS auctions such that no true market existed during the Class Period. The SCAC alleges all of this and more.

Further, Passidomo has suffered damages, as have all investors in Citigroup ARS, resulting from Defendants' manipulative conduct. Defendants – much as they try to convince the Court otherwise – did not buy their way out of this litigation through the Regulatory Settlement; they did not obtain a release, which constitutes the only proper way for the Defendants to have avoided liability here. Were the Court to hold otherwise, it would nullify not only the claims specifically preserved by and carved out of the Regulatory Settlement, but also the requirement that a district court approve the compromise of class claims. *See* FED. R. CIV. P. 23(d), (e).

Accordingly, the SCAC satisfies the pleading prerequisites of the Fed. R. Civ. P., the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and the *Sept. 11th Op.*

**FACTUAL BACKGROUND**

Beginning in the summer of 2007 and throughout the Class Period, Defendants knew that sellers outstripped buyers of Citigroup ARS. ¶¶54-57, 89.  This imbalance required increasing intervention into Citigroup ARS auctions to prevent their failures.[3] ¶¶58-62, 68. Indeed, Defendants openly discussed the circumstances of the imbalance and the consequences to themselves and to investors in e-mails. For example:

> "[O]n August 16, 2007 [*i.e.*, just after the Class Period commenced], Short-Term Trading management emailed senior management, 'We need to discuss the current state of the auction rate market, ***our commitment to the auctions***, its ***impact on our balance sheet*** and the effect of our actions on our clients…***our actions will have broad-reaching implications to*** all of ***our constituents, the market, and our franchise*.'" SEC Compl. ¶ 34  (emphasis added).

¶59. *See also* ¶¶67, 85-87, 99-101.

Yet, rather than let market forces reign, Defendants continued to underwrite Citigroup ARS and sell them (through auctions they managed) to Passidomo and the Class for Defendants' own benefit. ¶¶64, 67, 88.  Indeed, Defendants gave their brokers incentives to sell Citigroup ARS as Citigroup's supply increased without a concomitant demand: increased commission rates. ¶¶90, 93-96.

It worked. Defendants continued the charade that the market for Citigroup ARS existed until its inevitable, eventual collapse on February 11, 2008 (¶53), when Defendants ceased intervening to prop up the auctions. ¶¶99-103, 106. As the SCAC alleges in ¶105:

> "On February 9, 2008, a senior [Global Markets] official emailed other senior officials:  'I believe that we ***should allow market dynamics to determine the pricing and success/failure of these auctions*** [student loans]. If we do so, I'd expect them to fail.'"  SEC Compl. ¶ 70 (emphasis added).  "Another senior official replied: 'I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing.'"  SEC Compl. ¶ 70.

---

[3]    The SCAC describes Citigroup ARS and the general procedures for the sale of auction rate securities. ¶¶39, 41-45, 48-49. For brevity's sake, the discussion of the auction process will not be repeated here.

**ARGUMENT**

As this Court explained in the *Sept. 11ᵗʰ Op.* at 8:

> In deciding a motion to dismiss a complaint for failure to state a claim … the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor…. [T]o survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."

Further,

> [a] court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level."… The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, No. 08 Civ. 7422(VM), 2009 WL 4668579, at *4 (S.D.N.Y. Dec. 9, 2009) (citations omitted) (denying motion to dismiss a 10b-5 claim). The SCAC satisfies this standard.

**I.    THE SCAC SUFFICIENTLY ALLEGES DEFENDANTS' MARKET MANIPULATION**

> The basic aim of the antifraud provisions is to "prevent rigging of the market and to permit operation of the natural law of supply and demand." The theory of a natural, unrigged market is that the "competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price."

*S.E.C. v. First Jersey Securities Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) (citations omitted). Defendants' manipulative conduct contravenes the basic aim of the federal securities laws supporting Plaintiff's claim for violations of §10(b) and Rule 10b-5 (a) and (c). *See generally*, ¶¶54-122, 124-76. The SCAC sufficiently alleges each element of a market manipulation claim. *See ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).

**A.    Defendants' Manipulation Constitutes Unlawful Conduct**

"In the end, '[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply

4

and demand, not rigged by manipulators.'" *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281,

387 (S.D.N.Y. 2003) ("*IPO* (2003)") (alteration in original) (*quoting Gurary v. Winehouse*, 190 F.3d 37,

45 (2d Cir. 1999)).  That is precisely the type of misconduct at issue here:

> During the Class Period and unbeknownst to Lead Plaintiff and the Class, [Defendants] manipulated the market for Citigroup ARS by intervening into the Citigroup ARS market at unprecedented increasing levels, fostering the illusion that a valid, liquid and sustainable market existed for Citigroup ARS as liquid securities, where buyers and sellers came together with supply and demand in balance, allowing for the successful completion of auctions, when in fact no such balance existed.

¶9; *see also* ¶71.[4]

The SCAC demonstrates the nature, purpose and effect of Defendants' manipulation of the

Citigroup ARS market.  *See* ¶¶54-122.  Thus, the SCAC's detailed allegations are more than sufficient

to meet the pleading requirements for stating a market manipulation claim under §10(b).  *See Sept.*

*11th Op.* at 9-10; *see also IPO* (2003), 241 F. Supp. 2d at 386.

Defendants' only argument is that their conduct was "lawful" as it was "explicitly

acknowledged and condoned by the SEC" and disclosed to customers.  *Defendants' Memorandum of*

*Law in Support of their Motion to Dismiss the Second Consolidated Amended Complaint* ("*Defs' Br.*") 14-15.

That argument is, at best, premised on a flawed reading of the 2006 SEC Order and the SCAC.

The 2006 SEC Order did not legitimize Defendants' conduct.  Defendants' contention is

---

[4]  Indeed, Defendants' conduct fits squarely within the proscription against market manipulation noted in some of their own cited authorities.  *Compare* ¶¶9, 71 *with ATSI Comm'ns*, 493 F.3d at 100 ("The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'"), and *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) ("*IPO* (2006)") ("[A] section 10(b) claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation.'") (both *quoting Gurary*, 190 F.3d at 45).  Defendants' remaining cases regarding a showing of "deception" for a market manipulation claim under §10(b) are inapposite.  *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985), involved a misrepresentation claim concerning tender offers.  *See Schreiber*, 472 U.S. at 4-5.  Likewise, in *Rothenberg v. Perelman*, No. 89 Civ. 4308, 1990 WL 3244, at *2-*3 (S.D.N.Y. Jan. 9, 1990), the court dismissed a misrepresentation or omission in the context of a proposed tender offer for plaintiff's failure to comport with Rule 9(b).

rooted in the mistaken assumption that the 2006 SEC Order's narrow allowances somehow insulate them from **all** conduct related to the purchase and sale of Citigroup ARS. While the 2006 SEC Order does not prohibit broker-dealers from bidding for their proprietary accounts upon proper disclosure to customers, that is a far cry from condoning Defendants' covert control and manipulation of the Citigroup ARS market. It is the undisclosed extent, purpose and effect of Defendants' manipulative intervention that are at the crux of this action and violate §10(b) – not Defendants' occasional purchase of Citigroup ARS for their own account. No regulator has permitted Defendants to deceive investors into the perception that Citigroup ARS traded in a valid, liquid and sustainable market where the natural interplay of supply and demand set prices and interest rates.[5]

Defendants' argument also defies reason. If the SEC had condoned Defendants' practices, why then did it initiate in the spring of 2008 – along with state regulators – an investigation into Defendants' sale of Citigroup ARS? Indeed, in the aftermath of the collapse of the Citigroup ARS market, SEC Chief of the Office of Municipal Securities declared, in the June 5, 2008 edition of *The Bond Buyer*, that:

> Even though broker-dealers disclosed that they were bidding on auctions, **the extent of their participation was unknown**....
>
> "If investors could see that broker-dealers were so active in this market ... perhaps it wouldn't have grown so large, well beyond the broker-dealers' ability to hold it up," Haines said, speaking at the Securities Industry and Financial Markets

---

[5]    The cases upon which Defendants rely – *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), and *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) – each determined that otherwise legal conduct did not constitute manipulative conduct where no other illegal intent existed. *See GFL*, 272 F.3d at 209 (short selling); *Sullivan*, 47 F.3d at 862 (arbitrage); *Mulheren*, 938 F.2d at 370-71 (open market trading for investment purposes). Here, however, market manipulation to foster the illusion that prices and interest rates were set based upon the natural interplay of supply and demand when the opposite was known by Defendants to be true (¶¶78-80, 105) is *not* an otherwise legitimate device employed in the securities arena. Thus, these cases provide no support for dismissal of Passidomo's §10(b) claim.

Association's legal and compliance conference in New York. "We may not have gotten into this mess had there been transparency." [Emphasis added.]

¶82.

Equally futile is Defendants' argument that they are immunized from liability because their bidding practices were publicly known and expressly disclosed to customers (as supposedly conceded by Plaintiff). *Defs' Br.* 15. Again, Defendants fail to appreciate that it is their **manipulation** of the Citigroup ARS market, not their mere participation in it, that is at issue. The facts underlying Defendants' manipulation were unknown to investors. Indeed, the very paragraph relied on in support of Passidomo's purported concession states: "During the Class Period the Smith Barney website, ostensibly modified to reflect the sanctions imposed upon them pursuant to the 2006 SEC Order, **did not reflect the extent to which they actually intervened into the Citigroup ARS market so as to contradict its prior statements and impressions conveyed to the Class.**" ¶150 (emphasis added); *see also* ¶¶147-54 (explaining that disclosures pursuant to the 2006 SEC Order did not, among other things, reveal the extent of Defendants' intervention, the true liquidity risks associated with Citigroup ARS, or that the Citigroup ARS market was in danger of collapsing). Thus, the SCAC sufficiently alleges unlawful conduct under Rule 10b-5(a) and (c), and comports with the very requirement articulated in *IPO* (2006), 471 F.3d at 43, that plaintiff acquire the securities "in ignorance of the fact that the price was affected by the alleged manipulation." (internal quotation marks and citation omitted).

### B.    The SCAC Satisfies the Pleading Requirements of Rule 9(b)

As this Court previously held, "at early stages of the litigation a plaintiff need not plead manipulation to the same degree of specificity as a simple misrepresentation claim." *Sept. 11th Op.* at 10. The rationale for this lower pleading standard is based on the simple fact that, as is the case here, "[a] claim of manipulation [] can involve facts solely within the defendant's knowledge…." *ATSI Commc'ns*, 493 F.3d at 102. Accordingly, a complaint need only "set[] forth, *to the extent possible*,

7

what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* (emphasis added) (noting that this test meets Rule 9(b)'s goals, while also considering what facts a plaintiff can realistically plead at such an early stage of the litigation).

Defendants try to gloss over dozens of new allegations gleaned from regulatory proceedings brought against them, which are based exclusively on Defendants' own documents and communications. Unable to deny their own internal documents, Defendants attempt to avoid them by mischaracterizing the SCAC as relying on the existence of the regulatory complaints and consent orders as proof of their liability. However, Passidomo cites these materials for the *statements and facts contained therein* (¶¶10,-11, 59, 62, 73-74, 89, 94, 96, 99-104*)* that are wholly discoverable but for the automatic stay of discovery under the PSLRA. Even if Passidomo were citing the complaints and decrees as evidence (as opposed to the facts contained therein), courts regularly hold that such allegations are proper. *See, e.g., United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (decree admissible under Rule 404(b) to show knowledge); *Brotman v. National Life Ins. Co.*, No. 94 CV 3468 (SJ), 1999 WL 33109, at *2 (E.D.N.Y. Jan. 22, 1999) (consent order admissible under Rule 404(b) to show motive and credibility); *ClearOne Commc'ns, Inc. v. Lumbermens Mut. Cas. Co.*, No. 2:04-CV-00119 TC, 2005 WL 2716297, at *8 n.10 (D. Utah Oct. 21, 2005) (consent decrees may be used for factual background). The SCAC satisfies these standards. *See, e.g.,* ¶¶7, 10-11, 17-18, 37, 47 (background); ¶¶56, 57, 67, 78-80, 85-89, 99-100 (knowledge); ¶¶58-59, 62, 73, 94-95 (motive/scienter/credibility).[6] Nevertheless, Defendants engage in intellectual gymnastics by trying to rely upon the 2006 SEC

---

[6]     Even Defendants' cases recognize this distinction. *See, e.g., Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) (noting that evidence referenced in the SEC complaint would surely be admissible if relevant); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y 2003) (striking references to an SEC complaint because its existence was cited to prove liability).

Order to escape liability. They cannot have it both ways.

When the SCAC's factual allegations are not simply glossed over, but rather are accepted as true and all reasonable inferences are drawn in Passidomo's favor – as is the proper standard on this motion – it is evident that SCAC satisfies the pleading standard for a market manipulation claim. The SCAC alleges:

- **The manipulative acts performed and the effect of the scheme:**

Defendants knew that the number of buyers of Citigroup ARS did not match or exceed the sellers of Citigroup ARS, and that sellers were increasing and buyers were decreasing. The new allegations, which quote extensively from Defendants' own documents and communications, amply demonstrate that Defendants were aware of this imbalance. *See* ¶¶55-106. Moreover, these allegations demonstrate that Defendants were aware that the consequences from this imbalance would lead to failed auctions without their routine and frequent intervention, which they provided up until the market's ultimate collapse. *Id.* For example, citing the findings of the SEC, the SCAC alleges:

> [d]uring the fall of 2007 [*i.e.*, at the beginning of the Class Period], the credit crisis and deteriorating market conditions caused [Global Markets] to have to support its auctions to a greater extent. [Global Markets] knew that the ARS market was deteriorating and [Global Markets]'s inventory of ARS was significantly increasing. Accordingly, [Global Markets] knew the risk of failed auctions had materially increased."

¶57 (alterations in original).

As the New York Attorney General found, "[Global Markets'] support bids filled the increasing gap in the demand for auction rates securities, sustaining the impression that the market was functioning." ¶60. Because of Defendants' routine and increasing intervention by way of providing support bids, they needed to unload their ARS inventory on unsuspecting Class members. Citigroup ARS traders were informed: "We are currently at our extended limit. Hit all bids….***Times like these, we need to do whatever is necessary. Just make sure all hands are***

9

*on deck and paper is sold*." ¶62 (*quoting* SEC Compl. ¶41).

  In spite of Defendants' clear awareness of the imbalance in supply and demand for Citigroup ARS and the ever-present risk of widespread auction failures, throughout the Class Period Defendants informed investors that there had never been a failed auction in the 20 year history of the market, implying that the Citigroup ARS market was fully developed and liquid. ¶¶70, 73-74. However, Defendants knew that it was only their frequent intervention in increasing monetary amounts in the Citigroup ARS market that provided this perception. ¶75. Passidomo and all Class members continued purchasing Citigroup ARS believing that the "auction process" was in fact occurring as an auction is intended, *i.e.*, buyers and sellers each bidding for and offering for sale Citigroup ARS based upon an unmanipulated market's determination of a specified clearing rate. ¶69.

  Indeed, the entire manipulative scheme is succinctly summarized in an e-mail from one senior Global Markets official to another on February 9, 2008 (two days before Defendants ceased intervening in the Citigroup ARS market):

> "I believe we **should allow market dynamics to determine the pricing and success/failure of these auctions** [student loans]. If we do so, I'd expect them fail." Another senior official replied: "I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing."

¶105 (citations omitted).

  Once Defendants finally allowed "market dynamics" (rather than their manipulative scheme) to determine the pricing and success and failure of the Citigroup ARS market, the entire market collapsed less than 48 hours later. It is hard to imagine, at the pleading stage, any stronger evidence of Defendants' manipulative scheme and its effects on the Citigroup ARS market.

  • **Which defendants performed the acts**: Citigroup, Global Markets and Smith Barney. ¶¶23-24, 26, 54-106.

  • **When the manipulative acts were performed**: Commencing in August 2007 and

continuing until February 11, 2008. ¶¶4, 7, 9-12, 54-106.

In concluding their argument, Defendants try to make something out of the SCAC's lack of identification of the specific Citigroup ARS that Defendants acquired or the auctions in which they bid. *Defs' Br.* 17-18. However, as is the case with virtually all market manipulation claims, these are facts which are "solely within the defendant's knowledge." *ATSI Commc'ns*, 493 F.3d at 102. It is impossible for any individual outside of Defendants to know which Citigroup ARS they purchased for their own accounts. Indeed, the findings from the regulatory proceedings confirm that there was simply no way for investors to know these facts:

> "[b]ecause investors could not ascertain how much of an auction was filled through [Global Markets] proprietary trades, ***investors could not determine if auctions were clearing because of normal marketplace demand, or because [Global Markets] was propping up auctions through support bids.***"

¶80 (alterations in original) (*quoting* AOD ¶9); *see also* ¶¶78-79, 81-82.

Accordingly, Passidomo has "set[] forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue," *ATSI Commc'ns*, 493 F.3d at 102 (citation omitted),[7] and has remedied the Court's concerns in this regard. *See Sept. 11th Op.* at 11.

---

[7]    The allegations in *Zisholtz v. SunTrust Banks, Inc.*, No. 1:08-cv-1287-TWT, 2009 WL 3132907 (N.D. Ga. Sept. 24, 2009) (*Defs' Br.* 16), pale in comparison to the particularity of the allegations in the SCAC. The plaintiff in *Zisholtz* was unable to even allege the fundamental notion that defendants intervened in any auctions by placing support bids. 2009 WL 3132907, at *6 ("The most specific allegation that the Plaintiffs make is that, 'throughout the Class Period, SunTrust ***either*** intervened in the auctions by placing support bids to purchase [auction rate securities] for its own account, ***or*** knowingly acquiesced in the fraudulent 'support' by other brokerage firms." (second emphasis added) (alteration in original) (citation omitted). In stark contrast, the SCAC alleges that Defendants routinely and increasingly intervened in the Citigroup ARS market to prevent its failure, and unlike the *Zisholtz* complaint, relies on Defendants' own documents and communications in support.

**C.     The SCAC Specifies the Basis for the Class's Reasonable Reliance
Upon the Natural Interplay of Supply and Demand**

1.     The SCAC alleges reasonable reliance on an unmanipulated market

A market manipulation claim requires a showing that:

> an alleged manipulator engaged in market activity aimed at deceiving investors as to
> how other market participants have valued a security.  The deception arises from the
> fact that investors are misled to believe "that prices at which they purchase and sell
> securities are determined by the natural interplay of supply and demand…."

*ATSI Comm'ns*, 493 F.3d at 100 (*quoting Gurary*, 190 F.3d at 45).

Because a market manipulation claim is primarily based upon undisclosed market activity

engaged in by defendants, a plaintiff need only show reliance upon the integrity of the market, *i.e.*,

that the prices were free from manipulation. *ATSI Comm'ns*, 493 F.3d at 101 (plaintiff's "reliance on

an assumption of [a] … market free of manipulation" must be alleged); *Gurary*, 190 F.3d at 45

(plaintiff must establish he or she purchased "in ignorance of the fact that the price was affected by

the alleged manipulation"); *IPO* (2003), 241 F. Supp. 2d at 297 (explaining reliance as "reliance on

the integrity of the market (*i.e.,* that they believed it was *not* manipulated)").

Notwithstanding Defendants' mischaracterization of the SCAC by isolating three paragraphs

(*see Defs' Br.* 18-19, *citing* ¶¶139, 141, 151) out of thirty-four new allegations (¶¶10, 37, 40, 47-52, 70-

74, 78-80, 108, 139-46, 147-54), Passidomo sufficiently alleges a basis for his – and the Class's –

belief in the integrity of the Citigroup ARS market, *i.e.*, that the market for Citigroup ARS was "not

manipulated." *IPO* (2003), 241 F. Supp. 2d at 297.

- "The SEC found that '[i]n August 2007, … internal documents provided to
[Global Markets'] senior management … stated, 'Investors and issuers might believe
that there is **implied liquidity** provided by [Global Markets] **because we have
marketed the fact that that we have never had a failed auction as lead
manager in twenty years[.]**…'" ¶10 (emphasis in original).

- "As set forth in the AOD, '…. **There was no way for investors to monitor
supply and demand in the market or to assess when broker-dealers may
decide to stop supporting the market, which could cause its collapse**.'" ¶47
(*quoting* AOD ¶9).

12

> • "During the Class Period, and unbeknownst to Lead Plaintiff …, auctions managed by entities other than the Defendants began to fail, slightly at first and building to complete failure by February 13, 2008 …." ¶51.

*See also* ¶¶37, 70-74, 141-43.

The allegations, when read together, demonstrate that investors believed – as Defendants knew and encouraged – that the Citigroup ARS market functioned properly, with demand and supply in balance. Thus, as in *IPO* (2003), Passidomo has pled reliance "by relying on a market for securities … controlled or artificially affected by defendant's deceptive or manipulative conduct…." 241 F. Supp. 2d at 385.

Such reliance was reasonable (even though Defendants knew the truth was contrary to the illusion they fostered), as the SCAC alleges:

> • "**The lead manager** [in an ARS transaction] **is also the only party … who knows whether the lead manager itself bid at an auction of its own account and whether that bid was necessary for the auction's success**." ¶48

> • "As the SEC found, …. '[E]ven if a customer had been informed that there was liquidity risks associated with ARS, **the customer would not know that the liquidity risk, to a significant degree, depended upon [Global Market]'s discretion to bid to support auctions**.'" ¶79 (second alteration in original).

> • "[b]ecause investors could not ascertain how much of an auction was filled through [Global Markets] proprietary trades, **investors could not determine if auctions were clearing because of normal marketplace demand, or because [Global Markets] was propping up auctions through support bids**." ¶80 (alterations in original).

*See also* ¶¶47, 75, 78, 81, 82, 140, 144-46. Thus, the SCAC adequately pleads reliance on the integrity of the Citigroup ARS market, and unawareness of Defendants' clandestine manipulation of the price for Citigroup ARS and of the Citigroup ARS market itself.

> 2.    Defendants do not proffer a contrary inference that negates the
>        SCAC's allegations of reasonable reliance

Defendants' argument (*Defs' Br.* 6-8, 18) that the prospectuses (*see Declaration of Charles E. Davidow in Support of Defendants' Motion to Dismiss the Second Consolidated Amended Complaint* (the

13

"*Davidow Decl.*") Exs. 5-12) and the 2006 SEC Order undermine reasonable reliance has no merit. *Defs' Br.* 3 n.3 (*citing Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991); *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007); and the *Sept. 11th Op.*). First, the prospectuses are not properly before the Court. Passidomo does not rely upon the prospectuses in bringing the action. To the contrary, the SCAC alleges: "Neither Global Markets nor Smith Barney provided to Lead Plaintiff…purchasing Citigroup ARS a prospectus or other offering document before, or contemporaneously with, [his] purchases." ¶40. Defendants' suggestion that the prospectuses were available and thus their contents should be imputed to Plaintiff (*Defs' Br.* 7 n.6) has no foundation. The prospectuses submitted are outdated – they were issued in 1999-2002, years before the Class Period, and there exists no reason to suppose that an investor should rely upon the statements in them – indeed, the information in them is stale. *See* 15 U.S.C. §77j(a)(3); 17 C.F.R. §230.427. Moreover, Defendants admit they need not have provided the prospectuses because the purchase of Citigroup ARS were made long after the initial offering and through the auction process. *Defs' Br.* 7 n.6. Thus, contrary to Defendants' argument (*Defs' Br.* 6-8), the disclosures made at least five years before the Class Period commenced do not defeat Plaintiff's pleading of reliance.

The 2006 SEC Order (*Defs' Br.* 4-6; *Davidow Decl.* Ex. 1) similarly does not provide a contrary inference that negates the SCAC's allegations of reasonable reliance. *See* ¶¶148-54. That order found that Global Markets engaged in practices that violated *disclosure* laws; nowhere did it condone market manipulation.[8] Moreover, the order's requirement that Global Markets disclose its practices and its

---

[8]    The mere fact that news media may have reported the sanction of Defendants and others (*Defs' Br.* 4 n.4) does not negate reliance. Citigroup ARS did not trade on an open, efficient market (¶158); they traded only in Citigroup-managed auctions, *i.e.*, they only could be bought or sold in Defendants' auctions (¶¶43, 44, 157) and, during the Class Period, Defendants intervened, setting the clearing rates at which the auctions succeeded. ¶¶47-48, 60. Thus, no outside information could be or was assimilated into the price (*i.e.*, the clearing rate) at which investors purchased Citigroup ARS. Only if the Citigroup ARS traded on an open market, such as a stock exchange, might it be reasonable (under the fraud-on-the-market theory or its corollary, the truth on the market defense)

subsequent website disclosures (*see Davidow Decl.* Ex. 2), over a year before the Class Period, only addressed future *possibilities.*[9]  During the Class Period, it was not a *possibility* that Defendants might intervene into their auctions for Citigroup ARS; they did so routinely, and in so doing, controlled the supply of and manipulated the illusion of demand for Citigroup ARS. That is a far cry from the scope of permissible conduct required by the 2006 SEC Order and the securities laws.

**D.**    **The SCAC Alleges Defendants'** ***Scienter***

1.    Defendants' conscious manipulation of the Citigroup ARS market

Although Defendants complain – in the face of twenty-six new allegations (¶¶7, 10, 56-62, 67-68, 85-87, 89, 94, 95, 99-103, 105, 128, 130-31) – that the SCAC does not sufficiently allege their *scienter* (*Defs' Br.* 19-22), the simple fact remains that they do not dispute engaging in the underlying conduct alleged in the SCAC and reflected in their own documents.  They only assert its legality. *Defs' Br.* 14-16.  Yet, the 2006 SEC Order, which forms a predicate for Defendants' motion, demonstrates that they affirmatively knew that, at a minimum, "intervention into auctions" to affect the clearing rate or prevent auction failure violated the securities laws disclosure provisions. The 2006 SEC Order found that: "[E]ach Respondent [including Global Markets] *engaged in one or more of the following violative practices* in connection with certain auctions:" III. ¶B at 3; *see also id.* at ¶D at 8 ("Each Respondent violated Section 17(a)(2) by engaging in one or more of the practices described in Section III.C.2 above. As a result, Respondents willfully violated Section 17(a)(2) of the Securities Act.") (footnote omitted). Among the violative practices covered in the 2006 SEC Order, the SEC

---

to impute the information from these articles to the prices set for Citigroup ARS. *See* ¶149.  That, however, does not comport with the facts alleged here.

[9]        Defendants assert, without support, that "in September 2006, Citigroup sent all customers a written disclosure which described this auction rate bidding process…." *Defs' Br.* 5. However, nowhere do Defendants provide evidence (and indeed, it would not be proper to do so on this motion) that they sent notices to new customers beginning in August 2007. Notwithstanding any of this, the disclosures of Defendants' practices failed to disclose their complete control over the supply and the illusion of demand for Citigroup ARS.

included C.2.b.1 "intervention in auctions," the misconduct underlying the market manipulation at issue here. Finally, the 2006 SEC Order categorized Global Markets within Tier I, *i.e.*, a firm "which had a relatively large share of the auction rate securities market and engaged in more types of violative practices than the firms in Tier Two…." *Id.* ¶E, at 9. Defendants do not deny knowing any of this. Moreover, market manipulation is expressly prohibited by 15 U.S.C. §78j(b).

Further, the SCAC alleges, at the beginning of the Class Period:

> 85.    "When [Global Markets] discussed the possibility of failed auctions, [Global Markets] often stated that ARS have high, above market, maximum rate resets if an auction failed to compensate the holder for the lack of liquidity and to create incentives for the issuer to restructure the ARS, thereby providing liquidity to the holder….[However,] certain ARS had low, below market, maximum rate resets." SEC Compl. ¶ 46.

> 86.    "Certain types of ARS, such as certain classes of municipal ARS, did have fixed maximum rate resets as high as fifteen or twenty percent. In contrast, however, ***other ARS, such as Student loan ARS***…and preferred ARS issued by closed-end funds…***had formulaic maximum rate resets that were determined by reference to certain market indices. At least since August 2007, these market indices were generally low***…." SEC Compl. ¶ 47 (emphasis added).

> 87.    "During the fall of 2007, [Global Markets] increasingly became aware that ARS with low maximum rate resets were not 'viable' instruments in the market conditions at that time because if an auction failed, ***a holder of these ARS would receive a below-market rate***, rather than an above-market rate to compensate the holder for the illiquidity." SEC Compl. ¶ 50 (emphasis added).

The SCAC also alleges that by the middle of the Class Period, in the early winter of 2007:

> 99.    "By the beginning of December 2007, Short-Term Trading management communications discussed various scenarios under which auctions might fail." SEC Compl. ¶ 58.

> 100.    "A December 7, 2007 email stated that senior [Global Markets] officials 'don't have much of a problem of letting them [ARS] go if times get much tougher.'" SEC Compl. ¶ 59.

> 101.    "On December 15, 2007, internal emails discussed subordinate student loans, which were a significant portion of [Global Markets'] inventory, and [Global Markets] potentially allowing those auctions to fail when certain maximum loss or balance sheet limits were reached. One email stated, 'Of course if they [the subs] go, everything will probably go as well….'" SEC Compl. ¶60 (last alteration in original.)

16

102.    Six weeks before Smith Barney and Global Markets ceased portraying the illusion that the Citigroup ARS market operated as it had for 20 years, *i.e.*, without manipulating, the perception that the natural interplay of supply and demand set prices and interest rates for Citigroup ARS, according to the SEC, an internal document, dated December 24, 2007, "provided to senior management about the ARS market discussed [Global Markets'] current goals and objectives and its plan in the event of failed auctions." SEC Compl. ¶61.

103.    "In the cover email to the December 24, 2007 document, a senior official stated that a failed auction at [Global Markets] 'seems like an unavoidable eventuality.'" SEC Compl. ¶ 64.

Finally, the SCAC alleges on the eve of the complete collapse of the Citigroup ARS market:

105.    "On February 9, 2008, a senior [Global Markets] official emailed other senior officials: 'I believe that we ***should allow market dynamics to determine the pricing and success/failure of these auctions*** [student loans]. If we do so, I'd expect them to fail.'" SEC Compl. ¶ 70 (emphasis added). "Another senior official replied: 'I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing.'" SEC Compl. ¶ 70.

These facts – coupled with Defendants' reliance upon the 2006 SEC Order – demonstrate that Defendants engaged in knowing misbehavior sufficient to overcome a motion to dismiss.[10] The court in *IPO* (2003), in considering a claim for market manipulation, reached this very conclusion. There, Judge Scheindlin found *scienter* sufficiently alleged where plaintiffs:

have alleged that the Allocating Underwriters "engaged in [the] deliberately illegal behavior" of requiring customers to enter into Tie-in Agreements in order to obtain IPO stock. As the Plaintiffs correctly argue, "[t]he Underwriter Defendants do not even attempt to suggest that the misconduct alleged here was anything but intentional." Nor could they Tie-in Agreements do not happen accidently, negligently, or even recklessly. Tie-in Agreements only happen if the Allocating Underwriters intentionally require them.

241 F. Supp. 2d at 385 (alteration in original) (citation and footnote omitted)(*citing Novak v. Kasaks,*

---

[10]    These allegations contain far more specificity than those rejected in *Zisholtz*, 2009 WL 3132907. There, in a misrepresentation case, plaintiffs in a conclusory manner alleged defendants' *scienter* based upon purported directives and marketing materials that misrepresented the ARS. However, the court, while recognizing that such allegations might support a finding of *scienter*, found that plaintiff failed to provide any specificity for that theory. *Id.* at *5.

216 F.3d 300, 311 (2d Cir. 2000)).[11]

> 2.   Defendants' documents concede their motive

The courts in this Circuit recognize that when evaluating allegations of *scienter* as to a corporation, they ought not to "'create a nearly impossible pleading standard when the 'intent' of a corporation is at issue.'" *Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) (citation omitted). Moreover, contrary to the circumstances in Defendants' cases (*see Defs' Br.* 20-21), the SCAC does not merely invoke "magic words," *Novak*, 216 F.3d at 311, to establish Defendants' motive to engage in their manipulative conduct.[12]

The SCAC provides a concrete explanation of the unique circumstances of Citigroup's motive to manipulate the Citigroup ARS market during the Class Period. For example:

> As early as August 2007 [*i.e.*, the beginning of the Class Period], ***[Global Markets] recognized that the amount of available ARS exceeded the demand, but [Global Markets] continued to increase the amount of ARS that [Global Markets] underwrote and marketed, thereby contributing to the inventory and balance sheet problems that threatened its ability to continue supporting auctions*** .…[Global Markets] investment bankers also wanted to continue bringing new ARS to market, to ***earn fees*** and to ***maintain their position*** vis-a-vis bankers at other broker-dealers, despite the ***need to control the supply and inventory of ARS***. Not until early November 2007 did [Global Markets] finally curtail new ARS issuances for the year."

¶67 (alterations in original)(*quoting* SEC Compl. ¶37); *see also* ¶¶8, 57-59, 73, 95, 126, 131-34. In addition, the SCAC alleges that the Defendants engaged in market manipulation for the purpose of having a vehicle by which to unload its increasing inventory of Citigroup ARS. The SCAC alleges:

---

[11]   The Second Circuit has defined "conscious misbehavior" in cases cited by Defendants – *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) and *Novak*, 216 F.3d 300 – as "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Kalnit*, 264 F.3d at 142 (citation omitted). Unquestionably, the SCAC alleges conduct demonstrating that "the danger [*i.e.*, the collapse of the Citigroup ARS market and the consequent inability of the Class to sell their Citigroup ARS] was … known" to Defendants.

[12]   Defendants do not challenge the "opportunity" to engage in manipulative misconduct, nor could they. They controlled the Citigroup ARS market.

61.     "As [Global Markets]'s ARS inventory grew, [Global Markets] increased its efforts to sell the inventory." *SEC Compl.* ¶ 40.

62.     "For example, on August 30, 2007 [*i.e.*, one month into the Class Period], an email to ARS traders stated, 'Make sure you don't leave any stones unturned today. We are currently at our extended limit. Hit all bids….***Times like these***, ***we need to do whatever is necessary***. ***Just make sure all hands are on deck and paper is sold***." *SEC Compl.* ¶ 41 (emphasis added).

*See also* ¶¶7-8, 64, 67, 95.

Defendants' cases instead reject boilerplate allegations of seeking to increase compensation or retain executive positions (*Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *17, n.30 (S.D.N.Y. Aug. 22, 2005)), to increase fees received by an individual with a close business relationship to another defendant (*Vogel*, 126 F. Supp. 2d at 739), and a general desire to increase investment banking fees received from a client (*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230 (LMM), 2003 WL 21088506, at *6 (S.D.N.Y. May 14, 2003)).  Here, the SCAC alleges a "concrete" benefit to Defendants. ¶¶8, 57-59, 67, 73, 95, 126, 131-34.  Thus, Plaintiff has sufficiently alleged Defendants' motive to manipulate the Citigroup ARS market during the Class Period.

Furthermore, Defendants' expression of confusion about the relevance of their increase in bidding during the Class Period, *Defs' Br.* 15-16, does not negate motive.  The SCAC clearly explains how Defendants' increased intervention was symptomatic of their efforts to manipulate the Citigroup ARS market and foster the illusion of stability for their own gains.  Indeed, the SCAC alleges that Defendants ultimately unloaded their Citigroup ARS inventory on unsuspecting buyers before they let the Citigroup ARS market collapse. ¶¶8, 61, 64, 94-95. Those efforts – not the isolated fact of Defendants' increased bidding in auctions – were purposely concealed from investors and constitute unlawful market manipulation.  *See, e.g.*, ¶¶64-68, 75, 77. Thus, the SCAC differs from the circumstances presented in Defendants' cases.  *Compare In re JP Morgan Chase Sec.*

19

*Litig.*, 363 F. Supp. 2d 595, 629 (S.D.N.Y. 2005) (allegations of JPMorgan shareholders of "the massive scope and effective concealment of Enron's fraud" in which JPMorgan allegedly participated through its business relationship with and investment in Enron, undercut allegations that JPMorgan "should have been aware" that Enron would likely default on its obligations to JPMorgan); *Davidoff,* 2005 WL 2030501, at *11 (court concluded purchases of issuer-defendant's stock by sophisticated, institutional defendants who had access to issuer's business plan undercut plaintiffs-stockholders claim of issuer defendants' failure to disclose undercapitalization); *In re Bristol-Myers Squibb Sec. Litig.,* 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (defendants' Class Period purchases of stock inconsistent with *scienter*). As such, the SCAC sufficiently pleads *scienter,* either by Defendants' knowing misconduct and/or their motive to engage in unlawful manipulative conduct.

Accordingly, Defendants' motion to dismiss the manipulation claim should be denied.

## II.    PASSIDOMO STATED HIS OWN COGNIZABLE LOSS AND LOSS CAUSATION

Defendants premise their entire cognizable loss argument on the false notion that Passidomo has elected and received rescissory damages under §10(b) by virtue of redeeming his Citigroup ARS pursuant to the Regulatory Settlement. However, no such election or receipt of rescissory damages ever occurred. Indeed, neither the Regulatory Settlement nor the SCAC ever even mentions the term rescission. To the contrary, Passidomo has steadfastly maintained that he is entitled to his full benefit-of-the-bargain damages (*see* ¶¶16, 76, 110, 116-19).[13] When the Regulatory Settlement provided Passidomo with the opportunity to mitigate some of his losses while explicitly preserving his right to pursue additional damages, Passidomo reasonably elected to participate.  It is those benefit-of-the-bargain damages, not recoverable through the Regulatory Settlement, that Passidomo seeks to recover here. As discussed below, by expressly preserving Passidomo's ability to

---

[13]      "[P]laintiffs are normally entitled to choose which damages avenue to pursue…." *Panos v. Island Gem Enters., Ltd.*, 880 F. Supp. 169, 182 (S.D.N.Y. 1995).

pursue additional damages, the Regulatory Settlement cannot effectuate a rescission.

Defendants misplace reliance on the results reached by the courts in *Aimis Art Corp. v. Northern Trust Secs., Inc.*, 641 F. Supp. 2d 314 (S.D.N.Y. 2009) and *In re UBS Auction Rate Sec. Litig.*, No. 08 CV 2967 (LMM), 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ("*UBS*"). First, neither decision addressed the impact of an express preservation of class members' rights to pursue damages not recoverable through the Regulatory Settlement. Second, both decisions, contrary to Second Circuit law, essentially categorized an election to mitigate losses as a "rescissory" remedy.

### A.    The Regulatory Settlement Preserves Class Claims

Defendants' insinuation that the Regulatory Settlement should bar any further recovery flies in the face of the plain terms of the agreement itself and Defendants' own communications to Class members.    Both the SEC Consent Order and Defendants' correspondence with Passidomo *explicitly provide that the settlement does not function as an exclusive remedy:*

> The SEC Consent Order states:
>
> <u>Other Proceedings/Relief</u>. All customers, including but not limited to Eligible Customers who avail themselves of the relief provided pursuant to this Consent, may pursue any remedies against Defendant available under the law….

*Sobel Decl.* Ex. A, ¶IX. B; *see also* ¶19.  Likewise, the letter that Smith Barney sent to Passidomo, dated October 3, 2008, which informed him of the general terms of the Regulatory Settlement and his rights and obligations in choosing to participate in it, stated:

> You should consider the following when deciding what action you want Citi to take with respect to your ARS:
> •    Acceptance of this offer to purchase will not result in or constitute a waiver of any claim that you believe you may have.

*Sobel Decl.* Ex. B at 2.

Mindful of the clear terms of the Regulatory Settlement, and his right to pursue this action, Passidomo sought to mitigate his losses by partaking in the Regulatory Settlement.   Indeed, he arguably had a legal duty to do so:  "New York's courts adhere to the universally accepted principle

that a harmed plaintiff must mitigate damages." *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985) (footnote omitted); *see also Federal Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 350 (2d Cir. 1986); *Van Syckle v. C.L. King & Assocs., Inc.*, 822 F. Supp. 98, 101-02 (N.D.N.Y. 1993) (examining duty to mitigate damages for violations of §10(b) and Rule 10b-5 and noting that "[a] party cannot recover the part of their loss caused by their own failure to take reasonable steps to avoid further harm once they had reason to know of the wrongdoing.").[14]

Given the illiquid state of the Citigroup ARS market since February 11, 2008, Defendants' offer to purchase certain Class members' Citigroup ARS presented an opportunity for Passidomo to recoup some of his losses. The failure to take advantage of the offer (which did not limit the ability to pursue further litigation) could have arguably barred recovery of any losses claimed beyond the purchase offer. *See Federal Ins. Co.*, 783 F.2d at 350.

Passidomo's mitigation efforts did not recoup all of his losses. The return of par value to investors falls short of compensating them for the increased risk they assumed in purchasing Citigroup ARS. Had investors been aware of the real risks of Citigroup ARS, they would have demanded far greater interest rates to reflect the near certain risk of illiquidity. ¶¶116-17, 138-39. Instead, investors were paid rates consistent with safe, liquid investments while unknowingly assuming risks inherent to far riskier investment vehicles. The Regulatory Settlement does nothing to compensate any investors for the additional risk they undertook. In pursuing this action, Passidomo has chosen to exercise his rights – as expressly preserved under the Regulatory Settlement – to recover the remainder of his actual damages, as measured by the "benefit-of-the-bargain."[15]

---

[14]    Passidomo's actions permit him to "recover despite the existence of another reasonable course of action that would have avoided further damage." *Federal Ins. Co.*, 783 F.2d at 350.

[15]    The Regulatory Settlement did not require the purchase of Citigroup ARS from *all* Class members. *See Sobel Decl.* Ex. A, 3.I.B.

1.    <u>The Regulatory Settlement did not operate to release Class claims</u>

Taking the untenable position that the Regulatory Settlement effectively operated to release the claims here (although calling it "rescission"), Defendants argue that Passidomo has no legally cognizable damages.  *Defs' Br.* 12-13.  The fatal flaw in Defendants' argument and in *UBS*, upon which they rely, is that the Regulatory Settlement did not, and cannot, waive Passidomo's right to pursue his claims or any remedies for them.  Having mitigated some, but not all, of his damages, Passidomo remained free to pursue his – and the Class's – claims here. If Defendants desired to preclude that possibility, avenues existed for doing so: the Regulatory Settlement could have provided a release of all claims asserted in this action, or the parties here could have compromised this action under Rule 23 which would then require this Court's oversight, including notice that comports with Rule 23(c), the PSLRA, and due process, an opportunity to be heard and object, and an opportunity to opt out.[16]  Indeed, by Defendants' characterization of Passidomo's acceptance of the offer in the Regulatory Settlement as a "rescission" and an "election of remedy," Defendants not only disavow the clear statement in the Regulatory Settlement regarding the non-waiver of claims, but also seek to obtain relief that requires judicial approval under Rule 23.

Defendants took no steps to seek releases or comply with Rule 23, the PSLRA or due process.  Instead, they agreed to "settle" with the regulators to end their investigations and threatened proceedings, while preserving the claims and remedies available to Passidomo and others who accepted the offer contained in the Regulatory Settlement: "*Acceptance of this offer to purchase will not result in or constitute a waiver of any claim that you believe you may have* []" and "All customers, including

---

[16]    Because this action commenced before the Regulatory Settlement, if Defendants wanted a release of the Class's claims or to limit investors' choice of remedies, they needed to ensure that the investors *knew* of that consequence. *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) ("Communications that threaten the choice of remedies available to class members are subject to a district court's supervision…."). Because the Regulatory Settlement did *not* "threaten the choice of remedies" it did not require court supervision. Defendants may not now do an end-run around the rules and this Court's authority, to achieve what it never bargained for.

but not limited to Eligible Customers who avail themselves of the relief provided pursuant to this Consent, *may pursue any remedies against Defendant available under the law*." *Sobel Decl.* Ex. A, ¶IX. B and Ex. B at 2 (emphasis added). They cannot now renege on the deal. Thus, Passidomo may continue to prosecute his and the Class claims, and pursue damages measured by the benefit-of-the-bargain theory, as preserved in, and not waived or released by, the Regulatory Settlement.

2.    <u>Passidomo has properly pled benefit-of-the-bargain damages</u>

Section 28 of the 1934 Act provides that an aggrieved party may maintain an action for "actual damages on account of the act complained of." 15 U.S.C. §78bb(a). "Noting that Congress left the term 'actual damages' undefined, courts interpreting § 28 have been reluctant to read the statute as applying a straight jacket to their traditional remedial role." *Panos v. Island Gem Enters. Ltd.*, 880 F. Supp. 169, 175 (S.D.N.Y. 1995). As the Second Circuit has held, "there cannot be any one rule of damages prescribed which will apply in all cases, even where it is conceded that the finding must be limited to actual damages.'" *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir. 1981) (citation omitted) (permitting plaintiff to recover benefit-of-the-bargain damages). Accordingly, "'[i]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance.'" *Panos*, 880 F. Supp. at 175 (alteration in original)(citation omitted).

The court in *UBS* acknowledged:

> [b]enefit-of-the-bargain damages are measured as the value of the security as represented by the defendant at the time of the sale less the security's actual value at that time.... The aim of benefit-of-the-bargain damages is to "put the injured plaintiff in the position he would have been in had his expectancy ensued."

*UBS*, 2009 WL 860812, at *5 (citation omitted). The *UBS* plaintiffs alleged that they "expected to receive interest or dividends that were 'based on the natural interplay of supply and demand'" but, instead, received interest and dividends at artificially depressed levels due to defendant's manipulation. *Id.* (citation omitted). The *UBS* court found that "[p]laintiffs' damages allegation fits

precisely within the benefit-of-the-bargain theory of damages." *Id.*

Here, Passidomo has alleged the same theory of damages on behalf of all Class members who participated in the Regulatory Settlement. *See* ¶16 ("The interest rates set in the Citigroup ARS auctions in which Passidomo purchased his Citigroup ARS were lower than they would have been absent Defendants' manipulative conduct alleged herein."); *see also* ¶¶76, 110, 116-19. Accordingly, there can be no question that Passidomo has properly pled benefit-of-the-bargain damages on behalf of all Class members whether on not they obtained some relief afforded by the Regulatory Settlement, and Defendants do not contend otherwise.[17]

Defendants' argument that Plaintiff has forfeited his pursuit of benefit-of-the-bargain damages is belied not only by the preservation of claims set forth in the Regulatory Settlement as discussed above, but also by the definition of "rescission." "The meaning of rescission is an exchange meant to put the parties in a status quo." *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1979). Under the federal securities laws, in order for a typical rescission to have occurred, Passidomo would have had to return the Citigroup ARS **and** the interest that he received on the Citigroup ARS **to the issuer who paid it**. *Id.* at 1036 n.8 (noting in a rescission case under §12(2), the statute "is clearly intended to insure that the plaintiff…returns the dividends he has received on the stock he is tendering to his vendor.") Only then would the parties be restored to their original positions as if the transactions never occurred. This did not happen here. Instead, pursuant to the Regulatory Settlement, Defendants **purchased** Passidomo's Citigroup ARS while preserving his right to seek other damages. They did not "**rescind**" the original investment transaction. As such, the parties to the original transactions have not been restored to their previous positions, and no

---

[17]     The SCAC also alleges additional damages on behalf of those Class members who were not eligible to participate in the Regulatory Settlement. ¶¶76, 116.

rescission has occurred.[18]

### B.      Passidomo Adequately Alleges Loss Causation

Defendants further argue that even if Passidomo has a cognizable injury, he has failed to plead loss causation. *Defs' Br.* 22-24. That, too, is misguided. In its prior opinion, the Court raised two concerns with respect to loss causation. *See Sept. 11th Op.* at 16 ("Plaintiff does not specifically allege that he tried to sell his ARS, nor does he allege that the interest rates set through Defendants' allegedly manipulative conduct were lower than they would have been absent such conduct."). Passidomo has now addressed these concerns by specifically alleging that he was unable to sell his Citigroup ARS following the collapse of the Citigroup ARS market. *See* ¶121. Additionally, Passidomo asserts that he would have earned a greater rate of interest on his Citigroup ARS holdings but for Defendants' misconduct. *See* ¶¶8, 16, 76, 83, 110, 115-19, 155, 162.

"Loss causation 'is the causal link between the alleged misconduct and economic harm ultimately suffered by the plaintiff.'" *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted). Plaintiff has clearly provided a "plausible" casual link between Defendants' alleged manipulation and Plaintiff's losses. *See Dover Ltd. v. Assemi*, No. 08 Civ. 13372009, 2009 WL 2870645, at *5 (S.D.N.Y. Aug. 5, 2009) (Swain, J.). The SCAC alleges:

> •Defendants engaged in a scheme to perpetuate an artificial Citigroup ARS market by routinely intervening in the auctions to set clearing rates and prevent failures;
>
> •without Defendants' ongoing support, investor demand was insufficient to sustain the Citigroup ARS market;
>
> •a material and foreseeable risk existed that Defendants would withdraw support for

---

[18]      Both the court in *UBS* and Defendants rely on *Kauffmann v. Yoskowitz*, No. 85 Civ. 8414 (PKL), 1989 WL 79364 (S.D.N.Y. July 13, 1989), an inapplicable summary judgment decision. The *Kauffmann* plaintiff acknowledged having rescinded the purchases. *See id.* at *8. Accordingly, plaintiff's claims for damages there went "beyond the rescission and restitution that they have already received, and go beyond actual damages, in that they seek benefits allegedly received by [defendant] from the limited partnerships." *Id.* That is not the case here.

the Citigroup ARS market as Defendants' own documents/communications demonstrate;

•as a result of Defendants' conduct, Class members suffered damage by receiving interest rates that were inadequate to compensate them for the risk of illiquidity;

•Class members suffered further damage when Defendants eventually withdrew their support for the Citigroup ARS market, rendering their investments illiquid.

*See* ¶¶110-22.

In *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ("*IPO* (2008)"), the court specifically distinguished loss causation pleading requirements in market manipulation cases from "pure misrepresentation" cases (*i.e.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and *Lentell*) upon which Defendants rely, *id*. at 298-99, finding them not equally applicable to market manipulation cases. *Id*. at 298. Thus, the court in *IPO* (2008) held that plaintiffs adequately pled loss causation where "plaintiffs' losses are those that could be expected to result from the concealment of the market manipulation scheme." *Id*. at 299.

As in *IPO* (2008), loss causation here is not specifically tied to misstatements or omissions, as in the cases Defendants cite. *See Defs' Br.* 22-24 (*citing Dura*; *Lentell*; *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, No. 08 Civ. 11260 (VM), 2009 WL 3631036 (S.D.N.Y. Oct. 26, 2009); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007)). Each of those cases speaks to the disclosure of what defendants concealed in a classic §10(b) omissions context.[19] Although market manipulation occurs in the absence of knowledge of the manipulative conduct (*Santa Fe Indus. v. Green*, 430 U.S. 462, 477 (1977)), the claim itself does not rest upon omissions but rather a scheme to defraud. *Compare* Rule 10b-5(b) *with* Rule 10b-5(a) and (c); *see also In re Pfizer, Inc. Sec. Litig.*, 584 F.

---

[19]    Although *Healthcare Fin. Group* (*Defs' Br.* 23), involved claims involving auction rate securities, that is where the similarities between that case and the present case end. Significantly, plaintiff there did not assert a claim for market manipulation. Accordingly, the court's loss causation analysis offers little guidance with respect to Passidomo's allegations here that Defendants' manipulation of the Citigroup ARS market caused his and the Class's losses.

Supp. 2d 621, 640 (S.D.N.Y. 2008). Here, the proximate cause of Class damages is the manipulation of the market for Citigroup ARS in the first instance, continuing until Defendants elected to cease their intervention into the Citigroup ARS auctions, resulting in the widespread failure of the Citigroup ARS auctions. ¶¶12, 106.

To defend their misconduct, Defendants argue that the Class's damages resulted from an intervening "marketwide phenomenon." *See Defs' Br.* 23 (*citing Lentell*, 396 F.3d 161). As an initial matter, such a defense is clearly a question for the jury. *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006). Further, Defendants' defense lacks any factual support. The *Lentell* court referred to "marketwide phenomenon" as affecting all investors – those in the class case and others. *Lentell*, 396 F.3d at 174. In using the phrase "marketwide phenomenon," the *Lentell* court quoted from *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), which considered the effect of a real estate market crash on the loss attributed to the investors in the publicly traded securities at issue. *Id.* No similar "marketwide phenomenon" exists here, particularly because the Citigroup ARS do not trade on an efficient market in which such outside market forces could affect the price paid for or interest rate received for Citigroup ARS. *Compare First Nationwide*, 27 F.3d at 772 and *Lentell*, 396 F.3d at 174-75 *with* ¶¶3, 158. As such, any "marketwide phenomenon" necessarily would be exclusive to the Citigroup ARS market and, thus, refutes any contention that some intervening factor severs loss causation here.

Even assuming *arguendo* that such a defense is available and may appropriately be considered at this time, the defense does not address the losses incurred by Class members **prior** to the auctions failing. Passidomo has repeatedly and adequately alleged that all Class members suffered damage from Defendants' manipulation by not receiving adequate interest on their Citigroup ARS to compensate them for the risk of illiquidity. *See* ¶¶8, 16, 76, 83, 110, 115-19, 155, 162. The "marketwide phenomenon" argument with respect to the collapse of the Citigroup ARS market

(even if true) has no bearing on the pre-collapse losses.  Those losses – represented by inadequate interest rates – have no other possible cause but Defendants' manipulative scheme.  Accordingly, Passidomo has adequately pled loss causation for damages resulting from Defendants' market manipulation.

**III.    THE SCAC ALLEGES SECONDARY LIABILITY**

Defendants argue, as they did in the initial motion to dismiss, only that the absence of a primary liability claim under §10(b) precludes sustaining the secondary liability claim under §20(a). *See Defs' Br.* 24. However, as demonstrated above, the SCAC states a viable claim under §10(b) and Rule 10(b)-5. Thus, the Defendants' motion to dismiss the §20(a) claim must fail.

Independently, the SCAC states a §20(a) claim against Citigroup and Global Markets.  To state a claim under §20(a), "a plaintiff must show: (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.[20] The SCAC alleges that Citigroup and Global Markets, by virtue of their relationship with each other and Smith Barney, had the power to influence and control, and did influence and control, the misconduct of Global Markets and/or Smith Barney.  ¶¶164-76.  Accordingly, the control person claims are properly pleaded *See In re Tommy Hilfiger, Sec. Litig.*, No. 04-civ-7678, 2007 WL

---

[20]    In a footnote (*Defs' Br.* 24 n.14), Defendants claim that the primary fraud claims against Smith Barney and the §20(a) claim against Global Markets are not valid because Smith Barney is not a judicially recognizable entity. *See also Defs' Br.* 1 n.1.  That argument amounts to little more than wordplay, as Smith Barney was, undeniably, a distinct unit of Global Markets which was responsible for the sale of Citigroup ARS during the Class Period.  ¶¶25-26.  Defendants fail to cite any authority deeming such an actor a legal fiction immune to suit. *Compare Hawkins v. Inserra*, No. 8:07CV368, 2007 WL 4527836, at *6 (D. Neb. Dec. 18, 2007), and *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-CV-13447 (CM), 2008 WL 650385, at *2 (S.D.N.Y. Mar. 7, 2008) (rejecting claim that a named defendant "is not a judicial entity" and presuming allegations in complaint to be true for purposes of motion to dismiss). Accordingly, because Smith Barney has not moved to dismiss the claims against it, the Court should either enter a default judgment or order Smith Barney to answer the SCAC.

5581705 (S.D.N.Y. July 20, 2007); *see also Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780, at *16 (S.D.N.Y. Aug. 9, 2005) (Swain, J.).

## CONCLUSION

The SCAC sufficiently pleads Defendants' manipulation of the market for Citigroup ARS resulting in damage to the Class of investors who purchased billions of dollars of Citigroup ARS during the Class Period. Indeed, "[w]ho would knowingly roll the dice in  a crooked crap game?" *Schlanger v. Four-Phase Sys. Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982). For the foregoing reasons, Passidomo respectfully requests that the Court deny the motion in its entirety.

DATED:        January 21, 2010

Respectfully submitted,
**ZWERLING, SCHACHTER
& ZWERLING, LLP**

By: _____ s/ Robert S. Schachter _____
        Robert S. Schachter
        Hillary Sobel
        Stephen J. Riegel
        Paul Kleidman
        Justin M. Tarshis
        41 Madison Avenue, 32nd Floor
        New York, NY 10010
        Tel:  (212) 223-3900
        Fax:  (212) 371-5969
        rschachter@zsz.com
        hsobel@zsz.com
        sriegel@zsz.com
        pkleidman@zsz.com
        jtarshis@zsz.com

*Lead Counsel for Lead Plaintiff Dr. Michael A. Passidomo and the Class*

CRIDEN & LOVE, P.A.
Michael E. Criden
Kevin Love
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel:  (305) 357-9000
Fax:  (305) 357-9050
mcriden@cridenlove.com

klove@cridenlove.com

***Co-Counsel for Lead Plaintiff***