UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP AUCTION RATE SECURITIES LITIGATION | 1:08-CV-03095-LTS<br>1:09-md-2043<br><br>AND RELATED CASES |
| This Document Relates to:<br>*In re Citigroup Auction Rate Securities Litigation*,<br>08-cv-3095 (LTS) | |

## PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiff Michael A. Passidomo ("Passidomo" or "Lead Plaintiff"), and Michael Puder, Trustee of the MP Trust ("Puder"), on behalf of themselves individually (collectively, "Plaintiffs") and all others similarly situated and by their attorneys, and pursuant to Federal Rules of Civil Procedure ("FED. R. CIV. P.") Rule 11(b)(3), make the allegations in this Third Consolidated Amended Complaint ("Complaint") upon information and belief (except as to allegations about themselves) and based upon the investigation of counsel into the facts and circumstances alleged herein, which included, *inter alia*, a review and analysis of: (i) the filings of defendant Citigroup, Inc. ("Citigroup") made with the Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, news articles, and other publications disseminated by or concerning Citigroup and the other defendants named in this Complaint (together, the "Defendants") and relating to auction rate securities ("ARS"); (iii) media reports concerning the Defendants and ARS; (iv) transcripts of Citigroup's quarterly earnings conference calls; (v) the websites of Defendants; (vi) other public and non-public information concerning Defendants and ARS; (vii) consultations with consultants and investigators; (viii) the Consent Order, dated December 9, 2008, entered by the Texas State Securities Board in *In the Matter of the Dealer*

*Registration of Citigroup Global Markets Inc.*, Order No. IC08-CAF-21 (the "Texas Consent Order"); (ix) the complaint, dated December 11, 2008, in *SEC v. Citigroup Global Markets, Inc.*, Case No. 08-Civ.-10753 (S.D.N.Y.) ("SEC Compl.") and accompanying consent order, and the Assurance of Discontinuance entered into between Citigroup Global Markets Inc. and the Office of the Attorney General of the State of New York ("NYAG"), dated December 11, 2008 ("AOD") which were filed after initiating investigations in which both the SEC and the NYAG had access to documentary evidence cited therein; and (x) the Administrative Complaint filed by the Office of the Secretary of the Commonwealth of Massachusetts in *In the Matter of UBS Securities, LLC and UBS Financial Services, Inc.*, Docket No. 2008-0045 (the "Mass. Compl."). Plaintiffs believe that after reasonable opportunity for discovery, substantial evidentiary support will likely exist for the following allegations:[1]

## NATURE OF ACTION

1.      Plaintiffs bring this action, pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a) and (c), on behalf of a Class of investors (as defined below in ¶33).

2.      Defendants, during the Class Period (defined below in ¶33), engaged in a scheme, practice or course of conduct to manipulate the market for ARS underwritten and/or sold in auctions managed by Global Markets or purchased through broker-dealer defendant Smith Barney ("Citigroup ARS").

3.      Prior to and during the Class Period, Citigroup ARS could only be sold in auctions managed by Defendants; no public market for Citigroup ARS existed.

---

[1]    The SEC Compl. quotes from documents produced in the SEC investigation of defendant Citigroup Global Markets Inc. ("Global Markets"). Plaintiffs believe that these documents and others produced to the SEC and NYAG will provide further evidentiary support for the allegations herein.

4.      In August of 2007, Global Markets and Smith Barney embarked on a practice designed to give the illusion that the market for Citigroup ARS – controlled and operated by them – had not changed from its successful operation over the prior two decades.

5.      Global Markets and Smith Barney frequently and at increasing monetary levels, intervened into the Citigroup ARS market to manipulate it and to foster the appearance that demand for and supply of Citigroup ARS were in balance.

6.      Without the Defendants' frequent intervention in increasing amounts into the Citigroup ARS market, the Citigroup ARS market would have collapsed no later than the outset of the Class Period, rather than nearly six months later at the end of the Class Period.

7.      Defendants knew, as early as August 2007, at the beginning of the Class Period, that the Citigroup ARS market would collapse absent its frequent intervention at increasing amounts. As the Texas Consent Order found:

> Because of the significant increase in [Global Markets'] ARS inventory, [Global Market] personnel began to discuss the possibility that there might come a time when [Global Markets] could no longer support the auctions. These discussions started in or about August 2007 and continued until the 2008 Auction Failures [*i.e.*, February 2008]. During this time, [Global Markets] understood that its withdrawal from the ARS market would result in some auction failures and the illiquidity of ARS held by its clients.

Texas Consent Order ¶ 31.

8.      By this frequent intervention in increasing amounts, Global Markets and Smith Barney, continued to support the façade that Citigroup ARS auctions were not failing and thus: (a) garnered auction dealer fees based, in part, upon the amount of the Citigroup ARS sold in their auctions; (b) had a vehicle through which to sell some of their own inventory of Citigroup ARS to members of the Class, in an attempt to offset their and Citigroup's balance sheet problems created not only by the market crisis, but by increasing their purchases of Citigroup

ARS to prevent the auctions from failing; (c) set interest rates for Citigroup ARS that were lower than they would have been absent Defendants' manipulative conduct alleged herein; and (d) forestalled the day on which the market would not be manipulated and the fallout Defendants would face from clients, *i.e.*, issuers of Citigroup ARS (including governmental and quasi-governmental entities), federal and state regulators, the public and the Class.

9.      During the Class Period and unbeknownst to Plaintiffs and the Class, Global Markets and Smith Barney manipulated the market for Citigroup ARS by intervening into the Citigroup ARS market at unprecedented increasing levels, fostering the illusion that a valid, liquid and sustainable market existed for Citigroup ARS as liquid securities, where buyers and sellers came together with supply and demand in balance, allowing for the successful completion of auctions, when in fact no such balance existed.

10.     The SEC found that "[i]n August 2007, when concerns about ARS were heightened at [Global Markets], internal documents provided to senior management discussed the implications if [Global Markets] were to stop supporting auctions. The documents stated, 'Investors and issuers might believe that there is *implied liquidity* provided by [Global Markets] *because we have marketed the fact that we have never had a failed auction as lead manager in twenty years*[.]...*" SEC Compl. ¶ 26 (emphasis added).

11.     Near the end of the Class Period, "[o]n February 9, 2008, a senior [Global Markets] official emailed other senior officials: 'I believe that we *should allow market dynamics to determine the pricing and success/failure of these auctions* [student loans]. If we do so, I'd expect them to fail.'" SEC Compl. ¶ 70. "Another senior official replied: 'I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing.'" SEC Compl. ¶ 70 (emphasis added).

12.     Finally on February 11, 2008, Defendants ceased intervening into auctions for Citigroup ARS; the auctions failed in their entirety, and the Citigroup ARS market came to a sudden and immediate halt.

## JURISDICTION AND VENUE

13.     The claims asserted in this Complaint arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78o(a), and Rule 10b-5(a) and (c), promulgated thereunder.

14.     Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act, 28 U.S.C. §1391(b), and 28 U.S.C. §1337. Defendants maintain their principal places of business and transact business in this District, and many of the acts giving rise to the violations alleged herein occurred in this District.

## PARTIES

### Lead Plaintiff Michael A. Passidomo

16.     Passidomo purchased Citigroup ARS through his account at Smith Barney during the Class Period, and suffered damages thereby. The interest rates set in the Citigroup ARS auctions in which Passidomo purchased his Citigroup ARS were lower than they would have been absent Defendants' manipulative conduct alleged herein.  The annexed Certification by Passidomo reflects his Class Period Citigroup ARS purchases.  The Court appointed Passidomo Lead Plaintiff in this action by an order dated June 25, 2008.

17.     At the time of filing the Lead Plaintiff's Consolidated Amended Complaint, dated August 26, 2008, Passidomo had not redeemed his Citigroup ARS; however, when the interest rates payable on those Citigroup ARS dropped, Passidomo redeemed his Citigroup ARS in 2009,

pursuant to the terms of the Citigroup Settlement with the SEC as reflected in the Consent of

Defendant Citigroup Global Markets Inc., dated December 13, 2008 (the "SEC Consent Order")

and the AOD (collectively, the Regulatory Settlements").

18.    The AOD provides:

All customers, including but not limited to Eligible Investors who avail themselves
of the relief provided pursuant to this Assurance, may pursue any remedies against
CGMI available under the law. However, Eligible Investors that elect to utilize the
special arbitration process set forth above are limited to the remedies available in
that process and may not bring or pursue a claim relating to Eligible Auction Rate
Securities in another forum.

AOD ¶ 35.

19.    The SEC Consent Order provides:  "All customers, including but not limited to

Eligible Customers who avail themselves of the relief provided pursuant to this Consent, may

pursue any remedies against [Global Markets] available under the law."  SEC Consent Order ¶

IX B.

**Plaintiff Puder**

20.    Puder purchased Citigroup ARS through his account at Charles Schwab & Co.,

Inc. ("Charles Schwab") during the Class Period and suffered damages thereby. The interest rates

set in the Citigroup ARS auctions in which Puder purchased his Citigroup ARS were lower than

they would have been absent Defendants' manipulative conduct alleged herein. The annexed

Certification by Puder reflects his Class Period Citigroup ARS purchases.

21.    AOD defined Eligible Customer to include: "1. Natural Persons who purchased

ARS at Defendant [Global Markets.]..."

22.    Because Puder purchased his Citigroup ARS at Charles Schwab, he was not

eligible to participate in the Regulatory Settlements.

**Defendants**

23.　　Citigroup is a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup was incorporated in 1988 under the laws of the State of Delaware.

24.　　Global Markets is Citigroup's primary U.S. broker-dealer subsidiary. Global Markets is a broker-dealer registered with the SEC pursuant to §15(b) of the Exchange Act. Global Markets has its principal place of business and is headquartered in New York.

25.　　Global Markets has conducted Citigroup ARS auctions at least since 2003.

26.　　Global Markets has been appointed by the issuers of ARS to serve as a dealer in auctions and is paid by these issuers a dealer fee for those services based upon the principal amount of the securities placed through Citigroup.

27.　　The Short-Term Tax-Exempt Sales and Trading Desk at Global Markets had the responsibility for trading in Citigroup ARS during the Class Period. Texas Consent Order ¶¶ 9-10.

28.　　Smith Barney provides investment advice, financial planning and brokerage services to affluent individuals, companies, and non-profits. For the fiscal year 2007, Smith Barney earned over $3 billion in commissions and fees, which includes brokerage services. During the Class Period, Smith Barney was a division of Global Markets. During the Class Period, Smith Barney was within the Global Wealth Management segment of Citigroup's business.

29.　　Smith Barney has sold Citigroup ARS to investors at least since 2004, and sold Citigroup ARS to Plaintiffs and other members of the Class during the Class Period.

7

30.     In underwriting Citigroup ARS, selling Citigroup ARS and/or managing auctions of Citigroup ARS, Global Markets and Smith Barney, and through them Citigroup, received fees for their services from, among others, the issuers of Citigroup ARS.

31.     When Global Markets underwrote offerings of Citigroup ARS, the issuer paid them underwriting fees.

32.     When Global Markets and/or Smith Barney managed auctions of Citigroup ARS, they receive from the issuer "auction dealer fees." These fees were paid on the principal amount of the securities, *i.e.*, the Citigroup ARS, placed with investors through Defendants.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action as a class action pursuant to FED. R. CIV. P. 23(a) and 23(b)(3), on behalf of all persons or entities that purchased (including those persons or entities that purchased by hold orders as described in ¶46 below) Citigroup ARS during the period from August 1, 2007 through February 11, 2008 (the "Class Period") and were damaged thereby (the "Class"). Excluded from the Class are the Defendants, their partners, directors, officers and employees or their subsidiaries or affiliates (as defined in SEC Rule 12b-2) during the Class Period ("Excluded Persons"), or any entity in which any Excluded Person has a controlling interest, and the legal representatives, heirs, successors and assigns of any Excluded Person.

34.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

35.     Defendants underwrote, sold or managed auctions of more than $30 billion of Citigroup ARS. During the Class Period, Defendants underwrote, sold or managed auctions of billions of dollars of Citigroup ARS.

36.     Plaintiffs' claims are typical of the claims of the Class because they and the Class

members sustained damages from Defendants' wrongful conduct.

37.     Plaintiffs will adequately protect the interests of the Class.  Plaintiffs have retained

counsel who are experienced and competent in class action securities litigation.  Plaintiffs have

no interests which are in conflict with those of the Class.

38.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

39.     Common questions of law and fact predominate over questions which affect only

individual members.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts;

(b)     Whether Defendants pursued the manipulative conduct complained of;

(c)     Whether Defendants acted with the laws' required knowledge, intention

or recklessness;

(d)     Whether Defendants manipulated the market for the Citigroup ARS in

auctions that they managed or co-managed; and

(e)     The extent and measure of damages sustained by the Class.

## FACTUAL ALLEGATIONS

### General Background: Auction Rate Securities and the Citigroup ARS Market

40.     ARS have existed for over two decades.  As alleged by the NYAG, "[Global

Markets] told investors that it had never had a failed auction in its 20 year history in the market,

implying that the auction rate securities market was fully developed and liquid." AOD ¶ 6.

41.     In the aggregate, by the end of the Class Period, the ARS market had grown to

nearly $340 billion.  Of that, according to an Industry Focus report issued by Global Markets,

entitled, "Collapse of the Auction Rate Market," dated April 14, 2008, "80% of the outstanding

auction rate securities are debt instruments and the remaining 20% (or $72 b) are preferred securities (essentially a form of equity, largely used by closed-end funds)."

42.    ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 28, or 35 days.  Generally, ARS trade and are callable at par on the auction date.

43.    Neither Global Markets nor Smith Barney provided to Plaintiffs or members of the Class purchasing Citigroup ARS a prospectus or other offering document before, or contemporaneously with, their purchases.

44.    The auctions serve two purposes. First, an auction provides liquidity or a means for investors who no longer want to hold their ARS, to resell them to other investors. Second, an auction determines the interest rate the issuer of the ARS will pay during the period until the next auction.

45.    Interest is paid in the current period based on the interest rate determined in the prior auction.

46.    Investors submit orders to buy (or bid), hold or sell ARS through the broker-dealers selected by the issuer of a specific ARS.  In a buy or sell order, an investor (new or pre-existing) submits a bid to purchase or sell the ARS.  A hold order, while resulting in a new purchase of the same ARS, does not require a bid in order to receive the interest rate determined at the auction.

47.    The broker-dealer manages the auction process.  Most auctions are run by a single broker-dealer.

48.    Once the broker-dealer receives the orders, it then submits them to the auction agent.  The auction agent collects orders from the broker-dealers, determines the amount of ARS

available for sale, organizes the bids, and determines the clearing rate, *i.e.*, the final rate at which all of the ARS are sold.

49.     During the Class Period, Defendants did not disavow that the process set out in paragraphs 46 through 48 was not the basic process used in auctions for Citigroup ARS.

50.     As set forth in the AOD, "While [Global Markets] could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. *There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers may decide to stop supporting the market, which could cause its collapse.*" AOD ¶ 9 (emphasis added).

51.     In a letter, dated August 15, 2008, the Regional Bond Dealers Association explained this lack of transparency:

> Lead managers in an ARS transaction exercise an almost complete degree of control over information associated with auctions. Lead managers are the only dealers associated with an ARS that know, for example, the number of bidders at an auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there are sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions (before those rates are disclosed to the issuer and investors). *The lead manager is also the only party* (other than perhaps the auction agent, who is not a principal in the transaction) *who knows whether the lead manager itself bid at an auction for its own account and whether that bid was necessary for the auction's success.* [Emphasis added.]

52.     In the event the auction agent does not receive sufficient orders to purchase all the ARS being sold in the auction, the auction is said to have failed.  In other words, an auction fails if there are more ARS for sale than there are bids for them.  If there is a failed auction, holders of ARS are not able to exit their positions in the ARS through the auction.

53.     In the over two decades prior to the beginning of the Class Period, according to reports by Moody's of an analysis, only thirteen auctions of ARS failed, the last one in 2006.

None of those was a Defendants'-managed auction.

54.     During the Class Period, and unbeknownst to Plaintiffs and the members of the Class, auctions managed by entities other than the Defendants began to fail, slightly at first and building to complete failure by February 13, 2008, while Citigroup ARS auctions did not fail until February 11, 2008.

55.     Plaintiffs and the Class had, until February 11, 2008, to their detriment relied upon the market activity in, and the operation of, the market for Citigroup ARS and that it was not rigged based upon its operation for the prior two decades.

56.     On February 11, 2008, the Citigroup ARS market collapsed.

**Defendants' Manipulation of the Citigroup ARS Market during the Class Period**

57.     Beginning no later than August 1, 2007 and continuing throughout the Class Period, in their roles actively selling and managing Citigroup ARS auctions, Smith Barney and Global Markets knew that the number of buyers for Citigroup ARS did not match or exceed the sellers of Citigroup ARS, and that sellers were increasing and buyers were decreasing. As a consequence of this imbalance, Citigroup ARS auctions would have failed without the intervention of Smith Barney and Global Markets.

58.     Smith Barney and Global Markets knew of this imbalance and the trends of the imbalance and that the consequence of these imbalances and trends would lead to failed auctions of Citigroup ARS without their intervention because of the roles they played in the Citigroup ARS auctions they managed.

59.     As alleged by the NYAG, "[Global Markets] was aware of the increasing strains on the auction rate securities market, and increasingly questioned the viability of the auction rate securities market and planned for potential widespread failure." AOD ¶ 12.

60.     Similarly, the SEC found that "[d]uring the fall of 2007 [*i.e.*, at the beginning of the Class Period], the credit crisis and deteriorating market conditions caused [Global Markets] to have to support its auctions to a greater extent.  [Global Markets] knew that the ARS market was deteriorating and [Global Markets]'s inventory of ARS was significantly increasing. Accordingly, [Global Markets] knew the risk of failed auctions had materially increased." SEC Compl. ¶ 2.

61.     Contemporaneously with the "credit crisis and deteriorating market conditions," as alleged by the SEC, "[b]eginning in August 2007, as [Global Markets] increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of [Global Markets]'s ARS inventory reached the internal balance sheet limit that [Global Markets] had set for its ARS inventory." SEC Compl. ¶ 33.

62.     "[O]n August 16, 2007 [*i.e.*, just after the Class Period commenced], Short-Term Trading management emailed senior management, 'We need to discuss the current state of the auction rate market, *our commitment to the auctions*, its *impact on our balance sheet* and the effect of our actions on our clients...*our actions will have broad-reaching implications to* all of *our constituents, the market, and our franchise*.'" SEC Compl. ¶ 34  (emphasis added).

63.     "[Global Markets'] support bids filled the increasing gap in the demand for auction rate securities, sustaining the impression that the market was functioning.  As a result, [Global Markets'] auction rate securities inventory grew significantly, requiring [Global Markets] to raise its risk management limits on its auction rate securities inventory several times." AOD ¶ 11.

64.     "As [Global Markets]'s ARS inventory grew, [Global Markets] increased its efforts to sell the inventory." SEC Compl. ¶ 40.

65.     "For example, on August 30, 2007 [*i.e.*, one month into the Class Period], an email to ARS traders stated, 'Make sure you don't leave any stones unturned today. We are currently at our extended limit. Hit all bids....*Times like these, we need to do whatever is necessary. Just make sure all hands are on deck and paper is sold*." SEC Compl. ¶ 41 (emphasis added).

66.     As alleged in paragraphs 59-65 above, Smith Barney and Global Markets knew at the very beginning of the Class Period that without their continued intervention into the Citigroup ARS market, that market would fail, affecting not only investors, but Defendants' own well-being, reflecting both on their balance sheet and in public perception of their "franchise."

67.     In order to prevent failed auctions, the consequent loss of underwriting and auction dealer fees, and to allow Smith Barney and Global Markets to sell the Citigroup ARS inventory held on Citigroup's balance sheet, these Defendants embarked on a practice to regularly and increasingly intervene to prevent failed auctions.  By so doing, Smith Barney and Global Markets fostered the illusion of a stable market for Citigroup ARS auctions it managed during the Class Period.

68.     Throughout the Class Period, supply of Citigroup ARS was increasing while the demand for Citigroup ARS was decreasing.

69.     When the supply of Citigroup ARS exceeded the bids (or demand) for Citigroup ARS, Smith Barney and Global Markets submitted bids to ensure that those ARS offered would be sold in the auction.  They did this more frequently and at increasing monetary levels throughout the Class Period.  Indeed, while competitors of Smith Barney and Global Markets experienced failed auctions during the Class Period, Citigroup ARS  auctions did not.

70.     As the SEC alleged,

As early as August 2007 [*i.e.*, the beginning of the Class Period], *[Global Markets]* *recognized that the amount of available ARS exceeded the demand, but [Global* *Markets] continued to increase the amount of ARS that [Global Markets]* *underwrote and marketed, thereby contributing to the inventory and balance sheet* *problems that threatened its ability to continue supporting auctions*....[Global Markets] investment bankers also wanted to continue bringing new ARS to market, to *earn fees* and to *maintain their position* vis-a-vis bankers at other broker-dealers, despite the **need to control the supply and inventory of ARS.** Not until early November 2007 did [Global Markets] finally curtail new ARS issuances for the year."

SEC Compl. ¶ 37 (emphasis added).

71.    "The balance sheet limit for ARS ultimately was increased, and [Global Markets]

continued to support auctions. The balance sheet limit had to be increased additional times

throughout the fall of 2007 and beginning of 2008 [*i.e.*, throughout the Class Period] to

accommodate [Global Markets]'s ARS inventory as it increased from approximately $4 billion to

more than $10 billion in February 2008 when [Global Markets] stopped supporting auctions."

SEC Compl. ¶ 36.

72.    Plaintiffs and members of the Class continued to purchase Citigroup ARS

believing that the "auction process" was in fact occurring as an auction is intended, *i.e.*, buyers

and sellers each bidding for and offering for sale Citigroup ARS based upon an unmanipulated

market's determination of a specified clearing rate.

73.    As alleged by the NYAG, "[Global Markets] told investors that it had never had a

failed auction in its 20 year history in the market, implying that the auction rate securities market

was fully developed and liquid." AOD ¶ 6.

74.    Plaintiffs and all members of the Class purchased Citigroup ARS, in ignorance of

Defendants' manipulative conduct, instead relying upon the market activity in, and the operation

of, the market for Citigroup ARS and that it was not rigged, based on its operation for the prior

two decades, specifically that the prices at which they purchased Citigroup ARS, the prices at which Citigroup ARS were sold, and the interest rates set on the Citigroup ARS were determined by the natural interplay of supply and demand.

75.     Plaintiffs and all members of the Class reasonably relied on the market activity in, and the operation of, the market for Citigroup ARS and that it was not rigged based on the fact that it operated for two decades without a failed auction.

76.     The SEC found that "[i]n August 2007, when concerns were heightened at [Global Markets], internal [Global Markets] documents provided to senior management discussed the implications if [Global Markets] were to stop supporting auctions. The documents stated, 'Investors and issuers might believe that there is *implied liquidity* provided by [Global Markets] *because we have marketed the fact that we have never had a failed auction as lead manager in twenty years, and also identified the risk of lawsuits.*"   SEC Compl. ¶ 26   (emphasis added).

77.     The SEC refers to another Citigroup document from Short-Term Trading management which states: "Implied liquidity: bankers, salespeople and trades have implied the concept of liquidity provided by [Global Markets] for investors and issuers for over 20 years." SEC Compl. ¶ 26.

78.     As alleged in paragraphs 73 through 77 above, Smith Barney and Global Markets understood that investors in the Citigroup ARS market believed that they continued to provide liquidity in the Citigroup ARS market as they had "for over 20 years," while Smith Barney and Global Markets knew that only their frequent intervention in increasing monetary amounts provided that perception.

79.     Because Plaintiffs and the Class reasonably relied on the market activity in, and the operation of, the market for Citigroup ARS and that it was not rigged based on its operation for the prior two decades, Plaintiffs and the Class did not pay less than par or demand an increased interest rate for the Citigroup ARS they purchased in order to compensate them for investing in a manipulated Citigroup ARS market.

80.     The scope and pattern of Smith Barney and Global Markets' frequent and increasing intervention into the auctions for Citigroup ARS was unknown to Plaintiffs and the members of the Class, and could not be known.

81.     As set forth in the AOD, "While [Global Markets] could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. *There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers may decide to stop supporting the market, which could cause its collapse.* AOD ¶ 9 (emphasis added).

82.     As the SEC found, Defendants' market manipulation concealed the extent to which the liquidity of Citigroup ARS depended upon Citigroup bidding in the auctions.  SEC Compl. ¶ 23.  Thus, "even if a customer had been informed that there was liquidity risks associated with ARS, *the customer would not know that the liquidity risk, to a significant degree, depended upon [Global Markets]'s discretion to bid to support auctions.*" SEC Compl. ¶ 23 (emphasis added).

83.     Moreover, "[b]ecause investors could not ascertain how much of an auction was filled through [Global Markets] proprietary trades, *investors could not determine if auctions were clearing because of normal marketplace demand, or because [Global Markets] was propping up auctions through support bids.*" AOD ¶ 9 (emphasis added).

84.     As noted in an article in the April 14, 2008 edition of the DealBook page of *The New York Times*, "A Long, Cold Cashless Siege," in the aftermath of the failure of the Citigroup ARS market, and other ARS markets:

> Indeed, experts say that calling these securities auction-oriented is something of a misnomer because real auctions – during which buyers and sellers meet and an interest rate is set based upon their interest – weren't taking place in recent years. Instead, the Wall Street firms in charge of the auctions smoothed the process by bidding with their own capital rather than rustling up thousands of buyers to meet up with sellers every week or so.
>
> Given this market's size, it became harder for Wall Street to arrange true auctions regularly.
>
> ***
>
> "Auction securities became a managed bidding system, not a true investor auction," said Joseph S. Fichera, chief executive of Saber Partners, a financial advisory firm. "*The investor never knew how many investors there were, how often the brokerage firms were stepping in to make the system work, nor that the broker's support could stop all of a sudden.*
>
> "*If we had transparency in the system, investors could have judged the ability to sell in the individual auctions and bid accordingly,*" he added. [Emphasis added.]

85.     As reported in the June 5, 2008 edition of *The Bond Buyer*:

> Martha Mahan Haines [SEC Chief of Office of Municipal Securities] said that *one of the biggest problem in the ARS market was its opacity, which may have kept investors from knowing that a small group of broker-dealer firms that bid on the auctions were critical to preventing widespread failures.* Even though broker-dealers disclosed that they were bidding on auctions, *the extent of their participation was unknown,* she said.
>
> "If investors could see that broker-dealers were so active in this market ... perhaps it wouldn't have grown so large, well beyond the broker-dealers' ability to hold it up," Haines said, speaking at the Securities Industry and Financial Markets Association's legal and compliance conference in New York. "We may not have gotten into this mess had there been transparency." [Emphasis added.]

86.     Accordingly, and in light of the allegations in paragraphs 81 through 85 above, Plaintiffs and all members of the Class relied upon the market activity in, and the operation of, the market for Citigroup ARS and that it was not rigged based on its operation for the prior two

decades, and paid prices for and received interest rates based on the reasonable belief that those prices and interest rates were determined in a market free from manipulation by Smith Barney and/or Global Markets.

87.     Notwithstanding that Smith Barney and Global Markets knew during the Class Period that sellers and Citigroup ARS supply outstripped buyers and demand, and that the auctions for Citigroup ARS would collapse without frequent intervention at increasing monetary levels, they nonetheless continued to underwrite Citigroup ARS and/or act as a broker-dealer managing auctions through which Plaintiffs and the Class purchased Citigroup ARS.

88.     "When [Global Markets] discussed the possibility of failed auctions, [Global Markets] often stated that ARS have high, above market, maximum rate resets if an auction failed to compensate the holder for the lack of liquidity and to create incentives for the issuer to restructure the ARS, thereby providing liquidity to the holder....[However,] certain ARS had low, below market, maximum rate resets." SEC Compl. ¶ 46.

89.     "Certain types of ARS, such as certain classes of municipal ARS, did have fixed maximum rate resets as high as fifteen or twenty percent.  In contrast, however, *other ARS, such as Student loan ARS...*and preferred ARS issued by closed-end funds...*had formulaic maximum rate resets that were determined by reference to certain market indices.  At least since August 2007, these market indices were generally low ....*" SEC Compl. ¶ 47 (emphasis added).

90.     "During the fall of 2007, [Global Markets] increasingly became aware that ARS with low maximum rate resets were not 'viable' instruments in the market conditions at that time because if an auction failed, *a holder of these ARS would receive a below-market rate*, rather than an above-market rate to compensate the holder for the illiquidity."  SEC Compl. ¶ 50 (emphasis added).

91.     During the Class Period, and while knowing that sellers and supply of Citigroup ARS outstripped buyers and demand, the Global Markets "auction desk" continued to encourage Smith Barney brokers to sell new issues of Citigroup ARS.

92.     "A November 1, 2007 internal email from Short-Term Trading management expressed concerns about 'monolines and growing illiquidity in the ARS market.'... They stated, 'Since the credit crisis hit this summer, the ARS market has been under pressure caused by investor risk aversion and other dealers' failed auctions...As a result, liquidity has been thin. Given the difficulty of monolines... we are very concerned that a further investor pullback could increase the risk of widespread failed auctions." SEC Compl. ¶ 57.

93.     As reported in *The Wall Street Journal* on July 28, 2008:

Wall Street firms started raising commissions paid to some brokers at outside dealers who sold the securities to clients, an action that might serve as an enticement to them to sell more. *On Nov. 2, 2007, for example, Credit Suisse's short-term trading desk sent out an email informing its salespeople that Citigroup was increasing its commissions to outside dealers from 0.15 of a percent of the security sold to 0.20 of a percent on certain of its auction-rate securities, according to a person familiar with the email.* By the start of January, their commissions on all types of Citigroup's auction-rate securities rose to 0.15 of a percent, instead of 0.1, says the person. [Emphasis added.]

94.     The auction desk, the central command center for its Citigroup ARS business, sent mass e-mails to Smith Barney's brokers identifying Citigroup ARS issues, the commission to the brokers for placing the Citigroup ARS, and the "price talk" (*i.e.*, the range of likely clearing rates for the auction) payable to investors who purchased these issues.

95.     E-mail traffic to Smith Barney's brokers touting the sale of Citigroup ARS to the Class increased significantly during the second half of 2007 (*i.e.*, during the Class Period).

96.     To entice Smith Barney's brokers into selling and investors into acquiring these new issues, the commission rates to brokers increased as did the interest rates paid on the

Citigroup ARS to investors.

97.    "[I]n early November 2007, [Global Markets] raised its commission to [Financial Advisers] for seven-day municipal ARS from twenty to twenty-five basis points....[a]n internal memorandum explained that the increased commissions were to 'help to move increasing inventory while capital is sparse,'...'assist in managing another large year of new issuance distribution,'...'make[] the product more attractive relative to other options,' and 'answer[] the call of banking and management to find additional methods to augment distribution.'" SEC Compl. ¶ 42.

98.    The Texas Consent Order found:

[O]n or about November 8, 2007, [Global Markets] increased the sales credit paid to Smith Barney Financial Advisers in connection with the sale of 7-day Municipal ARS.

[Global Markets'] internal reasons for the increased sales credit included: (1) "move increasing inventory"; (2) make "the product more attractive relative to other options; (3) "greater pressure on our balance sheet"; and (4) "greater pressure from issuers concerning execution versus competitors."

Texas Consent Order ¶¶ 33-34.

99.    In December 2007, in a mass e-mail to Smith Barney's brokers, Smith Barney and Global Markets encouraged those brokers to sell a Defendants'-underwritten offering of Citigroup ARS issued by Baylor School of Medicine ("Baylor ARS"), with the "price talk" of 3.3-3.4%. As an incentive to its brokers to sell the Baylor ARS, Defendants Smith Barney and Global Markets offered an increased commission to 25 basis points (from the usual 18-20 basis points). After the initial e-mail, Defendants Smith Barney and Global Markets internally disseminated another e-mail, this time with the "price talk" increasing the yield to investors to 3.5-3.6%, and increasing the Smith Barney brokers' commission from 25 basis points to 50 basis points.

21

100.    The auction desk told Smith Barney's brokers that the attractive terms did not reflect any increased risk associated with the ARS, but rather was a means to bring money into the firm because Citigroup was contending with the negative financial impact of the subprime crisis.

101.    During the Class Period, Smith Barney and Global Markets continued to create incentives to push sales of Citigroup ARS to investors, such as Plaintiffs and the Class, in an effort to alleviate their own financial burdens at the expense of investors, as described in paragraphs 93 through 100 above.

102.    "By the beginning of December 2007, Short-Term Trading management communications discussed various scenarios under which auctions might fail." SEC Compl. ¶ 58.

103.    "A December 7, 2007 email stated that senior [Global Markets] officials 'don't have much of a problem of letting them [ARS] go if times get much tougher.'" SEC Compl. ¶ 59.

104.    "On December 15, 2007, internal emails discussed subordinate student loans, which were a significant portion of [Global Markets'] inventory, and [Global Markets] potentially allowing those auctions to fail when certain maximum loss or balance sheet limits were reached. One email stated, 'Of course if they [the subs] go, everything will probably go as well....'" SEC Compl. ¶60 (last alteration in original.)

105.    Six weeks before Smith Barney and Global Markets ceased portraying the illusion that the Citigroup ARS market operated as it had for 20 years, *i.e.*, without manipulating, the perception that the natural interplay of supply and demand set prices and interest rates for Citigroup ARS, according to the SEC, an internal document, dated December 24, 2007, "provided to senior management about the ARS market discussed [Global Markets'] current goals and objectives and its plan in the event of failed auctions." SEC Compl. ¶61.

106.   "In the cover email to the December 24, 2007 document, a senior official stated that a failed auction at [Global Markets] 'seems like an unavoidable eventuality.'" SEC Compl. ¶ 64.

107.   An e-mail, dated February 7, 2008 (between and among personnel of UBS [one of Defendants' competitors]), reflected Smith Barney's and Global Markets' knowledge of the impact of no longer supporting auctions (*i.e.*, letting them fail) on the eve of their decision to cease supporting auctions:

> This is bad. I took a ride w my neighbor from citi, they are looking at some worse case scenarios that are really shaking them up. ... Things like affects to IBD, lending and other businesses if corporations get stuck with billions in failed auctions, where do they get their cash and from whom. ... I would say if body language is meaningful, they are either teetering on the edge or the pressure is just unbelievable. He was dying to ask me if we are contemplating failing auctions.

Mass. Compl. Ex. 23.

108.   "On February 9, 2008, a senior [Global Markets] official emailed other senior officials:  'I believe that we *should allow market dynamics to determine the pricing and success/failure of these auctions* [student loans]. If we do so, I'd expect them to fail.'"  SEC Compl. ¶ 70 (emphasis added).  "Another senior official replied: 'I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing.'" SEC Compl. ¶ 70.

109.   Ultimately, on February 11, 2008, six weeks after acknowledging that failures of Citigroup ARS auctions were "an unavoidable eventuality," SEC Compl. ¶ 64, Smith Barney and Global Markets ceased intervening into the auctions to prevent them from failing and finally allowed "market dynamics to determine the pricing and success/failure of these auctions." SEC Compl. ¶ 70. Consequently, all of Citigroup ARS auctions failed.

110.   Not until March 2008, when Smith Barney and Global Markets mailed Lead Plaintiff's brokerage statements for the period from February 1 through February 29, 2008, did they finally admit in a "Message" at the end of the statement, "that the Auction-Rate Securities (ARS) market is experiencing a supply and demand imbalance, resulting in failed auctions and significantly reduced or lack of liquidity."

111.   An article entitled "What Ails the Auction-Rate Market," reproduced in a Smith Barney publication, entitled "Perspectives <<on the markets" dated March 2008, stated, in part:

> SO, WHAT HAPPENED? ... The market has functioned well—so long as participants could assume investors would be available to buy subsequent auctions. In the past few weeks, that assumption suddenly proved invalid because of tight balance sheets at banks that historically have provided liquidity during periods of supply/demand imbalances ....

**Loss Causation/Economic Loss**

112.   As alleged above, Smith Barney and Global Markets manipulated the market for Citigroup ARS.

113.   This comprehensive scheme and course of conduct manipulated the Citigroup ARS market by, among other things, creating a false impression of the supply and demand for Citigroup ARS for the purpose of overvaluing the price of, and manipulating the interest rates for, those securities. Specifically, the interest rates set were lower than they would have been absent Defendants' manipulative conduct.

114.   The materialization of the risks concealed by the manipulation of the Citigroup ARS market by Smith Barney and Global Markets was foreseeable to them throughout the Class Period:

- "Because of the significant increase in [Global Markets'] ARS inventory, [Global Market] personnel began to discuss the possibility that there might come a time when [Global Markets] could no longer support the auctions.  These discussions started in or about August 2007 and continued until the 2008 Auction Failures [i.e., February 2008].  During this time, [Global Markets] understood that its withdrawal from the ARS market would result in some auction failures and the illiquidity of ARS held by its clients." Texas Consent Order ¶ 31.

- "[Global Markets] was aware of the increasing strains on the auction rate securities market, and *increasingly questioned the viability of the auction rate securities market and planned for potential widespread failure.*" AOD ¶ 12 (emphasis added).

- "During the fall of 2007 [i.e., at the beginning of the Class Period], the credit crisis and deteriorating market conditions caused [Global Markets] to have to support its auctions to a greater extent.   [Global Markets] *knew that the ARS market was deteriorating* and [Global Markets]'s inventory of ARS was significantly increasing.  Accordingly, [Global Markets] *knew the risk of failed auctions had materially increased.*" SEC Compl. ¶ 2 (emphasis added).

- "[O]n August 16, 2007 [i.e., just after the Class Period commenced], Short-Term Trading management emailed senior management, 'We need to discuss the current state of the auction rate market, our commitment to the auctions, its impact on our balance sheet and the effect of our actions on our clients...our actions will have broad-reaching implications to all of our constituents, the market, and our franchise.'" SEC Compl. ¶ 34.

- "By the beginning of December 2007, Short-Term Trading management communications *discussed various scenarios under which auctions might fail.*"  SEC Compl. ¶ 58 (emphasis added).

- "A December 7, 2007 email stated that senior [Global Markets] officials 'don't have much of a problem of letting them [ARS] go if times get much tougher.'" SEC Compl. ¶ 59.

- "In the cover email to the December 24, 2007 document, a senior official stated that a failed auction at [Global Markets] *'seems like an unavoidable eventuality.'*" SEC Compl. ¶ 64 (emphasis added).

- "On February 9, 2008, a senior [Global Markets] official emailed other senior officials: 'I believe that we *should allow market dynamics to determine the pricing and success/failure of these auctions* [student loans]. If we do so, I'd expect them to fail.'" SEC Compl. ¶ 70. "Another senior official replied: 'I agree. It's time to let the market itself try to correct the supply/demand imbalances we are experiencing.'" SEC Compl. ¶ 70 (emphasis added).

115.    Those risks, which became apparent to Defendants in August 2007, materialized when Defendants refused to continue supporting the market for Citigroup ARS, and that market collapsed on February 11, 2008.

116.    Materialization of those risks directly and/or proximately caused the damages sustained by Plaintiffs and Class members.

117.    Only through the persistent conduct of Smith Barney and Global Markets in artificially supporting, maintaining, and intervening in the auctions frequently and at increasing monetary amounts to prevent failures, was the Citigroup ARS market able to exist during the Class Period.

118.    The Citigroup ARS market depended on the voluntary, pervasive, and ongoing participation of Smith Barney and Global Markets in the auctions, their manipulation of the price and interest rates of Citigroup ARS, and their acquisition of Citigroup ARS in order to keep the auctions from failing.  That conduct created an illusory market that, unbeknownst to Plaintiffs and Class members, would otherwise fail and further, limit the interest payable to investors to below-market rates.

119.    If not for the manipulation by Smith Barney and Global Markets of the market for Citigroup ARS, Plaintiffs and Class members would not have purchased Citigroup ARS or would not have purchased them for the price (*i.e.*, at par) and/or at the interest rates at which they did.

120.    Among other things, the manipulative conduct of Smith Barney and Global Markets caused the interest rates on Citigroup ARS both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had Plaintiffs and the Class been aware of the true characteristics of the Citigroup ARS market and in the absence of the manipulative conduct.

121.   Defendants' wrongdoing directly or proximately caused economic losses to Class members by limiting the interest that they would have received in the absence of Defendants' manipulation.

122.   Certain Class members continue to receive interest and/or dividends on their Citigroup ARS at below-market rates that are insufficient to compensate for the lack of liquidity features inherent in the securities, as Global Markets knew, as of the fall of 2007. SEC Compl. ¶50.

123.   As a result of Defendants' manipulation of the Citigroup ARS market, the values of Citigroup ARS have declined substantially.

124.   Citigroup ARS can only be sold in a Citigroup-managed auction. Thus, Plaintiffs and other members of the Class who held Citigroup ARS as of February 11, 2008, when new auctions had not yet been scheduled in which to sell their Citigroup ARS, could not sell their Citigroup ARS.

125.   Because of Defendants' manipulation of the Citigroup ARS market, Plaintiffs and Class members were damaged when Defendants withdrew their support for the Citigroup ARS market.

## COUNT I
### Violations of Section 10(b) and Rule 10b-5(a) and (c): Market Manipulation
### (Against Defendants Smith Barney and Global Markets)

126.   Plaintiffs repeat and reallege each of the allegations set forth in ¶¶ 1 through 125.

### *Use of the Means or Instrumentalities of Interstate Commerce or the Mails*
### *in Connection with the Plaintiffs' Purchases of Citigroup ARS*

127.   Defendants' manipulative conduct, in connection with the purchases of Citigroup ARS by Plaintiffs and the members of the Class, was furthered by their use of the means or

instrumentalities of interstate commerce and the mails, including, but not limited to, sending to Lead Plaintiff and the Class their brokerage statements reflecting that an unmanipulated market for Citigroup ARS existed during the Class Period.

### Scienter

128.   During the Class Period, with knowledge of or reckless disregard for the truth, Defendants engaged in manipulative conduct.

129.   Defendants knew or recklessly disregarded that: (a) as of the commencement of the Class Period, sellers and supply of Citigroup ARS outstripped buyers and demand for Citigroup ARS, an imbalance that would lead to failed auctions; (b) in order to avoid failed auctions, Defendants would need to intervene in the Citigroup ARS market more frequently and in increasing monetary amounts to give the illusion of an equality of buyers and sellers of Citigroup ARS; and (c) without Defendants' intervention in the Citigroup ARS market more frequently and in increasing monetary amounts, the auctions would fail, and Defendants would: (i) not receive underwriting fees for new Citigroup ARS offerings, (ii) not receive broker-dealer fees and commissions associated with the offering and sale of Citigroup ARS; (iii) not receive auction dealer fees associated with the auctions of Citigroup ARS; (iv) subject themselves to huge liabilities to issuers of Citigroup ARS and investors who purchased Citigroup ARS (including Plaintiffs and the members of the Class); and (v) subject themselves to regulatory investigations and proceedings.

130.   No later than by the commencement of the Class Period, Defendants knew that Citigroup's financial statements would reflect a continuing negative impact from the subprime crisis. Accordingly, Smith Barney and Global Markets needed to find a means by which to offset the negative impact and so, embarked on a course of conduct to support its auctions of Citigroup

ARS to generate underwriting, broker-dealer and auction dealer fees.

131.   By August 2007, Smith Barney and Global Markets recognized that investors believed that the Citigroup ARS auctions were safe and liquid even though Smith Barney and Global Markets knew that the Citigroup ARS auctions were not safe, not liquid, and not reflective of the natural interplay of supply and demand.

132.   With that knowledge, Smith Barney and Global Markets undertook to further manipulate the Citigroup ARS auction process by increasing its bidding authority and making increasingly larger purchases of Citigroup ARS to continue manipulating the Citigroup ARS market activity at a time when the risks to Citigroup ARS investors had already materialized.

133.   The affirmative acts of increasing internal limits to purchase Citigroup ARS to support the Citigroup ARS market – as alleged in paragraphs 60, 61 and 63 above – further evidences Smith Barney's and Global Markets' *scienter* and efforts to concealing the anticipated failure of the Citigroup ARS market.

134.   Defendants succeeded in offsetting the negative impact from its exposure to the subprime crisis quarter after quarter during the Class Period.  As alleged by the SEC:

(a)   "During the fall of 2007 [*i.e.*, at the beginning of the Class Period], the credit crisis and deteriorating market conditions caused [Global Markets] to have to support its auctions to a greater extent.  [Global Markets] knew that the ARS market was deteriorating and [Global Markets]'s inventory of ARS was significantly increasing.  Accordingly, [Global Markets] knew the risk of failed auctions had materially increased." SEC Compl. ¶ 2;

(b)   "Beginning in August 2007, as [Global Markets] increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of [Global Markets]'s ARS

inventory reached the internal balance sheet limit that [Global Markets] had set for its ARS inventory." SEC Compl. ¶ 33; and

(c)   "[O]n August 16, 2007 [*i.e.*, just after the Class Period commenced], Short-Term Trading management emailed senior management, 'We need to discuss the current state of the auction rate market, *our commitment to the auctions*, its *impact on our balance sheet* and the effect of our actions on our clients…*our actions will have broad-reaching implications to* all of our *constituents, the market, and our franchise*.'" SEC Compl. ¶ 34 (emphasis added).

135.   As demonstrated by the statements of its then Chief Financial Officer (Gary Crittenden) later during the Class Period, specifically in the 3rd Quarter 2007 earnings conference call held on October 15, 2007 and again in the 4th Quarter 2007 earnings conference call held on January 15, 2008, Citigroup's Global Wealth Management business – of which Smith Barney is a part – continued to contribute growing revenues.

136.   During the 3rd Quarter earnings conference call, for example, Citigroup's CFO reviewed the slide presentation disseminated to analysts participating in the call, and stated:

… items which significantly impact the results for the quarter. First we took a 1.352 billion write-down in our highly-leveraged finance portfolio. Secondly, *we took write-downs in the value of our mortgage backed securities and leveraged loans which were warehoused for future CDO or CLO securitizations as well as on CDO positions of 1.561 billion net of any hedges.*

\*\*\*

Drivers of non-interest revenues also grew nicely … In our Global Wealth Management business assets under fee based management grew 38% or 20% organically. In Investment Banking we ranked Number 1 in global debt underwriting, Number 3 in announced and completed M&A and Number 2 in global equity underwriting on a year to date basis.

\*\*\*

*Year to date revenue growth trends are strong despite the severe market dislocations in the third quarter. We're pleased to see that the relative growth rates of our businesses: markets and banking, international consumer, and Global Wealth Management all grew revenues at double digit rates.*
[Emphasis added.]

137.    At the outset of the 4th Quarter earnings conference call, Citigroup's CEO Vikram

Pindit remarked: "In particular, we had record results in Wealth Management...."  Later during

that same call, Citigroup's then CFO Gary Crittenden reviewed the slide presentation

disseminated to analysts participating in the call, and stated:

> Slide 1 shows you the consolidated results that we have for the quarter. To
> summarize our fourth quarter results, *net revenues declined 70%, primarily on*
> *$17.4 billion in writedowns in fixed income on our direct subprime exposures,*
> *partially offset by continuing underlying growth in many of our other businesses.*
>                                        ***
> Drivers of non-interest revenues also grew nicely. Credit card purchase sales were
> up 8% in the U.S. and 37% internationally. Internationally, organic card purchase
> sales growth was 25%. International assets under management were up 24% in
> International Consumer, client capital under management in CAI was up 26%. In
> our Global Wealth Management business, assets under fee-based management
> grew 27%, or 9% organically. In Investment Banking, for the full year 2007, we
> ranked number one in global debt underwriting, number three in announced and
> completed M&A, and number three in global equity underwriting. [Emphasis
> added.]

138.    Defendants destroyed documents pertaining to Citigroup ARS in auctions

managed by them. The documents at issue were covered by *subpoena* issued by the NYAG on

April 14, 2008, and were also required to be preserved pursuant to the Private Securities

Litigation Reform Act of 1995.

139.    The *subpoena* demanded production of "recordings of telephone conversations

concerning the marketing, sale, distribution or auction of auction-rate securities."  Global

Markets admitted to the NYAG that its auction desk recordings had been destroyed and are not

recoverable.

### Reliance and Transaction Causation

140.    Plaintiffs and other members of the Class purchased Citigroup ARS during the

Class Period while Defendants engaged in the manipulative conduct alleged in this Count, and in

ignorance of Defendants' manipulative conduct.

141.    If not for the manipulation by Smith Barney and Global Markets of the market for Citigroup ARS, Plaintiffs and Class members would not have purchased Citigroup ARS or would not have purchased them for the price (*i.e.*, at par) and/or at the interest rates at which they did.

142.    When Plaintiffs and other members of the Class purchased Citigroup ARS, they did so in reliance upon the market activity in, and the operation of, the market for Citigroup ARS and that it was not rigged based on its operation for the prior two decades, specifically that the prices at which they purchased Citigroup ARS, the prices at which Citigroup ARS were sold, and the interest rates set on the Citigroup ARS were determined by the natural interplay of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct.

143.    As set forth in the AOD, "While [Global Markets] could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. *There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers may decide to stop supporting the market, which could cause its collapse.*" AOD ¶ 9 (emphasis added).

144.    As also alleged by the NYAG, "[Global Markets] told investors that it had never had a failed auction in its 20 year history in the market, implying that the auction rate securities market was fully developed and liquid." AOD ¶ 6.

145.    The SEC found that "[i]n August 2007, when concerns were heightened at [Global Markets], internal [Global Markets] documents provided to senior management discussed the implications if [Global Markets] were to stop supporting auctions. The documents stated, 'Investors and issuers might believe that there is *implied liquidity* provided by [Global

Markets] *because we have marketed the fact that we have never had a failed auction as lead manager in twenty years[.]…*"  SEC Compl. ¶ 26 (emphasis added).

146.   The SEC refers to another Citigroup document from Short-Term Trading management which states: "Implied liquidity: bankers, salespeople and trades have implied the concept of liquidity provided by [Global Markets] for investors and issuers for over 20 years." SEC Compl. ¶ 26.

147.   As set forth in the AOD, "While [Global Markets] could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. *There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers may decide to stop supporting the market, which could cause its collapse.*" AOD ¶ 9 (emphasis added).

148.   As the SEC found, Defendants' market manipulation concealed the extent to which the liquidity of ARS depended upon Citigroup bidding in the auctions.  SEC Compl. ¶ 23. Thus, "even if a customer had been informed that there was liquidity risks associated with ARS, *the customer would not know that the liquidity risk, to a significant degree, depended upon [Global Markets]'s discretion to bid to support auctions.*" SEC Compl. ¶ 23 (emphasis added).

149.   Moreover, "[b]ecause investors could not ascertain how much of an auction was filled through [Global Markets] proprietary trades, *investors could not determine if auctions were clearing because of normal marketplace demand, or because [Global Markets] was propping up auctions through support bids.*  AOD ¶ 9 (emphasis added).

### The 2006 SEC Order and the Smith Barney Website Do Not Negate Reliance

150.    As Citigroup ARS could only be purchased or sold in Citigroup-managed auctions, no outside information (*i.e.*, outside the closed market for Citigroup ARS) regarding Citigroup ARS affected the interest rate and price at which the auctions cleared.

151.    The Order issued by the SEC on May 31, 2006 (the "2006 SEC Order") was not widely disseminated information that could objectively impact the price paid and interest rates set for Citigroup ARS.

152.    Plaintiffs and the Class did not and could not consider the 2006 SEC Order in determining at what price and interest rates to purchase the Citigroup ARS, so as to have those prices and interest rates reflect what was unknown to them, *i.e.*, whether there were enough bids for the Citigroup ARS auctions to succeed without Defendants' frequent intervention at increasing monetary levels.

153.    During the Class Period the Smith Barney website, ostensibly modified to reflect the sanctions imposed upon them pursuant to the 2006 SEC Order, did not reflect the extent to which they actually intervened into the Citigroup ARS market so as to contradict its prior statements and impressions conveyed to the Class:

> Citigroup is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller and routinely does so in the auction rate securities market in its sole discretion. If Citigroup submits an order for its own account, it would have an advantage over other bidders because Citigroup would have knowledge of some or all of the other orders placed through Citigroup in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the auction is likely to clear at a particular rate. For this reason, and because Citigroup is appointed and paid by the relevant issuer to serve as a broker-dealer in the auction, Citigroup's interests in conducting an auction may differ from those of existing holders and potential holders who participate in auctions.

***

Bidding with Knowledge

Citigroup may routinely place one or more bids in an auction for its own account to acquire ARS for its inventory, to prevent a failed auction (i.e., an event where there are insufficient clearing bids which would result in the auction rate being set at the Maximum Rate) or an auction from clearing at a rate that Citigroup believes does not reflect the market for the particular ARS being auctioned. Citigroup may place such bids even after obtaining knowledge of some or all of the other orders submitted through it. When bidding for its own account, Citigroup may also bid outside or inside the range of rates that it posts in its Price Talk. See "Price Talk."

Bidding to Prevent Failed Auctions or to Prevent ARS from Clearing    at    Rate    Different    than    Market    Rate Citigroup also may routinely encourage bidding by others in auctions, including to prevent a failed auction or to prevent an auction from clearing at a rate that Citigroup believes does not reflect the market for the particular ARS being auctioned. Citigroup may routinely encourage such bids even after obtaining knowledge of some or all of the other orders submitted through it.

154.    Such statements did not indicate that Smith Barney and Global Markets, beginning in the fall of 2007, intervened into the Citigroup ARS auctions with increasing frequency and at increasing monetary amounts, by submitting orders as both bidder and seller, to prevent failed auctions. Thus, even if the Class had reviewed the policy after the initial purchase of Citigroup ARS, the members of the Class would still have been unaware of the extent to which Citigroup engaged in this practice or the fact that the Citigroup ARS market was in danger of collapsing.

155.    The statements on the Smith Barney website did not negate the impression that the Citigroup ARS market operated as it had for the prior two decades. Indeed, even employees of the Defendants admitted, during the Class Period and notwithstanding the Smith Barney website statements, that investors had the impression that the Citigroup ARS market provided liquidity – in stark contrast to the reality of the manipulated Citigroup ARS market. For

example:

(a)      As alleged by the NYAG, "[Global Markets] told investors that it had never had a failed auction in its 20 year history in the market, implying that the auction rate securities market was fully developed and liquid." AOD ¶ 6;

(b)      The SEC found that "[i]n August 2007, when concerns were heightened at [Global Markets], internal [Global Markets] documents provided to senior management discussed the implications if [Global Markets] were to stop supporting auctions. The documents stated, 'Investors and issuers might believe that there is *implied liquidity* provided by [Global Markets] *because we have marketed the fact that we have never had a failed auction as lead manager in twenty years*[.]...'" SEC Compl. ¶ 26 (emphasis added); and

(c)      The SEC refers to another Citigroup document which states: "Implied liquidity: bankers, salespeople and trades have implied the concept of liquidity provided by [Global Markets] for investors and issuers for over 20 years." SEC Compl. ¶ 26.

156.    "While [Global Markets] could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. *There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers may decide to stop supporting the market, which could cause its collapse.*" AOD ¶ 9 (emphasis added).

157.    The SEC and the NYAG recognized the inadequacy of the purported risk disclosures, required by the 2006 SEC Order and reflected on the Smith Barney website, as stated in both the SEC Compl. and the AOD. As the SEC found, Defendants' market manipulation concealed the extent to which the liquidity of ARS depended upon Citigroup bidding in the auctions. SEC Compl. ¶ 23. As the SEC Compl. stated, "even if a customer had been informed

that there was liquidity risks associated with ARS, *the customer would not know that the liquidity risk, to a significant degree, depended upon [Global Markets]'s discretion to bid to support auctions.*" SEC Compl. ¶ 23 (emphasis added).

<u>Loss Causation and Damages</u>

158.   Plaintiffs and other members of the Class would not have purchased the Citigroup ARS at the prices they paid, if at all, and if they purchased they would have done so at a lower price (*i.e.*, at less than par) or with higher interest rates, had they been aware of Defendants' manipulative conduct.

159.   When Defendants decided to no longer manipulate the market for Citigroup ARS and failed to step in to support the market, auctions for Citigroup ARS ceased and the market for Citigroup ARS collapsed.

160.   Citigroup ARS can only be sold in Citigroup-managed auctions.  Thus, Plaintiffs and other members of the Class who held Citigroup ARS as of February 11, 2008, when new auctions had not yet been scheduled in which to sell their Citigroup ARS, could not sell their Citigroup ARS.

161.   Defendants admitted, at least by June 2008 when they mailed to Lead Plaintiff his brokerage statements for the period from May 1 through May 31, 2008, that: "There is currently no publicly-traded market or price for ARS that are experiencing failed auctions."

162.   By reason of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, by employing devices, schemes and artifices to defraud, and/or engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class during the Class Period.

163.   At all relevant times, Defendants' manipulative conduct, directly or proximately

caused or was a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

164.   As alleged herein and in paragraphs 112 through 125 above, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Citigroup ARS during the Class Period, as a direct and proximate result of Defendants' wrongful conduct, in an amount to be determined at trial.

165.   Plaintiffs and the other members of the Class have suffered damages because the prices paid and the interest rates set were not determined by the natural interplay of supply and demand when they purchased Citigroup ARS; rather they were set by the manipulative conduct alleged.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Citigroup and Global Markets)

166.   Plaintiffs repeat and reallege each of the allegations set forth in Count I.

167.   Citigroup acted as a controlling person of Global Markets and Smith Barney within the meaning of §20 of the Exchange Act.

168.   Citigroup, in its Form 10-K for fiscal year ended December 31, 2007 (the "2007 10-K"), describes itself as "a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers."

169.   According         to         Smith         Barney's         website,         at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008):

We Provide an End-to-End Platform
Through the full range of affiliated Citigroup companies, we provide an end-to-end platform of financial services—everything from cash management to financial planning, brokerage services, estate planning, block trading and alternative investments, in addition to M&A advisory services for middle-market privately

held companies....

170.   Citigroup's 2007 10-K also illustrates Citigroup Segments and Products, and identifies Smith Barney as within Citigroup's Global Wealth Management business segment.

171.   According        to        Smith        Barney's        website,        at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008):

> Citigroup Inc., a leading global financial services company, has some 200 million customer accounts. Citigroup does business in 100 countries, providing consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. Major brand names under Citigroup include ... Smith Barney ....

172.   Citigroup's 2007 10-K identifies Global Markets as one of the "Citigroup's primary U.S. broker-dealer subsidiary."

173.   Citigroup incorporates the financial results of Global Markets and Smith Barney into its own financial statements which it files with the SEC.

174.   Citigroup provides for litigation reserves against losses from legal proceedings in which it and its subsidiaries, including specifically Global Markets, are named defendants.

175.   Citigroup, by virtue of its ownership of Global Markets and Smith Barney, had the power to influence and control, and did influence and control, the misconduct of Global Markets and Smith Barney about which Plaintiffs complain.

176.   According        to        Smith        Barney's        website,        at www.smithbarney.com/prospect/global_resources.html (last accessed on August 18, 2008): "Smith Barney is a division of Citigroup Global Capital Markets Inc., a global, full-service financial firm that provides brokerage, investment banking and asset management services to corporations, governments and individuals around the world."

177.   Global Markets, by virtue of its relationship with Smith Barney, had the power to influence and control, and did influence and control, the misconduct of Smith Barney about which Plaintiffs complain.

178.   By reason of such wrongful conduct, Citigroup and Global Markets are liable pursuant to §20(a) of the Exchange Act.

179.   As a direct and proximate result of Citigroup's and Global Market's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Citigroup ARS from Defendants during the Class Period in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to FED. R. CIV. P. 23(a) and 23(b) on behalf of the Class defined herein;

B.   Awarding Plaintiffs and the members of the Class compensatory damages;

C.   Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.   Awarding such other relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:      June _3_ , 2010

ZWERLING, SCHACHTER
& ZWERLING, LLP

By: _____
Robert S. Schachter
Richard A. Speirs
Hillary Sobel
Paul Kleidman
Justin M. Tarshis
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel:  (212) 223-3900
Fax:  (212) 371-5969
rschachter@zsz.com
rspeirs@zsz.com
hsobel@zsz.com
pkleidman@zsz.com
jtarshis@zsz.com

*Lead Counsel for Lead Plaintiff Dr. Michael A.
Passidomo, Plaintiff Michael Puder, Trustee of
the MP Trust, and the Class*

CRIDEN & LOVE, P.A.
Michael E. Criden
Kevin Love
Kim Lucas
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel.:  (305) 357-9000
Fax:  (305) 357-9050
mcriden@cridenlove.com
klove@cridenlove.com
klucas@cridenlove.com

*Co-Counsel for Lead Plaintiff Dr. Michael A.
Passidomo and Plaintiff Michael Puder, Trustee
of the MP Trust*

41

JASON SCOTT RUDOLPH, P.A.
Jason Scott Rudolph
10800 Biscayne Blvd., Suite 800
Miami, FL 33161
Tel.:  (305) 379-8438
Fax:   (786) 621-8441
jsr@preferredlegal.com

*Co-Counsel  for  Plaintiff  Michael  Puder,
Trustee of the MP Trust*

## CERTIFICATION OF PLAINTIFF DR. MICHAEL A. PASSIDOMO

I, Dr. Michael A. Passidomo, declare that:

1.    I have reviewed the Plaintiffs' Second Consolidated Amended Complaint in *In re Citigroup Auction Rate Securities Litigation*, Master File No. 08 Civ. 3095 (LTS)(FM) (the "Action") and authorize its filing.

2.    I did not purchase any security, which is the subject of this action, at the direction of Lead Counsel or my other counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in the securities that are the subject of this action during the class period are described in the attachment to this Certification.

5.    During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in any action filed under the federal securities laws, with the exception of this Court appointing me as Lead Plaintiff in the Action.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond our *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Dr. Michael A. Passidomo, declare under penalty of perjury that the foregoing is true and correct.

October ___, 2009

_Dr. Michael A. Passidomo_

Dr. Michael A. Passidomo

*Lead Plaintiff's Class Period Citigroup ARS Purchases*

| Date Acquired | Description | Units | Unit Cost | Cost |
|---|---|---|---|---|
| 08/01/07 | BLACKROCK FLA MUN BD TR SR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 08/01/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 08/02/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 08/02/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 08/03/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 08/06/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 08/06/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 08/07/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 09/04/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 09/05/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 09/05/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 09/06/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 09/06/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 09/07/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 09/10/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 09/10/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 10/01/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |

1

| 10/01/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 10/02/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 10/03/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 10/03/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 10/04/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 10/04/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 10/05/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 10/26/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 10/29/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 10/29/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 11/01/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 11/01/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 11/06/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 11/07/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 11/07/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 12/03/07 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 12/03/07 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 12/04/07 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 12/05/07 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |

2

| Date | Description | | | |
|---|---|---|---|---|
| 12/05/07 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 12/06/07 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 12/06/07 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 12/07/07 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 80 | $ 25,002.75 | $ 2,000,220.00 |
| 01/02/08 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 01/02/08 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 01/03/08 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |
| 01/03/08 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
| 01/04/08 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 63 | $ 25,002.75 | $ 1,575,173.25 |
| 01/07/08 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 01/07/08 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 01/08/08 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 01/25/08 | NUVEEN FLA QUALITY INCOME MUN FD MUN AUCT RATE PFD SER F | 63 | $ 25,002.75 | $ 1,575,173.25 |
| 02/04/08 | NUVEEN DIV ADV MUN FD INC MUNI PFD SER M | 39 | $ 25,000.00 | $ 975,000.00 |
| 02/04/08 | NUVEEN ARIZ DIV ADV MUN FD 3 MUN AUCT RT PFD | 17 | $ 25,002.50 | $ 425,042.50 |
| 02/05/08 | BLACKROCK CALIF MUN INCOME TR MUN AUC RT CUM PFD SER T7 | 120 | $ 25,000.00 | $ 3,000,000.00 |
| 02/06/08 | BLACKROCK FLA MUN BD TR SR W7 MUN AUCT RT CUM PFD | 40 | $ 25,000.00 | $ 1,000,000.00 |
| 02/06/08 | MFS HIGH INCOME MUN TR MUN AUC RT PFD SER W | 80 | $ 25,000.00 | $ 2,000,000.00 |
| 02/07/08 | EATON VANCE INSD CALIF MUN BD FD SER B AUCT PFD | 20 | $ 25,000.00 | $ 500,000.00 |

3

| 02/07/08 | MFS MUNI INCOME TR AUCT RT CUM PFD SER TH | 60 | $ 25,000.00 | $ 1,500,000.00 |
|---|---|---|---|---|

4

## CERTIFICATION OF PLAINTIFF MICHAEL PUDER

I, Michael Puder, as Trustee of the MP Trust, declare that:

1.      I have reviewed the Third Consolidated Amended Complaint in *In re Citigroup Auction Rate Securities Litigation*, Master File No. 08 Civ. 3095 (LTS) (FM) (the "Action") and authorize its filing.

2.      I did not purchase any security, which is the subject of this action, at the direction of Lead Counsel or my other counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      MP Trust's transactions in the securities that are the subject of this action during the class period are as follows:

| Date | Citigroup ARS purchased | Amount |
|------|------------------------|--------|
| 11-28-07 | Educational Funding of the South Inc. | $200,000 |

5.      During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in any action filed under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond our *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Michael Puder, declare under penalty of perjury that the foregoing is true and correct.

June 3 , 2010

_____
Michael Puder
Trustee
MP Trust