UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------x

IN RE: CITIGROUP, INC., AUCTION
RATE SECURITIES (ARS)
MARKETING LITIGATION (NO. II)

Lead Docket No. 08 Civ. 3095 (LTS)
No. 09 Md 2043 (LTS)

--------------------------------------------------x

THIS DOCUMENT RELATES TO:
    08 Civ. 3095
    08 Civ. 3139
    08 Civ. 3904
    08 Civ. 4360
    08 Civ. 5016

--------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 0 1 MAR 2011

## MEMORANDUM OPINION AND ORDER

APPEARANCES:

ZWERLING, SCHACHTER &
ZWERLING LLP
  By: Robert S. Schachter, Esq.
      Hillary Sobel, Esq.
      Paul Kleidman, Esq.
      Justin M. Tarshis, Esq.
41 Madison Avenue
New York, NY 10010

*Lead Counsel for Plaintiffs*

CRIDEN & LOVE, P.A.
  By: Michael E. Criden, Esq.
      Kevin Love, Esq.
      Kim Lucas, Esq.
7301 S.W. 57th Court
South Miami, FL 33143

*Co-Counsel for Plaintiffs*

JASON SCOTT RUDOLPH, P.A.
  By: Jason S. Rudolph, Esq.
10800 Biscayne Blvd.
Miami, FL 33161

*Co-Counsel for Plaintiff Michael Puder*

DIMOND, KAPLAN & ROTHSTEIN, P.A.
  By: Robert Linkin, Esq.
      Jeffrey B. Kaplan, Esq.
2665 South Bayshore Drive
Miami, FL 33133

*Co-Counsel for Plaintiff Banco Industrial de
Venezuela, C.A. – New York Agency*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
  By: Brad S. Karp, Esq.
      Susanna M. Buergel, Esq.
      Karen R. King, Esq.
1285 Avenue of the Americas
New York, NY 10019
      - and -
  By: Charles E. Davidow, Esq.
2001 K Street, N.W.
Washington , DC 20006

*Counsel for Defendants*

LAURA TAYLOR SWAIN, United States District Judge:

By Order entered in this multidistrict litigation proceeding on June 25, 2008, the Court consolidated five putative class actions under the caption In Re: Citigroup Auction Rate Securities Litigation, and appointed Michael A. Passidomo ("Passidomo") as Lead Plaintiff. On August 26, 2008, Passidomo filed a Consolidated Amended Complaint ("Complaint") alleging that Citigroup, Inc. ("Citigroup"), Citigroup Global Markets, Inc. ("CGMI"), and Smith Barney (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5(a) and (c) promulgated thereunder, Sections 206 and 215 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), and various state laws in connection with Defendants' underwriting and/or selling of Auction Rate Securities ("ARS") in auctions that Defendants managed.

Defendants moved pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) to dismiss the Complaint for failure to state a claim upon which relief can be granted and lack of standing. On September 11, 2009, the Court granted Defendants' motion to dismiss the Complaint, without prejudice to Passidomo's ability to file a Second Consolidated Amended Complaint ("Second Amended Complaint").

On October 15, 2009, Passidomo timely filed the Second Amended Complaint, alleging that Smith Barney and CGMI violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and that Citigroup and CGMI violated Section 20(a) of the Exchange Act. On June 18, 2010, and September 24, 2010, the parties stipulated to the filing of

Third and Fourth Consolidated Amended Complaints, respectively.[1] Like the Second and Third Amended Complaints, the Fourth Amended Complaint alleges that Smith Barney[2] and CGMI violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and that Citigroup and CGMI violated Section 20(a) of the Exchange Act. Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Fourth Amended Complaint for failure to state a claim upon which relief can be granted. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

The Court has reviewed thoroughly and considered carefully the parties' submissions and, for the following reasons, grants Defendants' motions to dismiss the Fourth Amended Complaint.

## BACKGROUND

The following facts are drawn from the Fourth Amended Complaint unless otherwise indicated.

Plaintiffs assert claims on behalf of all persons who purchased Citigroup ARS (including persons who placed hold orders for such securities) during the period from August 1, 2007, through February 11, 2008 (the "Class Period"). (Fourth Am. Compl. ¶ 36.) Although

---

[1] The amendments to the Second and Third Consolidated Amended Complaints were each for the sole purpose of adding an additional named plaintiff. The Third Consolidated Amended Complaint added Plaintiff Michael Puder, Trustee of the MP Trust ("Puder"). The Fourth Consolidated Amended Complaint ("Fourth Amended Complaint") added Plaintiff Banco Industrial de Venezuela, C.A. – New York Agency ("BIV-NY"). Passidomo, Puder, and BIV-NY are collectively referred to as "Plaintiffs."

[2] In light of the disposition of the instant motion, the Court makes no determination as to the legal status of Defendant Smith Barney, which Defendants contend was a division and service mark of CGMI, and not a separate suable entity.

they have not been appointed as Lead Plaintiffs, Puder and BIV-NY are specifically named as plaintiffs in the Fourth Amended Complaint and also assert claims on behalf of the putative class of investors. (Id. ¶¶ 1, 36.)

ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically reset through auctions. (Id. ¶ 45.) Interest rates are paid in a given period based on a price determined at the prior auction. (Id. ¶ 48.) A broker-dealer manages the auction process; most auctions are run by a single broker-dealer. (Id. ¶ 44.) Investors submit buy, sell, or hold orders through broker-dealers selected by issuers of the ARS. (Id. ¶ 49.) The auction agent collects orders from the broker-dealers, determines the amount of ARS available for sale, organizes the bids, and determines the clearing rate (i.e., the final rate at which all of the ARS are sold). (Id. ¶ 51.) If there are more ARS for sale than there are bids for the ARS, the auction fails and the holders of the ARS are unable to resell the ARS at the failed auction. (Id. ¶ 55.) By virtue of his or her role as manager of an auction, the broker-dealer is aware if there is insufficient demand such that an auction would fail without the broker-dealer's intervention. (See id. ¶¶ 60-61, 66, 69, 70-72.) By submitting bids, the broker-dealer can prevent the failure of the action. (See id. ¶¶ 70, 72.)

## Allegations Regarding Defendants' Conduct

Defendants underwrote, sold or managed auctions of more than $30 billion of Citigroup ARS. (Id. ¶ 38.) During the Class Period, the supply of Citigroup ARS was increasing while demand was decreasing. (Id. ¶ 60.) Defendants knew that buyer demand for ARS did not match or exceed seller offerings of Citigroup ARS. (Id.) Defendants were aware that this imbalance would lead to failed auctions unless Defendants intervened. (Id.)

Defendants increasingly intervened in ARS auctions throughout the Class Period in order to prevent failed auctions. (Id. ¶¶ 64, 70.) Defendants' intervention created the impression that the market for Citigroup ARS was functioning in a stable manner. (Id. ¶¶ 66, 70.) Throughout the class period, Defendants continued to underwrite and/or act as a broker-dealer managing auctions despite their knowledge that supply of Citigroup ARS outpaced demand. (Id. ¶¶ 60-61, 70-71.)

Plaintiffs and other members of the putative class continued to purchase Citigroup ARS, believing that the auction process was occurring on a market basis free of intervention. (Id. ¶ 75.) Defendants' increasing intervention into the auctions was unknown and unknowable to Plaintiffs and purported class members. (Id. ¶¶ 77, 83, 86, 116.)

Defendants' "auction desk" continued to encourage Smith Barney brokers to sell new issues during the class period, despite Defendants' liquidity concerns. (Id. ¶¶ 94, 97, 102.) During the period of Defendants' increasing auction intervention, Defendants increased commission rates to brokers in order to entice brokers and investors to acquire new issues. (Id. ¶¶ 99-100.) Defendants' auction desk told Smith Barney brokers that the attractive terms did not reflect any increased risk associated with the ARS. (Id. ¶ 103.)

On February 11, 2008, Defendants ceased intervening in the auctions to prevent the auctions from failing. (Id. ¶ 112.) As a result, all of Defendants' Citigroup ARS auctions failed. (Id.) A brokerage statement for the February 1, 2008, through February 29, 2008, period, included a "Message" that "the Auction-Rate Securities (ARS) market is experiencing a supply and demand imbalance, resulting in failed auctions and significantly reduced or lack of liquidity." (Id. ¶ 113.)

Passidomo purchased eight Citigroup ARS through his account at Smith Barney during the Class Period. (Id. ¶ 16, pp. 45-49.) Puder purchased one Citigroup ARS through his account at Charles Schwab during the Class Period. (Id. ¶ 20, p. 50.) BIV-NY purchased four Citigroup ARS through its account at Smith Barney during the Class Period. (Id. ¶ 23, pp. 51-52.) Plaintiffs assert that, but for Defendants' intervention into the Citigroup ARS market, Plaintiffs and other class members would not have purchased these securities or would not have purchased them for the price and/or at the interest rates at which they did. (Id. ¶ 122.)

As a result of Defendants' conduct, the interest rates on Citigroup ARS both before and after the collapse of the ARS market were, according to Plaintiffs, lower than the rates the market would have placed on them in the absence of Defendants' manipulative conduct. (Id. ¶ 123.) Defendants' conduct caused economic losses to class members by limiting the interest to a rate below that which they would have received absent such conduct. (Id. ¶ 124.) "Certain class members" continue to receive interest and/or dividends on their Citigroup ARS at below-market rates that are insufficient to compensate them for the securities' lack of liquidity. (Id. ¶ 125.) As a result of Defendants' conduct, the values of Citigroup ARS have declined substantially. (Id. ¶ 126.)

Pursuant to a December 13, 2008, Regulatory Settlement ("2008 Settlement") (see Declaration of Hillary Sobel in Opp. to Defs.' Mot. to Dismiss the Second Consolidated Am. Compl. Ex. A), Passidomo was given the option to sell his illiquid ARS to Citigroup at par value.[3] Passidomo redeemed all of his Citigroup ARS in January 2009 at par, pursuant to the

---

[3]     The Court takes judicial notice of the Regulatory Settlement. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6): '[T]he complaint is deemed to include

terms of the 2008 Settlement with the SEC. (Fourth Am. Compl. ¶ 17; Declaration of Charles E.
Davidow in Supp. of Mot. to Dismiss the Second Consolidated Am. Compl. ("Second Davidow
Decl.") Ex. 14 at 3-4.) Puder was ineligible to participate in the 2008 Settlement because he
purchased his ARS through Charles Schwab, and he therefore still holds his ARS. (Fourth Am.
Compl. ¶ 22.) BIV-NY chose to retain its ARS, although it was eligible to redeem them at par
value pursuant to the 2008 Settlement. (Id. ¶¶ 24-25.)

2006 SEC Order and Subsequent Disclosures

                 Following an investigation into some of the practices described above and prior to
the commencement of the Class Period, the SEC issued an Order Instituting Administrative and
Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-
and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the
Securities Exchange Act of 1934, dated May 31, 2006 ("2006 SEC Order"). (See Declaration of
Charles E. Davidow in Supp. of Mot. to Dismiss the Fourth Consolidated Am. Compl. ("Fourth
Davidow Decl.") Ex. 1.)[4]  This 2006 SEC Order, which is publicly available on the SEC website,

---

> any written instrument attached to it as an exhibit or any statements or documents
> incorporated in it by reference. Even where a document is not incorporated by
> reference, the court may nevertheless consider it where the complaint relies heavily
> upon its terms and effect, which renders the document integral to the complaint.'")
> (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)); see
> also Staehr v. Hartford Financial Services Group, 547 F.3d 406, 426 (2d Cir. 2008).

[4]    The Court takes judicial notice of the 2006 SEC Order concerning ARS practices
and disclosure requirements, the disclosure statements printed on trade
confirmations and incorporated from the Citigroup Smith Barney website by
reference therein, and excerpts from the prospectuses issued in connection with the
ARS offerings cited in the Complaint, all of which have been proffered in
connection with the motion to dismiss. (Second Davidow Decl. Exs. 1-12; Fourth
Davidow Decl. Exs. 1, 5, 7-9.) Judicial notice of such public and transaction
documents integral to Passidomo's information-related market manipulation claims
is appropriate and does not require conversion of the motion to one for summary

and was reported on by The Associated Press, The New York Times, The Bond Buyer, and CFO

Magazine (see Defs.' Mot. to Dismiss Pls.' Second Am. Compl. 4 n.4), described the conduct of

certain broker-dealers, including CGMI, in the ARS market. (Fourth Davidow Decl. Ex. 1. at ¶

2.) Specifically, the 2006 SEC Order described broker-dealer practices in connection with ARS

auctions including intervention in the auctions through bidding from the broker-dealers'

proprietary accounts, and asking customers to make or change orders, without adequately

disclosing such conduct. (Id. 6.) According to the 2006 SEC Order, the broker-dealers

intervened to prevent failed auctions, to set a "market" rate, and to prevent all-hold auctions.

(Id.) The 2006 SEC Order noted that, in certain instances, such intervention affected the clearing

rate. (Id.) The 2006 SEC Order explicitly stated that it did not prohibit such conduct as long as it

was properly disclosed. (Id. n.6.) As part of the remedial action ordered, CGMI was directed to

---

judgment. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) ("where public
records that are integral to a fraud complaint are not attached to it, the court, in
considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those
records"); see also Mangiafico, 471 F.3d at 398 (The Second Circuit has long "held
that for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6):
'[T]he complaint is deemed to include any written instrument attached to it as an
exhibit or any statements or documents incorporated in it by reference. Even where
a document is not incorporated by reference, the court may nevertheless consider it
where the complaint relies heavily upon its terms and effect, which renders the
document integral to the complaint.'") (quoting Chambers, 282 F.3d at 152-53); see
also Staehr, 547 F.3d at 426 (district court did not err by refusing to convert
appellees' motion to one for summary judgment; although a Rule 12(b)(6) motion to
dismiss is to be treated as one for summary judgment if matters outside the
pleadings are presented to and not excluded by the court, "matters judicially noticed
by the District Court are not considered matters outside the pleadings."). Plaintiffs
have not contested the authenticity of the documents of which the Court takes
judicial notice. BIV-NY's request that it be allowed to proffer "competing
evidence" or that the Court convert the instant motions into ones under Rule 56 (see
Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Fourth Consolidated Am.
Compl. ("Pls.' Mem. of Law") 8-9) is denied. BIV-NY's request provides no
indication as to what its competing evidence would be.

provide a written description of its material auction practices and procedures on a specific portion of its website accessible to all customers and broker-dealers participating in an auction of ARS, as well as on another portion of its website accessible to the general public. (Id. 11.)

Trade confirmations for each ARS that Passidomo purchased and from at least one ARS purchased by BIV-NY from CGMI included language stating: "FOR A DESCRIPTION OF CITIGROUP GLOBAL MARKETS, INC.'S AUCTION PRACTICES AND PROCEDURES PLEASE VISIT WWW.SMITHBARNEY.COM/PRODUCTS_SERVICES/FIXED_INCOME/AUCTION_RATE_SECURITIES/" and stating that hard copy was available upon request. (See Second Davidow Decl., Exs. 3 at 1, 4 at 1; Fourth Davidow Decl. Ex. 5 at 1.) The practices and procedures section of the November 14, 2006, version of the website disclosure proffered by Defendants on this motion practice states, inter alia, that Citigroup is permitted to submit orders for its own account, that, in doing so, it would have an advantage over other bidders, and that, where Citigroup was the only broker-dealer, it could set the clearing rate with its order. (Fourth Davidow Decl. Ex. 7.) This section also states that Citigroup may routinely place one or more bids in an auction in order to prevent a failed auction or to prevent an auction from clearing at a rate that Citigroup does not believe reflects the market for the ARS being auctioned. (Id.) The website further states that "[b]ids by Citigroup or by those it may encourage to place bids are likely to affect (i) the auction rate – including preventing the auction rate from being set at the Maximum Rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Citigroup not bid or not encouraged others to bid . . . ." (Id.)

The official prospectuses for the eight Citigroup ARS alleged to have been purchased by Passidomo include similar disclosure language regarding broker-dealer conduct and

the potential inability to sell ARS. (See Second Davidow Decl. Exs. 5 at 8, 6 at 16, 7 at 17-18, 8

at 22, 9 at 11, 10 at 14, 11 at 10, 12 at B-19.) The prospectus supplement for one of the four

ARS alleged to have been purchased by BIV-NY also contained disclosures and cautionary

information regarding the operation of and risks associated with ARS auctions and the ARS

market, as well as disclaimers about the ability of broker-dealers to routinely bid in auctions.

(See Fourth Davidow Decl. Ex. 9 at S-70, S-72, S-73.) The prospectus for the single ARS

alleged to have been purchased by Puder contained warnings about auction failure and illiquidity,

but not about bidding by broker-dealers. (See Fourth Davidow Decl. Ex. 8 at 11, 17.)[5]  Plaintiffs

allege that they were not given copies of the relevant prospectuses in connection with their ARS

purchases. (Fourth Am. Comp. ¶ 46.) The prospectuses were, nevertheless, publicly available

on the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, at

www.sec.gov/edgar.shtml.

DISCUSSION

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure to dismiss a complaint for failure to state a claim, the Court accepts as true the

non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the

---

[5]     None of the Defendants was the auction agent or auction dealer for the ARS that
Puder purchased. The auction agent for Puder's Citigroup ARS was Deutsche Bank
Trust and the auction dealer was RBC Dain Rauscher Inc. (See Fourth Davidow
Decl. Ex. 2 at 1.) Salomon Smith Barney Inc. was the co-broker-dealer for Puder's
purchase. (Fourth Davidow Decl. Ex. 8 at 14.) The 2006 SEC Order states that "if
there is only one broker-dealer, the broker-dealer can discern the clearing rate before
submitting the orders to the auction agent." There appears to have been more than
one broker-dealer for the only ARS purchased by Puder. Plaintiffs do not indicate
how the presence of more than one broker-dealer is consistent with their allegations
of broker-dealer intervention in the auctions in which Puder participated.

plaintiff's favor. Roth, 489 F.3d at 501; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do." Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citation omitted). Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citations omitted). This standard applies to all civil actions. Id. at 1953.

Securities fraud claims are also subject to additional pleading requirements. Plaintiffs' Section 10(b) claims are thus subject to the heightened pleading standards of both Federal Rule of Civil Produce 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that allegations of fraud be stated with particularity. Fed. R. Civ. P. 9(b). Under the PSLRA, in an action for money damages requiring proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2) (West 2009).

A court considering a motion to dismiss "is normally required to look only to the allegations on the face of the complaint." Roth, 489 F.3d at 509. However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Id. Courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known

to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). The Court may also consider matters subject to

judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also

Staehr, 547 F.3d at 425 ("Although the general rule is that a district court may not look outside

the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, we

have acknowledged that the court may also consider matters of which judicial notice may be

taken." (internal quotation marks omitted)).[6]

      Defendants argue that the Fourth Amended Complaint must be dismissed with

prejudice because: (1) Plaintiffs have not suffered a loss cognizable under the Exchange Act; (2)

Defendants' conduct cannot form the basis for liability under the Exchange Act in light of

relevant disclosures and disclaimers; (3) Plaintiffs fail to plead fraud with the particularity

required by the PSLRA and Rule 9(b); (4) Plaintiffs fail to plead reasonable reliance; (5)

Plaintiffs fail to plead facts permitting an inference of scienter; (6) Plaintiffs fail to plead loss

causation; (7) Plaintiffs' "Control-Person" claims under Section 20(a) are insufficient; (8) the

bidding practices alleged by Plaintiffs could not have existed with respect to Puder because

Defendants were neither the auction agent nor the auction dealer for his purchase; and (9) BIV-

NY, as a sophisticated institutional investor, had "easy access" to public information and industry

disclosures about the nature and risks of ARS and therefore could not reasonably have relied on

any misrepresentations allegedly created by Defendants' conduct.

      Plaintiffs' Fourth Amended Complaint incorporates references to allegations

---

[6]   See supra footnote 5 (identifying matters of which the Court has taken judicial notice
in connection with the instant motion).

against and consent orders entered into by CGMI, as well as excerpts from reports prepared by governmental entities (see Fourth Am. Compl. ¶¶ 53-54, 62-68, 73-74, 76, 79-80, 84-86, 91-93, 95, 100-01, 105-12, 117, 125, 137, 146-52, 158-60) that were not included in the consolidated amended complaint, which was the subject of the Court's September 11, 2009, Opinion and Order. These new additions allege, in sum, allege that Defendants increased their market intervention, knew that their doing so could create the appearance of "natural" market stability, and intervened in order to protect CGMI's business interests. The Court concludes that dismissal is required because, even taking all of the factual allegations contained in the augmented Fourth Amended Complaint as true, Plaintiffs cannot allege facts sufficient to demonstrate plausibly that Defendants' conduct was deceptive or that Plaintiffs relied reasonably on any alleged misleading impressions arising from the conduct they characterize as market manipulation.

Market Manipulation Claim

Plaintiffs allege that Defendants engaged in market manipulation in violation of Section 10(b) and Rule 10b-5(a) and (c). Plaintiffs claim principally that Defendants increased their intervention in the Citigroup ARS auctions in the six months preceding the failed auctions at issue, thereby manipulating the market through the creation of an illusion of supply and demand stability and likely consistency with market conditions (i.e., absence of auction failures), as Plaintiffs understood them, over the preceding two decades.

In order to state a claim for market manipulation, a plaintiff must allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."

ATSI Commc'ns, 493 F.3d at 101. "[A market] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." Id. at 102. The PSLRA's heightened pleading standard for scienter also applies to a market manipulation claim. Id.

A market manipulation claim is premised on the proposition that manipulative conduct by a defendant misled a plaintiff into believing that it was participating in an efficient market that was free of manipulation. See id. at 99-101. Manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Id. at 100 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)). Plaintiffs allege that Defendants' participation in auctions, which prevented the auctions from failing as they would have absent Defendants' conduct, deceived them into believing that the ARS market was continuing to be driven by forces of supply and demand independent from Defendants.

Plaintiffs have, however, specifically disclaimed any invocation of the classic "fraud-on-the-market" theory of market manipulation (see Pls.' Mem. of Law 6, 8). Plaintiffs concede, by virtue of their allegation that their claims relate to closed markets for Citigroup ARS, that the "markets" they allege were manipulated were not, strictly speaking, efficient. That is, these closed markets, controlled by Citigroup, did not reflect and were not governed by unfiltered forces of supply and demand or by the "natural interplay" of such forces.

### Deception

A securities fraud claim under Section 10(b) requires a showing that an alleged market manipulator engaged in "market activity aimed at deceiving investors as to how other

market participants have valued a security." In re UBS Auction Rate Securities Litigation, No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *18 (S.D.N.Y. June 10, 2010) (quoting ATSI Comme'ns, 493 F.3d at 100). The concept of deception necessarily means giving a false impression. United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008). However, a plaintiff cannot premise a claim of securities fraud on conduct and risks that were previously disclosed to the investing public. See, e.g, In re Merrill Lynch Auction Rate Securities Litigation, 704 F. Supp. 2d 378, 390-91 (S.D.N.Y. 2010).

Plaintiffs allege that Defendants used, at an increasing rate and with increasing fervor, rate-setting and auction-saving techniques in order to give the ARS market the continued appearance of stability. However, extensive public information and disclosures in the form of the 2006 SEC Order, trade confirmations, information on CGMI's website, and prospectuses (see Second Davidow Decl. Exs. 1-12; Fourth Davidow Decl. Exs. 1, 5, 7-9) reveal that Defendants could use precisely these tools in connection with the auctions in question. The disclosures also describe Defendants' incentives to do so and the potential effect of such intervention. Plaintiffs' alleged assumptions as to the structure of the ARS auction market were inconsistent with the readily available, easily accessible public information indicating that the conduct about which Plaintiffs now complain was not only possible but that it would be engaged in "routinely." Therefore, Plaintiffs cannot show that they were deceived, as to the nature of the ARS market or as to the value of the securities, by Defendants' intervention.

Nor can Plaintiffs make a viable market manipulation claim based on the alleged increased use of the techniques about which Plaintiffs complain during the Class Period and nondisclosure of this increased frequency. Nothing in the public disclosures and information of

which the Court has taken judicial notice, and nothing in the Fourth Amended Complaint,

identifies any duty or undertaking by Defendants to disclose any information regarding the

particulars of their use of the market intervention techniques at issue, including the degree,

extent, and frequency of such use. Plaintiffs have, therefore, failed to identify any factual basis

for their assumptions that Defendants were refraining from engaging in, or only using to a limited

degree, the techniques of which Plaintiffs complain. They cannot demonstrate that such

assumptions were the product of deceptive conduct on Defendants' part.

Plaintiffs' allegations of manipulation thus fail to meet the Twombly/Iqbal

plausibility threshold of alleging facts sufficient to support a claim of deceptive, manipulative

conduct violating Rule 10(b).

*Reliance*

Even if the Fourth Amended Complaint were sufficient to carry Plaintiffs' burden

of alleging facts sufficient to support a claim for deception, Plaintiffs cannot, in light of the

information available to them, allege facts sufficient to demonstrate the requisite reasonable

reliance element of the market manipulation claim.

As noted above, "[t]he gravamen of manipulation is deception of investors into

believing that prices at which they purchase and sell securities are determined by the natural

interplay of supply and demand, not rigged by manipulators." Gurary v. Winehouse, 190 F.3d

37, 45 (2d Cir. 1999); accord ATSI Commc'ns, 493 F.3d at 100. Thus, as the Second Circuit

stated in ATSI, a necessary element of a market manipulation claim is that the damage alleged

was caused by reasonable reliance on an (ultimately incorrect) assumption of an efficient market

free of manipulation. ATSI Commc'ns, 493 F.3d at 101.

The Second Circuit recognizes "that reasonable reliance must be proved as an element of a securities fraud claim.'" First Lincoln Holdings, Inc. v. Equitable Life Assurance Society of U.S., 43 F. App'x 462, 463 (2d Cir. 2002) (emphasis in the original) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996)). "'An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.'" Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) (quoting Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993)). The Court concludes that Plaintiffs cannot establish reasonable reliance in light of the 2006 SEC Order, disclosures contained in the prospectuses, and ARS policies and practices information publicly available and easily obtainable on the CGMI website (referenced in trade confirmations as described above).[7]

Where market manipulation constituting fraud on the market is plead, there is a rebuttable presumption "that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate

---

[7]     The CGMI website disclosed, in relevant part, that

> Citigroup is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller and routinely does so in the auction rate securities market in its sole discretion. If CGMI submits an order for its own account, it would have an advantage over other bidders because CGMI would have knowledge of some or all of the other orders placed through CGMI in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the auction is likely to clear at a particular rate. . . . CGMI may routinely place one or more bids in an auction for its own account to acquire ARS for its inventory, to prevent a failed auction (i.e., an event where there are insufficient clearing bids which would result in the auction rate being set at the Maximum Rate) or an auction from clearing at a rate that CGMI believes does not reflect the market for the particular ARS being auctioned. CGMI may place such bids even after obtaining knowledge of some or all of the other orders submitted through it.

measure of their intrinsic value." Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004). Unrebutted, this presumption allows a securities fraud plaintiff to satisfy the reliance element of the Exchange Act. Id. As noted above, however, Plaintiffs have specifically disclaimed any invocation of the "fraud-on-the-market" approach to their market manipulation claim. (See Pls.' Mem. of Law 6, 8.) Where a plaintiff does not plead that the market in which he purchased his shares was efficient, he cannot rely on the "fraud-on-the-market presumption" of reliance, and must instead specifically allege facts demonstrating his own reliance. See, e.g., In re Initial Public Offering Securities Litigation, 471 F.3d 24, 42-43 (2d Cir. 2006) (fraud-on-the-market presumption of reliance not applicable where plaintiffs' own allegations and evidence demonstrate that an efficient market could not be established). As noted above, such reliance must have been reasonable.

Plaintiffs must therefore plead facts sufficient to demonstrate the basis for their reasonable reliance; the Complaint is fatally deficient in this regard. Plaintiffs have offered only conclusory allegations of reliance. They allege that they and the class members "believ[ed] the 'auction process' was in fact occurring as an auction is intended" and that they "purchased Citigroup ARS . . . in reliance upon the market activity in, and the operation of, the market for ARS and that . . . the prices at which they purchased Citigroup ARS, the prices at which Citigroup ARS were sold, and the interest rates set on the Citigroup ARS were determined by the natural interplay of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct." (Fourth Am. Compl. ¶¶ 75, 145.) Beyond the fact that the ARS market had not, to Plaintiffs' knowledge, exhibited insufficient demand in the past, Plaintiffs do not identify any basis for the market "integrity" assumption upon which the class allegedly relied.

Plaintiffs have not pled facts sufficient to demonstrate the basis for their reliance on their unfounded assumptions about the operation of the ARS in light of publicly available documents and information. See Olkey v. Hyperion 1999 Term Trust, Inc. 98 F.3d 2, 9 (2d Cir. 1996). The documents proffered by Defendants, of which the Court takes judicial notice and of which Plaintiffs are charged with knowledge, negate any inference that reliance by Plaintiffs and the class on such a view of the ARS pricing mechanism was reasonable. Id. The 2006 SEC Order disclosed that Defendants could engage in the very conduct of which Plaintiffs complain. In addition, Passidomo and BIV-NY received trade confirmations incorporating language on the Citigroup Smith Barney website (Second Davidow Decl., Exs. 3 at 1, 4 at 1; Fourth Davidow Decl. Ex. 5 at 1) which further disclosed that Defendants could engage in such conduct. Although Defendants have not proffered trade confirmations for Puder, Plaintiffs themselves acknowledge that the statements on the Citigroup Smith Barney website were public and readily available to all Plaintiffs. (See Fourth Am. Compl. ¶ 156.) Moreover, the official statements issued in connection with certain of the ARS Plaintiffs purchased disclosed that Defendants could engage in the very conduct of which Plaintiffs complain, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates, and the possibility that the auctions would fail if Defendants did not intervene in them. (See Second Davidow Decl. Exs. 5-12; Fourth Davidow Decl. Ex. 9.) These documents disclosed that the ARS market was not necessarily set by the "natural interplay of supply and demand," and that interest rates could be "routinely" set by broker-dealers such as CGMI, at the broker-dealer's sole discretion.

Plaintiffs are properly charged with knowledge of this public information, as it

was either directly provided to them or otherwise available through minimal diligence. See UBS ARS, 2010 WL 2541166, at *22-23. Plaintiffs' failure to proffer specific factual allegations as to the basis of their alleged reliance on market "integrity" is, in the face of disclosures and the admission that the ARS market was strictly efficient, fatal to their claims for market manipulation. See Merrill Lynch ARS, 704 F. Supp. 2d at 399-400 (holding that plaintiffs' alleged reliance on the efficiency of the auction rate securities market was unreasonable as a matter of law in light of the 2006 SEC Order, website disclosures, and cautionary prospectus language); UBS ARS, 2010 WL 2541166, at *22-23 (holding that "in light of [prospectuses, news items, and the 2006 SEC Order], Plaintiffs cannot show that they reasonably relied on an assumption of an efficient ARS market free of Defendants' intervention in actions"); cf. Borochoff v. GlaxoSmithKline PLC, No. 07 Civ. 5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008), aff'd 343 F. App'x 671 (2d Cir. 2009) (allegations of intent to defraud held inconsistent with defendants' disclosures on its website and to the FDA).

Section 10(b)'s prohibition on manipulative practices "is fully consistent with the fundamental purpose of the [Exchange] Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor." ATSI Commc'ns, 493 F.3d at 100 quoting Santa Fe Ind., Inc. v. Green, 430 U.S. 462, 476-77 (1977). Here, Defendants disclosed the practices of which Plaintiffs now complain; absent specific allegations proffering facts demonstrating plausibly the reasonableness of the alleged reliance in the face of such disclosures, Plaintiffs' claims must be dismissed. Plaintiffs had a duty to exercise due diligence when information contrary to the allegedly relied upon assumptions regarding market operation was readily accessible. See, e.g., Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195-96 (2d Cir.

2003). Plaintiffs' market manipulation claims must, therefore, fail.

In light of the Court's conclusion that the Fourth Amended Complaint must be dismissed because Plaintiffs have not alleged deception or reliance, the Court need not address Defendants' remaining arguments related to Plaintiffs' Section 10(b) claims.

Control Person Liability

Plaintiffs also assert claims for control person liability under Section 20(a) against Defendants Citigroup and CGMI. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 109. Plaintiffs have failed to allege sufficiently any primary violation and, thus, their Section 20(a) claims must fail. See Boguslavsky v. Kaplan, 159 F.3d 715, 721 (2d Cir. 1998) ("under § 20(a), controlling persons are liable only jointly and severally with the primary violators for damages caused by the primary violation").

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Fourth Amended Complaint is granted. This Opinion and Order resolves docket entries no. 98 and 138.

The Clerk of Court is respectfully requested to enter judgment dismissing the complaint in consolidated cases 08 Civ. 3095, 08 Civ. 3139, 08 Civ. 3904, 08 Civ. 4360, and 08 Civ. 5016, and close these cases.

In light of the foregoing, the conference currently scheduled for Friday, March 4,

2011, is cancelled.

SO ORDERED.

Dated: New York, New York
       March 1, 2011

LAURA TAYLOR SWAIN
United States District Judge